# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ADEPTUS HEALTH INC., *et al.*,<br><br>Defendants. | Case No. 4:17-CV-0449-ALM<br><br>Judge Amos L. Mazzant, III<br><br>**JURY TRIAL DEMANDED** |

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

### <u>PART ONE</u>

I.     PRELIMINARY STATEMENT ....................................................................... 2

II.    THE CLAIMS ASSERTED IN THE COMPLAINT ....................................... 10

III.   JURISDICTION AND VENUE ..................................................................... 11

IV.   PARTIES ....................................................................................................... 11

     A.    Plaintiffs............................................................................................ 11

     B.    Exchange Act Defendants.................................................................. 12

           1.    The Executive Defendants ....................................................... 12

           2.    The Sterling Defendants ......................................................... 13

     C.    Non-Party Adeptus ........................................................................... 13

V.    SUMMARY OF THE FRAUD ..................................................................... 13

     A.    Background On Adeptus And The Freestanding Emergency Room Industry....... 13

     B.    Sterling, Adeptus's "Sponsor," Takes The Company Public And Maintains Control Over It Throughout The Class Period........................................................ 14

     C.    Defendants Deceive Investors About Adeptus's Financial Health Through Misrepresentations Concerning The Acuity Of The Company's Patients, The Economics And Performance Of Its JVs, And The State Of Its Internal Controls.................................................................................................... 17

           1.    Defendants Assure Investors That Adeptus's Revenue Is Driven By "High Acuity" Treatments That May Be Billed To Payers As Emergency Room Care ........................................................... 17

           2.    Defendants Tout The JVs As A Profitable "Cornerstone" Of The Company's Growth With Shared Working Capital And Operating Costs.................................................................................. 23

           3.    Defendants Conceal Serious Control Deficiencies In Adeptus's Revenue Cycle Management Process ....................................... 30

     D.    As Adeptus's Stock Soars, Sterling And Other Insiders Sell Off Their Holdings, Reaping Hundreds Of Millions Of Dollars ........................................... 35

E.      The Truth Slowly Emerges ................................................................... 37

        1.      An Investigative Report Reveals That Adeptus Overbills Patients
                For Low-Acuity Conditions ..................................................... 37

        2.      Defendants Hall And Fielding Suddenly Depart Adeptus ........................ 38

        3.      After Delaying Third Quarter 2016 Results, Adeptus Discloses
                That It Is Facing A Liquidity Crisis ............................................ 39

        4.      Adeptus Discloses Additional Internal Control Failures And
                Announces That It Expects To Write Down Millions Of Dollars In
                Previously Reported Assets ..................................................... 42

F.      Post-Class Period Developments .......................................................... 44

VI.     ADDITIONAL ALLEGATIONS THAT DEFENDANTS KNOWINGLY OR
        RECKLESSLY MISLED INVESTORS REGARDING ADEPTUS'S TRUE
        FINANCIAL CONDITION ................................................................... 44

VII.    ADDITIONAL ALLEGATIONS OF STERLING'S CONTROL OVER
        ADEPTUS ......................................................................................... 51

VIII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
        AND OMISSIONS .............................................................................. 54

A.      Defendants' False And Misleading Statements Concerning The JVs And
        The JV Strategy ............................................................................... 55

        1.      Adeptus's Third Quarter 2014 Earnings Call .................................. 55

        2.      Adeptus's Fourth Quarter And Full-Year 2014 Earnings Call ............... 58

        3.      The March 12, 2015 Barclays Healthcare Conference ....................... 59

        4.      Adeptus's First Quarter 2015 Earnings Call ................................... 60

        5.      The June 2, 2015 Jefferies Global Healthcare Conference ................... 63

        6.      Adeptus's Second Quarter 2015 Earnings Call ................................ 64

        7.      Adeptus's Third Quarter 2015 Earnings Call .................................. 67

        8.      The November 10, 2015 Stephens Fall Investment Conference .............. 69

        9.      The December 1, 2015 Piper Jaffray Healthcare Conference ................ 71

        10.     Adeptus's Fourth Quarter And Full-Year 2015 Earnings Call ............... 72

11.     Adeptus's First Quarter 2016 Earnings Call ............................................ 74

12.     The May 10, 2016 Bank Of America Merrill Lynch Health Care Conference ............................................................................................... 75

13.     The June 9, 2016 Goldman Sachs Global Health Care Conference ......... 77

14.     Adeptus's Second Quarter 2016 Earnings Call ....................................... 78

15.     The September 12, 2016 Morgan Stanley Global Healthcare Conference ............................................................................................... 79

16.     Adeptus's SEC Filings ............................................................................ 79

B.     Defendants' False And Misleading Statements Concerning Patient Acuity ......... 83

1.     Adeptus's SEC Filings ............................................................................ 83

2.     Adeptus's Third Quarter 2014 Earnings Call .......................................... 85

3.     Adeptus's Fourth Quarter And Full-Year 2014 Earnings Call ................ 86

4.     The March 12, 2015 Barclays Healthcare Conference ............................ 87

5.     Adeptus's First Quarter 2015 Earnings Call ........................................... 88

6.     Adeptus's Second Quarter 2015 Earnings Call ....................................... 89

7.     Adeptus's Third Quarter 2015 Earnings Call and November 10, 2015 Stephens Fall Investment Conference ............................................. 90

8.     The December 1, 2015 Piper Jaffray Healthcare Conference .................. 91

9.     Adeptus's Fourth Quarter And Full-Year 2015 Earnings Call ................ 92

10.     Adeptus's First Quarter 2016 Earnings Call ........................................... 93

11.     The May 10, 2016 Bank Of America Merrill Lynch Health Care Conference ............................................................................................... 94

C.     Defendants' False And Misleading Statements Concerning Adeptus's Internal Controls ............................................................................................... 95

1.     Adeptus's SEC Filings ............................................................................ 95

2.     Fourth Quarter And Full-Year 2015 and First Quarter 2016 Earnings Calls ......................................................................................... 97

3.     Second And Third Quarter 2016 Earnings Calls ..................................... 99

D. Defendants' False And Misleading Statements Concerning Adeptus's Liquidity, Cash Flow, And Financial Performance ........................................... 100

1. Adeptus's SEC Filings ............................................................. 100

2. Fourth Quarter And Full-Year 2015 Earnings Call ............................... 105

3. First Quarter 2016 Earnings Call ................................................ 106

4. Second Quarter 2016 Earnings Call ............................................... 107

5. September 12, 2016 Morgan Stanley Global Healthcare Conference ........................................................................ 109

E. False And Misleading Omissions In Adeptus's SEC Filings ............................ 109

IX. LOSS CAUSATION ................................................................................ 112

X. PRESUMPTION OF RELIANCE ............................................................. 115

XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................................. 116

XII. CLASS ACTION ALLEGATIONS ............................................................ 116

XIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ...................................... 118

COUNT I  FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER (Against The Executive Defendants) ............................................................................ 118

COUNT II  FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT (Against All Exchange Act Defendants) ..................................... 120

XIV. SECURITIES ACT ALLEGATIONS ........................................................... 123

A. The Securities Act Plaintiffs ....................................................... 125

B. The Securities Act Defendants ....................................................... 126

1. The Sterling Defendants ........................................................... 126

2. The Executive Defendants ........................**Error! Bookmark not defined.**

3. The Director Defendants ........................................................... 126

4. The Underwriter Defendants ........................................................ 128

C. Non-Party Adeptus .................................................................. 129

      D.      Background To The Securities Act Claims ......................................................... 129

             1.      False And Misleading Omissions In The Offering Documents.............. 130

             2.      False And Misleading Statements In The Offering Documents
                    Concerning Patient Acuity........................................................................ 134

             3.      False And Misleading Statements In The Offering Documents
                    Concerning The JVs And The JV Model.................................................. 135

             4.      False And Misleading Statements In The Offering Documents
                    Concerning Adeptus's Internal Controls .................................................. 138

             5.      False and Misleading Statements In The Offering Documents
                    Concerning Adeptus's Liquidity, Cash Flow, and Financial
                    Performance .............................................................................................. 139

      E.      Claims For Relief Under The Securities Act ....................................................... 142

      COUNT III  For Violations Of Section 11 Of The Securities Act (Against The
             Executive Defendants, The Director Defendants, And The Underwriter
             Defendants)............................................................................................... 142

      COUNT IV  For Violations Of Section 12(a)(2) Of The Securities Act (Against
             The Underwriter Defendants) ................................................................... 144

      COUNT V  for Violations Of Section 15 Of The Securities Act (Against The
             Executive Defendants And Defendant Sterling).................................... 146

XV.   PRAYER FOR RELIEF ............................................................................................ 149

XVI.  JURY DEMAND ...................................................................................................... 150

Court-appointed Lead Plaintiffs Alameda County Employees' Retirement Association ("ACERA") and Arkansas Teacher Retirement System ("ATRS," collectively "Lead Plaintiffs"), and additional named Plaintiff Miami Firefighters' Relief and Pension Fund ("Miami," and collectively with Lead Plaintiffs, "Plaintiffs"), by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated purchasers of the securities of Adeptus Health, Inc. ("Adeptus" or the "Company") from June 25, 2014 through March 1, 2017, inclusive (the "Class Period").  Plaintiffs also bring this action under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act") on behalf of themselves and all other persons and entities who purchased or otherwise acquired the common stock of Adeptus pursuant or traceable to any of the Company's following public offerings:  the July 29, 2015 offering ("July 2015 Offering"); or the June 8, 2016 offering ("June 2016 Offering") (collectively, the "Offerings").

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.  Plaintiffs' information and belief is based on, among other things, the independent investigation of Court-appointed Lead Counsel Bernstein Litowitz Berger & Grossmann LLP and Kessler Topaz Meltzer & Check LLP.  This investigation included, among other things, a review and analysis of: (i) Adeptus's public filings with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) transcripts of Adeptus's investor calls; (v) interviews with former Adeptus employees who worked at the Company during the Class Period; and (vi) other publicly available material and data identified herein.  Lead Counsels' investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein

are known only to the Defendants or are exclusively within their custody or control.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.  This Amended Consolidated Class Action Complaint is being filed pursuant to, and in compliance with, the Court's September 12, 2018 decision on Defendants' motions to dismiss.

<div align="center">**PART ONE**</div>

## I.   PRELIMINARY STATEMENT

1.      This federal securities class action arises from the rapid decline and ultimate implosion of Adeptus, the largest operator of freestanding emergency rooms ("FERs") in the United States.  In June 2014, Sterling Partners ("Sterling") – the Chicago-based private equity firm that controlled Adeptus – aided by Adeptus's top executives (which Sterling had handpicked to run Adeptus as it wished) and multiple investment banks, took the Company public.  In that IPO and through three additional public offerings over the next two years, Defendants caused Adeptus to sell over $863 million worth of common stock to investors, comprised mostly of Defendants' own Adeptus shares.  Indeed, in the four Offerings, Defendants sold nearly all of their personal stock holdings, pocketing for themselves hundreds of millions of dollars as they cashed out of the Company.

2.      Unfortunately, while they were cashing out, Defendants sold Adeptus to the investing public based on a false story of stable growth and financial health.  Starting in November 2015, a series of stunning disclosures gradually revealed that Defendants had misstated the profitability, costs, and financial risks associated with Adeptus's all-important joint ventures, engaged in improper billing practices that hampered the Company's cash flows, and concealed crippling internal control deficiencies.  As investors slowly learned about Adeptus's true financial state, the Company's stock price plummeted, losing ***over 95%*** of its value and erasing nearly a

billion dollars in market capitalization.  Investors suffered enormous losses.  By the end of the Class Period, the Company's top executives were gone, their replacements had acknowledged the "need to deliver more transparent information" and, following a liquidity crisis requiring emergency funding, the Company wrote off hundreds of millions of dollars' worth of previously reported assets, including over eighty million dollars' worth of accounts receivable.  In April 2017, less than three years after it first sold stock to the investing public, Adeptus filed for bankruptcy.

3.      Prior to its collapse, Adeptus ran a network of nearly a hundred FER facilities throughout the Southern and Western United States.  FERs are similar to urgent care centers in that they allow patients to see doctors after minimal waiting time, but they are designed to provide the same level of emergency care as hospital-based emergency rooms.  The Company's revenues were based on charges for the purported emergency services that it provided to patients.  As such, substantially all of the Company's revenues were generated from the collection of fees from patients, insurers, and other third-party payers.

4.      Adeptus was controlled at all relevant times by Sterling, which Adeptus identified as the Company's "Sponsor" in its filings with the SEC.  Sterling's control over Adeptus was exercised through, among other things, its significant holdings in the Company, ability to hire and fire the Company's CEO and other management, right to designate Board members, and power to direct the Company's business plan and affairs.  Indeed, Adeptus acknowledged in public filings that Sterling "***has the ability to control us***,"[1] that Adeptus "depended on [the] relationship with [Sterling] to help guide our business plan," and that Sterling had "significant influence" over the Company, including the "ability to control decision-making with respect to our business direction

---

[1] All emphasis is added, unless otherwise noted.

and policies" and the "ability to influence or effectively control [the Company's] decisions to enter into any corporate transaction."

5.      Sterling and the Executive Defendants caused Adeptus to sell well over a half-billion dollars' worth of their own stock to the investing public during the Class Period, including through the four Offerings.   While doing so, Defendants concealed several serious, highly significant risks to the Company's cash flow and liquidity through a variety of misleading statements, including misstatements concerning the economics of the Company's joint ventures, its billing practices, and the sorry state of its internal controls.

6.      ***First***, Defendants deceived investors about the profitability and economic risk associated with Adeptus's key joint ventures with hospitals.   During the Class Period, Adeptus launched a campaign to grow the Company through the formation of joint venture partnerships ("JVs") with health systems across the country.   Identifying the JV strategy as a "key element" of the Company's growth, Defendants touted its positive impact on the Company's profitability and margins, and assured investors that the strategy was reducing Adeptus's operating risk, improving the Company's cash flow, and even helping it deleverage.   For example, Defendant Thomas Hall, the Company's former Chairman and CEO, told investors that the JV strategy provided Adeptus with "***a pretty significant EBITDA contribution and for a pretty low out-of-pocket capital cost***. And so if anything, our Company ***is deleveraging real-time*** as our profitability grows." Defendants also highlighted the performance of the JVs during the Class Period, telling investors that they were consistently meeting or exceeding the Company's guidance.   With respect to Adeptus's key Arizona JV, for instance, Hall stated, "I am just sitting here looking at it right now, [the Arizona JV facilities] are absolutely performing at the level we told you before, or above."

7.      Critically, Defendants told investors that Adeptus was sharing with its partners the costs of its JV expansion.  For instance, on Adeptus's February 19, 2015 earnings call, an analyst specifically asked Defendants, "***So are you [Adeptus] bearing all the pre-opening costs or is the partnership bearing that cost?***"  Defendant Timothy Fielding, Adeptus's CFO, answered, "***we do share the pre-opening with our partner***."  This was an important issue because investors were concerned that Adeptus's aggressive expansion through the JV model would strain the Company's capital and cash flow.

8.      Defendants' statements touting the economics and performance of Adeptus's JVs were false.  Contrary to Defendants' assurances that the Company was "shar[ing]" costs with its JV partners, Adeptus was in reality funding ***100% of the working capital and operating losses of the JVs***.  Thus, unbeknownst to investors, the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, with the JV partners sharing only in the upside.  Accordingly, contrary to Defendants' statements touting the financial benefits of the JVs, they were in reality an indefinite drag on the Company's margins, earnings, and cash flow.  Indeed, as Adeptus later admitted in its bankruptcy filings, "all of the Joint Ventures, except for the Colorado JV have . . . operated at a loss."

9.      ***Second***, Defendants assured investors that Adeptus's ability to collect payment from insurers, and thus maintain strong cash flow and valid reported revenues, was sound because the Company was treating high acuity patients, for whom it was appropriate to seek reimbursement for emergency treatment.  Patient "acuity" – a measure of the severity of the conditions treated at Adeptus's facilities – was a powerful indicator of the Company's ability to collect on claims submitted to insurers, as insurers will not pay fees associated with emergent care, such as the

substantial facility fees Adeptus charged its patients, if the condition treated was in fact low-acuity and thus non-emergent.

10.     Throughout the Class Period, Defendants repeatedly touted the high acuity of the patients treated at Adeptus's facilities, signaling to investors that the Company had stable revenues and providing confidence that Adeptus would obtain reimbursement from insurers.  For instance, in its IPO offering prospectus, Adeptus stated "We operate at the ***higher end of the acuity and emergency care spectrum***."  Hall publicly stated that "[a]bout ***93% of our patients are [high acuity]* . .** *.they are true emergent patients that need to be in an emergency room* . . . [which] has had a positive impact on us" and "***we don't see the low-end [acuity] folks***."  Likewise, Hall reassured investors, "We spend a lot of time and energy making sure that we are not an urgent care . . . . [***I***]*t is really important with our relationship with our payers* . . . *that we are not seen as milking the system, charging $1,000 for an urgent care person* . . . .  It is working out really well for us."

11.     In reality, Adeptus was engaged in a widespread practice of overcharging low-acuity patients fees for emergent care, including substantial facility fees, despite the fact that no emergent care was provided to those patients.  This practice, which Defendants' statements misleadingly concealed from investors, had a negative effect on payer reimbursement, and thus revenues, earnings, and cash flow.

12.     As discussed below in ¶62, a former member of Adeptus's Executive Committee with firsthand insight into Adeptus's financials and decision-making processes explained in detail that the story sold to Wall Street misled investors on several fronts, including regarding the viability of the Company's business model and by understating Adeptus's reported bad debt.  This former Adeptus employee further stated that, during an analysis of the Company's diagnosis codes

in late 2015, clinical leaders in the Company estimated that over 60% of Adeptus's patients could have been treated in urgent care.

13.     ***Third***, Defendants repeatedly assured investors that Adeptus's internal controls, including those controls governing revenue cycle management (and thus feeding cash flow), were functioning properly.  When potential symptoms of revenue collection problems began to surface in early 2016, Defendants downplayed them, attributing the issues to "growing pains" with a new third party vendor and assuring investors that those issues had already been fixed by the time they were first reported.

14.     Contrary to these statements, and as Adeptus has now admitted, by at least October 2015, its senior management (which would include Defendants Hall, Fielding and Cherrington (collectively, the "Executive Defendants")) was aware that "key aspects of its revenue cycle management process were not being performed."  These undisclosed material weaknesses resulted in "significant loss of revenue," over eighty million dollars in write offs of uncollectible cash receivables, and helped precipitate the Company's liquidity crisis.

15.     Fueled by Defendants' false and misleading statements and omissions, Adeptus's stock price soared from $22 at the Company's IPO to as high as $115 in September 2015, just before the truth about Adeptus began to gradually emerge.  As noted above, Sterling and the Executive Defendants took advantage of Adeptus's rocketing stock price to sell nearly all of their personal holdings of Adeptus stock in just two years.  Sterling, for instance, sold off ***78% of its Adeptus holdings, reaping $607 million***; CEO Hall dumped ***71% of his holdings, with proceeds of more than $48 million***; CFO Fielding sold ***66% of his holdings, with proceeds of more than $7 million***; and COO Cherrington sold off ***69% of his holdings, while reaping over $11 million***. Notably, as Adeptus's liquidity problems began to intensify, the Executive and Sterling

Defendants accelerated the volume of their sales.  For example, while Sterling sold 7% of its holdings in the IPO (735,000 shares), it sold *38%* of its remaining holdings in the July 2015 Offering and *51%* of its remaining holdings in the June 2016 Offering.

16.     Beginning in late 2015, investors were blindsided by a series of partial disclosures of the serious risks to Adeptus's cash flow and liquidity that Defendants' false and misleading statements had concealed.  These disclosures included the results of a November 17, 2015 investigative report detailing the Company's practice of overbilling low-acuity patients, including, for example, Adeptus charging $3,690 for removal of a splinter and $6,237 for telling a patient with shortness of breath to go home and "relax."

17.     Then, one-by-one, after offloading the bulk of their personal holdings to unwitting investors, Defendants Fielding and Hall shocked the market by suddenly and unexpectedly resigning from Adeptus in July and September 2016.

18.     Next, on November 1, 2016, after delaying its third quarter earnings call, Adeptus announced that the Company was facing a stark liquidity crisis, and that it had been forced to seek emergency financing.  Adeptus management further disclosed, for the first time, that, contrary to Defendants' prior statements, the Company had been funding "***100% of the working capital needs [of] the JV partnerships***."  Adeptus management blamed these massive outlays for the Company's dire liquidity problems, and conceded that Adeptus should never have been "the ***sole capital source*** to [the] JVs."

19.     Adeptus's management also disclosed that the Company's inability to collect reimbursement from payers contributed to the liquidity crisis.  In its November 1, 2016 third quarter earnings press release, Adeptus stated that "collection issues associated with our third party billing agent" contributed to the Company's troubling financial condition.  Remarkably, the new

top executives that replaced the Executive Defendants acknowledged that the Company had not been forthright with investors during the Class Period, and recognized that Adeptus "***need[ed] to deliver more transparent information and results***" going forward.  In response to Adeptus's November 1, 2016 disclosures ***alone*** the Company's stock plummeted over 71%, from $30.12 on October 31, 2016 to $8.60 on November 2, 2016, on extremely high volume.

20.     Nevertheless, Defendants continued to conceal the complete truth about Adeptus's financial condition from investors, including the fact that there were material weaknesses in the Company's internal controls over revenue cycle management – a fact known to Defendants for at least an entire year.  Then, on March 2, 2017, Adeptus finally disclosed that it may need to record millions in write-downs in order to correct previously reported financial results for 2015 and 2016, and acknowledged that fundamental weaknesses in the Company's internal controls contributed to the Company's liquidity crisis.

21.     On April 19, 2017, the Company filed a petition for bankruptcy protection under Chapter 11.  In its filings in bankruptcy court, Adeptus made various admissions further demonstrating the falsity of Defendants' statements during the Class Period.  For instance, contrary to Defendants' statements during the Class Period touting the profitability and performance of its JVs, Adeptus admitted, "***all of [Adeptus'] Joint Ventures, except for the Colorado JV, have operated at a loss***."

22.     Likewise, Defendants admitted that serious deficiencies in the Company's internal controls over revenue cycle management led to the Company's liquidity crisis, and, ultimately, its bankruptcy.  Again, contrary to Defendants' statements, Adeptus's inability to collect the patient fees it was booking as revenue was not a product of minor "growing pains" and had never been "fixed," as Fielding had reassured investors.  As discussed above, these undisclosed material

9

weaknesses caused the Company to write-down approximately *$82 million* in previously reported revenue.

23.     The gradual disclosure of the full truth regarding Adeptus's financial condition, including its liquidity and cash flow risks concealed by Defendants' misstatements caused Adeptus's share price to fall *over 95%*, from $59.87 per share at the close of trading on November 16, 2015, to $2.79 per share at the close of trading on March 2, 2017.  This action seeks to recover for the enormous losses suffered by investors.

## II.     THE CLAIMS ASSERTED IN THE COMPLAINT

24.     In this Complaint, Plaintiffs assert two separate sets of claims.  Counts One and Two, found Part One of the Complaint, assert fraud claims pursuant to Section 10(b) and Section 20(a) the Exchange Act.  These claims are asserted against the Exchange Act Defendants (defined below) and allege that these Defendants intentionally or recklessly made material false and misleading statements and omissions during the Class Period.

25.     Counts Three, Four, and Five, found in Part Two of the Complaint, assert strict liability and negligence claims pursuant to the Securities Act of 1933 (the "Securities Act").  These non-fraud claims are asserted against those defendants (identified below in Section VIII), including the Underwriter Defendants (defined below) and the Director Defendants (defined below), who are statutorily liable for the untrue statements in the prospectuses and registration statements for the Offerings.

26.     Plaintiffs specifically disclaim any allegations of fraud in the non-fraud Securities Act claims asserted in Counts Three, Four and Five, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Offerings.

### III.    JURISDICTION AND VENUE

27.    The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), and under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, 77o).

28.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

29.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c) and Section 22 of the Securities Act 15 U.S.C. § 77v(a).   Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.  Additionally, Adeptus's principal place of business is located in this District.

30.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

### IV.    PARTIES

#### A.    Plaintiffs

31.    Lead Plaintiff ATRS is a public pension fund established in 1937 for the benefit of the employees of Arkansas' education community and manages billions of dollars in assets.  As set forth in the amended certification attached as Exhibit A hereto, ATRS purchased shares of Adeptus common stock on the NYSE during the Class Period and suffered losses as a result of the conduct complained of herein.

32.     Lead Plaintiff ACERA is the retirement pension plan for public employees in Alameda County, California and currently has $7.6 billion of assets under management.  As set forth in the amended certification attached as Exhibit B hereto, ACERA purchased shares of Adeptus common stock on the NYSE during the Class Period and suffered losses as a result of the conduct complained of herein.

33.     Additional named plaintiff Miami is a public pension fund with approximately $141 million in assets under management.  As set forth in the certification attached hereto as Exhibit C, Miami purchased shares of Adeptus common stock on the New York Stock Exchange ("NYSE") during the Class Period and suffered losses as a result of the conduct complained of herein.

**B.     Exchange Act Defendants**

**1.     The Executive Defendants**

34.     Defendant Thomas S. Hall served as Adeptus's CEO from March 2012 until his sudden "resignation" on November 8, 2016, just as the truth about Adeptus was beginning to emerge.  Hall also served as Adeptus's President from March 2012 until January 1, 2015.  Hall was a member of Adeptus's Board throughout his tenure at the Company, and served as its Chairman from January 1, 2015 until November 1, 2016.

35.     Defendant Timothy L. Fielding served as Adeptus's CFO and Principal Financial and Accounting Officer from January 2013 until his sudden "resignation," announced July 28, 2016, which became effective September 30, 2016.

36.     Defendant Graham B. Cherrington served as Adeptus's Chief Operating Officer from May 2012 until his employment with Adeptus was terminated on December 2, 2016.  Cherrington also served as Adeptus's President from February 2015 until his termination.  Further, Cherrington was Chairman of each of the boards of Adeptus's JVs.

### 2.     The Sterling Defendants

37.     Defendant Sterling Partners is a Chicago-based private equity firm.  Sterling Partners and its affiliated funds acquired 75% of Adeptus in 2011.  As discussed extensively below, Sterling Partners and its affiliated funds – including the following Delaware limited partnerships: SC Partners III, L.P.; SCP III AIV THREE-FCER Conduit, L.P.; and SCP III AIV THREE-FCER, L.P. – (collectively, "Sterling") had the power to control, and did control Adeptus, throughout the Class Period.

### C.     Non-Party Adeptus

38.     Adeptus, Inc. is a Delaware corporation, headquartered in Lewisville, Texas, that purports to be the largest operator of freestanding emergency rooms in the United States.  Adeptus was actively traded on the NYSE during the Class Period.  The Company went public on June 25, 2014 and, less than three years later, on April 19, 2017, Adeptus filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.

## V.     SUMMARY OF THE FRAUD

### A.     Background On Adeptus And The Freestanding Emergency Room Industry

39.     During the Class Period, Adeptus was the largest operator of FERs in the United States.  FERs provide patients with 24-hour care for emergent illnesses, such as heart attack and stroke.  Although FERs are not physically attached to a hospital, they are required to provide the same level of access and services as hospital-based emergency rooms, with the exception of trauma care. Because they provide emergency room-level care, FERs also charge far more for treatment than more commonplace urgent care centers.  Among other things, FERs, unlike urgent care centers, charge hefty "facility fees."  Traditional hospital-based emergency rooms charge facility fees in order to defray the overhead associated with operating a fully-equipped emergency care center, including 24-hour staffing and special diagnostic equipment.

40.	There are two types of FERs:  (1) hospital outpatient departments ("HOPDs"), which are owned and operated by a hospital system or medical center; and (2) independent free standing emergency centers ("non-HOPDs"), which are owned by non-hospital, for-profit entities.

41.	Importantly, a FER's HOPD status determines the payers from which it may seek reimbursement and the markets in which it is permitted to operate.  Because HOPDs are affiliated with a hospital system, and thus subject to regulation by the Centers for Medicare and Medicaid Services ("CMS"), they are permitted to seek reimbursement from government-funded health payers, like Medicaid, Medicare, and TRICARE.  Non-HOPDs, by contrast, are not recognized by CMS, and may not seek reimbursement for emergency services from government payers.

42.	In addition, although some states, like Texas and Colorado, permit non-HOPD FERs, in many states only HOPDs are allowed to deliver emergency services.  As Hall explained at a June 9, 2016 investor conference, given the patchwork of variegated state FER regulation, "if you want to go beyond [Texas, Colorado, and Rhode Island and operate in other states], you really need to be part of a hospital system, you really need to be a hospital outpatient department."

**B.	Sterling, Adeptus's "Sponsor," Takes The Company Public And Maintains Control Over It Throughout The Class Period**

43.	In 2011, Sterling, through its affiliated funds, acquired 75% of Adeptus's predecessor, First Choice ER, LLC ("First Choice").  To solidify its ability to direct and manage First Choice's business, Sterling caused First Choice to enter into an advisory services agreement ("Advisory Agreement") with Sterling's affiliated investment advisor, Sterling Fund Management, LLC.  Pursuant to the Advisory Agreement, dated September 30, 2011, Sterling provided First Choice with "management, consulting and financial services," including "advice and assistance concerning any and all aspects of the operations, planning and financing of the Company and its subsidiaries."  In exchange, Sterling was paid a minimum annual fee of $500,000.

14

44.     Sterling used its control over Adeptus to handpick the Company's key executives and nominate its directors.  For instance, on March 12, 2012, shortly after Sterling assumed its 75% majority stake in First Choice, the Company hired Defendant Hall as CEO.  An April 16, 2012 press release issued by Sterling quotes Defendant Daniel Rosenberg – a Managing Director of Sterling – as stating that "Sterling has worked very closely with existing management to identify Tom Hall."  Hall's employment agreement with First Choice further evinces Sterling's control over the Company, providing, for instance, that notice to First Choice under the agreement was effected by notice to Sterling's Chicago headquarters; that Hall's severance rights terminated if he took a job with Sterling; and that the agreement's "change-in-control" provisions would not be triggered if Sterling was Adeptus's acquirer.  Indeed, Defendant Rosenberg signed Hall's employment agreement on behalf of First Choice.  Shortly after First Choice hired Hall, it hired Defendants Cherrington as COO and Fielding as CFO (on May 29, 2012 and January 16, 2013, respectively).  Both of their employment agreements contained provisions identical to those in Hall's, described above.

45.     Sterling was also instrumental in helping Adeptus obtain credit, by, among other things, agreeing, as part of the Company's credit agreements with lenders, to maintain a $30 million reserve for future equity contributions prior to the Company's IPO.  Indeed, Sterling was a signatory to a June 11, 2014 amendment to Adeptus's credit agreement with respect to its senior secured credit facility.

46.     In anticipation of the Company's IPO, Adeptus was incorporated in Delaware in March 2014 as a parent of First Choice.  On June 25, 2014, Sterling and Adeptus entered into a Stockholders Agreement that would ensure Sterling would continue to exercise control of the Company even after it became public.  For example, Sterling's approval was required to hire or

fire the CEO, change the composition of Adeptus's Board, or consummate transactions, including the issuance of common stock, in excess of $50 million.  Sterling also had the right to nominate members of Adeptus's Board and cause Adeptus to vote for Sterling's nominees.  Further, Sterling was contractually guaranteed sweeping access to non-public Company information and direct input into the day-to-day management of Adeptus.  For additional details concerning the Stockholders Agreement, *see* ¶137, *infra*.

47.     Accordingly, in offering documents filed with the SEC in connection with its IPO, Adeptus acknowledged that Sterling would continue to exercise significant control over the Company after it went public.  In its June 24, 2014 prospectus, Adeptus, characterizing Sterling as the Company's "Sponsor," stated, "***We rely on our private equity sponsor whose interests may differ from yours and who <u>has the ability to control us</u>***."  The Company further acknowledged that Sterling would control Adeptus's Board following the IPO, stating:  "Pursuant to the stockholders' agreement to be executed in connection with the closing of this offering, representatives of our Sponsor will have the ability to appoint a majority of the seats on our board of directors."  Moreover, the Company acknowledged that:  "As a result of its ownership, our Sponsor may have the ability to control the outcome of matters submitted to a vote of stockholders and, through our board of directors, the ability to control decision-making with respect to our business direction and policies."

48.     Finally, in the June 24, 2014 prospectus, and in later SEC filings during the Class Period, including Adeptus's annual reports on Form 10-K, Adeptus acknowledged, "Our Sponsor [Sterling] ***will continue to have significant influence over us after this offering***, including in connection with decisions that require the approval of stockholders, which could limit your ability to influence the outcome of key transactions, including a change of control."

49.     On June 25, 2014, Adeptus completed its IPO of 5.6 million shares at $22 per share, with proceeds in excess of $124 million.  As discussed below, Sterling sold 735,000 shares of Adeptus common stock, with proceeds of more than $16 million.  Even after this sale, Sterling continued to own more than 62% of the Company's Class A common stock and to control 47.5% of Adeptus's voting securities.

C.      **Defendants Deceive Investors About Adeptus's Financial Health Through Misrepresentations Concerning The Acuity Of The Company's Patients, The Economics And Performance Of Its JVs, And The State Of Its Internal Controls**

50.     As set forth below, during the Class Period, Defendants concealed the true state of Adeptus's financial position through a series of misstatements concerning the economics of its joint ventures, its improper billing and ineffective collection practices and its internal controls. Defendants' misstatements were gradually revealed through a series of corrective disclosures, including media investigative reports of predatory over-billing, sudden departures of key executives, and disclosures of the truth concerning Adeptus bearing 100% of the costs of its joint ventures and its internal control deficiencies.   Ultimately, Adeptus was forced to file for bankruptcy in April 2017.

1.      **Defendants Assure Investors That Adeptus's Revenue Is Driven By "High Acuity" Treatments That May Be Billed To Payers As Emergency Room Care**

51.     Under Sterling's direction and control, Adeptus expanded rapidly and consistently reported highly positive financial results, including dramatic increases in revenue, during the Class Period.  For instance, in its 2015 Form 10-K, Adeptus reported a 104% increase in net revenue over the prior year.  Likewise, in the Company's 2016 Form 10-K, the Company reported a 73% increase in net revenue.

17

52.     As Adeptus explained in its public filings, its patient "acuity mix" was one of the Company's "key revenue drivers" and an important indicator of the Company's profitability. "Patient acuity" refers to the severity of a patient's condition as measured by the American College of Emergency Physicians acuity index, a five-level scale used by emergency departments to triage patients, with 1 being the least urgent and 5 being the most urgent.  Acuity **level 5** conditions, such as cardiac or respiratory arrest, require immediate lifesaving intervention; **level 4** conditions have a high risk of deterioration, such as a patient at high risk for acute coronary syndrome who presents with chest pain; and acuity level 3 conditions will require 2 or more medical "resources" – such as labs (*e.g.*, blood, urine), imaging (ECG, MRI, x-ray), IV fluids or nebulized medicine, or specialty consultation – to diagnose and treat.  By contrast, patients at **level 2** are stable and are expected to consume one medical resource (*e.g.,* an x-ray or sutures); patients at **level 1** are stable and will consume no resources beyond an exam and oral or topical medication (*e.g.*, poison ivy or a patient in need of a new prescription).  While primary care physicians and urgent care centers principally treat patients at acuity levels 1 and 2, as discussed below, Adeptus assured investors that the acuity mix of patients treated at its FERs was far higher and, indeed, that more than 90% of its patients were at an acuity level of 3 or greater.

53.     Patient acuity was key to Adeptus's revenues, including "patient service revenue" (*i.e.*, revenue attributable to patient service fees), because insurers and other payers reimburse treatments for higher acuity conditions at higher rates.  However, they will not pay fees associated with emergent care, such as the substantial facility fees Adeptus charged its patients, if the condition treated was low-acuity and thus non-emergent.  Accordingly, as Adeptus's patient acuity scores increased, so did its revenue.

18

54.     Defendants repeatedly touted the high acuity of Adeptus's patients throughout the

Class Period.  For example:

- In multiple SEC filings throughout the Class Period, including the registration statements and prospectuses pursuant to which Adeptus's public Offerings were conducted, the Company stated, "We operate at the *higher end of the acuity and emergency care spectrum*."  Further Adeptus differentiated its facilities from urgent care, stating, "Our capabilities and offerings *differ from other care models* as outlined below . . . . We also provide convenient access to *critical, high-acuity care as compared with urgent care centers* . . . ."

- On Adeptus's October 29, 2014 earnings call, Hall stated, "We spend a lot of time and energy making sure that we are not an urgent care . . . . *[I]t is really important with our relationship with our payers and all of that, that we are not seen as milking the system, charging $1,000 for an urgent care person* . . . .  It is working out really well for us."

- On Adeptus's February 19, 2015 earnings call, Hall stated, "*when we see people they are emergent.  They need to be seen*."

- On Adeptus's April 23, 2015 earnings call, Hall stated, "*we spend a lot of energy educating people that we are not an urgent care*.  It cost us.  *We could easily see those patients and charge them $1,000, or whatever, and make a lot of money.  But we don't think it is the right thing to do.*"

- At the December 1, 2015 Piper Jaffray Healthcare Conference, Hall stated, "About 93% of our patients are Level III, IV, and V.  I have talked about what those patients are, what they look like, and *they are true emergent patients that need to be in an emergency room*.  And so that has had a positive impact on us."

55.     Additionally, because Adeptus booked patient service fees when those services

were rendered, rather than when the fees were collected, Generally Accepted Accounting

Principles ("GAAP") required Adeptus to estimate potentially uncollectible patient service fees

and report them as "bad debt reserves."  Adeptus's bad debt reserves, which the Company reported

to investors in periodic filings with the SEC, reduced the Company's earnings on a dollar-for-

dollar basis.

56.     Specifically, GAAP Topic No. 275, Risks and Uncertainties, requires adequate

accounting and disclosure of risks and uncertainties that could significantly affect the amounts

reported in the financial statements in the near term or the near-term functioning of the reporting entity, based on the nature of the entity's operations, the use of estimates in the preparation of the entity's financial statements, or significant concentrations in certain aspects of the entity's operations.  GAAP Topic No. 450, Contingencies, requires adequate accounting and disclosure of loss and gain contingencies, such as impairments and incurred liabilities, as well as proper revenue recognition.

57.     Consistent with Defendants' statements that Adeptus overwhelmingly treated high acuity patients for whom fees associated with emergent care could properly be billed and reimbursed, Defendants, throughout the Class Period, reported bad debt reserves between 12% and 20% of revenue, showing that the Company would ultimately collect the vast majority of the revenue it reported.  Indeed, Hall noted that the bad debt reported by Adeptus was "quite a bit less than some of the other businesses that we have out there that do emergency care."

58.     Given the importance of acuity mix to Adeptus's revenue, earnings, and cash flow, investors and analysts were keenly focused on Defendants' statements.  For instance:

- In an October 1, 2014 report, RBC Capital Markets analysts stated that "ADPT's value proposition . . . [f]or Payors" is "comprehensive emergency care with acuity mix comparable to hospital-based ERs."  And in an October 30, 2014 report, these analysts echoed Defendants' statements that "***ADPT has made considerable effort positioning itself as a high acuity emergency room and not an urgent care center***."

- In an April 23, 2015 report, Piper Jaffray analysts stated, "The increase in [same store] revenues was drive[n] by higher acuity patients as ***the company continues to refer lower acuity patients to urgent care and other appropriate providers***."

- Similarly, in an April 24, 2015 report, Stephens analysts stated, "Adeptus significantly topped consensus estimates across the board and raised guidance meaningfully higher. Organic revenue increased over 11% despite a 10.5% volume decline. ***This was driven by better pricing on higher acuity patients which we think is a clear indication that consumer understanding of the difference between an FSED and an urgent care center is evolving***."

59.     As discussed in further detail below, Defendants' statements touting Adeptus's high patient acuity were materially misleading.  In truth, and unbeknownst to investors, Adeptus inflated its revenue by routinely overcharging low-acuity patients for minor medical treatments, including by charging them exorbitant facility fees.

60.     Indeed, as discussed further below, a months' long investigation by KUSA, an NBC-affiliate in Denver, Colorado, revealed that Adeptus engaged in widespread predatory overbilling of low-acuity patients, including by charging facility fees that ranged from $700 to more than $6,200 for a single visit.  The report also published a statement from Anthem Blue Cross/Blue Shield of Colorado estimating that 60 to 70 percent of their customers who visit FERs have conditions that could be treated in urgent care.  The insurer's data also indicated that, while the average cost to treat these low-acuity conditions at an urgent care center is approximately $200, a FER, including Adeptus's FERs, charges nearly $2,300 – *ten times as much* – to treat those same conditions.  Defendants' statements failed to disclose that payers were denying Adeptus's claims for low-acuity encounters and refusing to pay the Company's astronomical facility fees, which, in turn, was contributing to a liquidity crisis that forced the Company into bankruptcy.

61.     Likewise, Defendants' statements purporting to report Adeptus's revenue, earnings and bad debt were also false and misleading because they failed to properly account for uncollectible emergency fees billed for non-emergency treatment, which, among other things, was contrary to GAAP's mandates.[2]   Importantly, SEC Regulation S-X, Rule 4-01(a), provides that statements not compliant with GAAP "will be *presumed to be misleading or inaccurate*." 17 C.F.R. §210.4- 01(a)(1).  As discussed further below, at the end of the Class Period, these inflated

---

[2] Adeptus reported earnings and "net patient services revenue," both of which were net of "bad debt."  Thus, understatements of bad debt had the effect of overstating earnings and "net patient services revenue," among other financial metrics, as discussed below.

financial results collapsed under their own weight, as Adeptus was forced to write down hundreds of millions of dollars in assets, including uncollectible revenue.

62.     KUSA's report – and the factual allegations herein – have been corroborated by information provided by a former employee of the Company.  A former member of Adeptus's Executive Committee (the "Former EC Member") – who worked at Adeptus's headquarters in Lewisville, Texas with first hand insights into Adeptus' financials and decision-making processes – stated that "the story sold to Wall Street misled investors on several fronts":

a) ***"Viability of business model*** – Adeptus used various short term tactics to boost financial performance as business fundamentals collapsed.  He noted that the Company was headed for default in early 2015, before the CEO implemented an 80% price hike that would eventually exacerbate Adeptus' falling patient volumes.  Furthermore, Adeptus did not disclose any payor mix information to investors (other than Sterling Partners) which provided the illusion of stable patient volumes during a period when high paying commercial volumes were collapsing but low paying Medicaid were rising.  The Company never disclosed to investors that its prices (sometimes as high as 10x Medicare rates) twice exceeded what the industry deemed 'egregious.'"

b) ***"Visibility into monthly financials*** – It was misleading for Defendant Hall to state on the July 21, 2016 earnings conference call that "June got soft for some reason… [b]ut July has bounced back" because, in fact, patient volumes and revenues were continuing to decline and never "bounced back" at all.  The Former EC member opined that this misstatement was a way to stabilize the share price days before a secondary offering in which he and Sterling sold large quantities of stock.  In reality, Adeptus' performance in July was as insipid as it was in June."

c) ***"Opaque accounting formats*** – The Company used a non-GAAP term 'Adjusted EBITDA' to guide investors, but was extremely aggressive in determining how it would adjust its numbers creating an illusion of improved performance.  In particular, the Company chose to adjust off the cost of multi-million dollar marketing campaigns being used to support existing operations."

d) ***"Misleading bad debt assumptions*** – As a result of its massive price increases (*e.g.*, in February 2016), the quality of Adeptus' patient receivables was eroding, resulting in declining cashflows.  However rather than choosing to increase the Company's bad debt reserves to reflect the change in circumstances, Defendants continued to misleadingly use historical, pre-price hike collection averages to generate Adeptus' reported bad debt figures.  Furthermore, as payors started to grapple with Adeptus egregious pricing practices, some health insurance contracts started to dramatically cut their reimbursements to Adeptus.  Payors had successfully used these practices to put several other out-of-

network providers in Texas out of business in 2015 & 2016.  The Company chose not to disclose these growing issues and also failed to increase reserves for underpayment from the payors, thereby increasing the false illusion of profitability.  As a result of this practice, Adeptus's reported financial results understated the Company's bad debt and, consequently, overstated its revenue and earnings."

In addition, according to the Former EC Member, "during an analysis of the Company's diagnosis codes in late 2015, clinical leaders in the Company estimated that over 60% of Adeptus's patients could have been treated in urgent care."

> **2.  Defendants Tout The JVs As A Profitable "Cornerstone" Of The Company's Growth With Shared Working Capital And Operating Costs**

63.     Shortly after its IPO, Adeptus announced that it was embarking on a new strategy: the Company would seek to form joint venture partnerships ("JVs") with leading hospitals and health care systems across the country.  According to Defendants, this strategy would allow Adeptus to seek reimbursement from Medicaid, Medicare, and TRICARE, and expand the Company outside of Colorado and Texas.

64.     Defendants told investors that under the JV model, the hospital partner would take a bare majority stake in the JV (approximately 51%), while Adeptus would have a bare minority stake (approximately 49%).  On top of its equity stake, Adeptus would receive a percentage of revenues as management fees and would also charge the JV to staff its facilities.  According to Defendants, Adeptus would thus capture roughly 65% or more of the JV's economics.  Moreover, Defendants told investors that in markets where Adeptus had an existing presence, it negotiated an earnings "waterfall" – or preference – with the JV, whereby Adeptus would capture 100% of the JVs earnings up to a certain threshold before the hospital partner could even participate in earnings; Defendants touted this arrangement as essentially pure upside for Adeptus.  According to Defendants, the hospital partner's nominal majority ownership was a key feature of the JV model because "*it's their facilities*, they are the majority shareholders, it's their brand."

65.     On October 22, 2014, Adeptus announced that it had taken the first step in implementing this new strategy and had partnered with Dignity Health, a California-based non-profit hospital operator, to open a 39,000 square-foot full service health care facility in Phoenix, Arizona called Dignity Health General Hospital ("Arizona JV") by early 2015.

66.     Adeptus hailed its strategy of "partnering with leading health systems" as a "key element" of the Company's growth.  On Adeptus's October 29, 2014 earnings call, Hall stated, "we think that the economics will be better than what our economics are on our standalone First Choice, and then we also think what it does is opens up a lot of new markets for us . . . . Net/Net, it is a huge positive for us."  Likewise, at the June 2, 2015 Jefferies Global Healthcare investor conference, Hall stated, "[A]s we move forward, you are going to see us do joint ventures . . . . By partnering with the hospitals and becoming an outpatient department of the hospital system, we can then get reimbursed by Medicare, Medicaid and TRICARE.  We think that's very significant." At that June 2, 2015 conference, Hall told investors and analysts that the joint venture strategy would be the catalyst allowing the Company to eventually establish "hundreds and hundreds" of FERs across the country.

67.     Similarly, at the November 10, 2015 Stephens Fall Investment Conference, Hall stated that the JV strategy was so pivotal, Adeptus would "transform" its business model to accommodate it.  Hall stated, "[W]hat we've decided to do is, we've decided actually to partner with hospitals on a go forward basis and really transform our model . . . . The significance of that for the folks in this room is that where prior to that we were allowed only to take commercial pay. Today, we can take all payers throughout our facilities . . . . [W]e've doubled our [JV] development team.  We expect more JVs in the future.  We think that's the path that we need to go down."  At that same November 10, 2015 conference, Hall told investors that the JV model was so successful

and lucrative that Adeptus would even begin to roll up existing freestanding FERs into JVs – a strategy the Company ultimately began to implement during the Class Period – so that "it wouldn't be inconceivable that five years from now we have few if any facilities" that are not part of a JV.

68.     Defendants aggressively implemented the JV model throughout the Class Period. On April 21, 2015, following on the heels of the Arizona JV's launch, Adeptus announced a joint venture with University of Colorado Health ("Colorado JV"); Defendants told investors that, as part of this deal, Adeptus had secured the "waterfall" preference, discussed above.  On September 3, 2015, Adeptus announced that it was expanding into Louisiana through its partnership with New Orleans-based Ochsner Health System ("Louisiana JV").  Just a few months later, on February 4, 2016, Adeptus announced its expansion into Ohio through a partnership with Mount Carmel Health System ("Ohio JV").  Finally, on May 11, 2016, Adeptus entered into a JV with Texas Health Resources ("Texas JV") in an effort to expand the payer base of the Company's Dallas-Fort Worth area FERs.  Adeptus contributed 27 FERs and its Carrolton hospital to the Texas JV.

69.     In their public presentations to investors, Defendants emphasized the JV strategy's positive impact on the Company's profitability and margins.  For example:

- At the March 12, 2015 Barclays Healthcare Conference, Hall told investors that adoption of the JV model would boost earnings significantly and would yield high operating margins.  He stated, "we expect to see more volumes [through the JV, and, therefore, because] we are a fixed cost business[,] [o]nce you get above our breakeven our marginal costs for patients is about a $100, so even if you are taking a Medicare patient you are getting $500, *that's an 80% margin folks*."

- On Adeptus's July 23, 2015 earnings call, Hall stated that the "[p]artnerships with leading healthcare systems are a key driver of our growth," and attributed the Company's purportedly strong cash flow results to implementation of the JV model, stating, "What's very important to note is that our cash flow from operations was $13 million in the quarter. That is *real cash, folks, and demonstrates the profitability [of] our model*."

- At the December 1, 2015 Piper Jaffray Healthcare Conference, Hall stated that the Company's FERs, including those built through its JVs, made "*a pretty significant*

*EBITDA contribution and for a pretty low out-of-pocket capital cost*.  And so if anything, our Company *is deleveraging real-time* as our profitability grows."

- At the September 12, 2016 Morgan Stanley Global Healthcare Conference, Hall reassured investors that the JV model did *not* alter the high-margin character of the Company's fixed-cost business:  "the margin expansion is the same.  The marginal cost for that incremental patient is $100.  So, if it's a government patient and you're getting $300 or $400, then you have – clearly if it's $400, you have a 75% margin.  And if it's a commercial patient, you have a higher margin that than [sic].  And so, *those dynamics really haven't changed even under the JV model*."

70.    Defendants also highlighted the purportedly strong performance of the JVs during the Class Period, telling investors that they were consistently meeting or exceeding the Company's expectations.  With respect to Adeptus's key Arizona JV, for instance, Hall stated on Adeptus's July 23, 2015 earnings call, "our Arizona joint venture is doing very well . . . . [W]e're very pleased with the way it's functioning right now. We're seeing in the 20 plus patients a day."  The next quarter, on the Company's October 22, 2015 earnings call, Hall likewise stated, "I am just sitting here looking at it right now, [the Arizona JV facilities] are absolutely performing at the level we told you before, or above."

71.    Critically, Defendants made numerous statements assuaging investors' concerns about the strain the JV strategy – which, in some cases, entailed building new hospitals – might have on Adeptus's capital and liquidity position, and, in particular, assured investors that the Company shared these costs with its JV partners.  Indeed, Defendants *raised* earnings guidance consistently throughout the Class Period.  Defendants stated, for example:

- On Adeptus's February 19, 2015 earnings call, a Deutsche Bank analyst specifically asked Defendants, "*So are you [Adeptus] bearing all the pre-opening costs or is the partnership bearing that cost?*"  Fielding answered, "*we do share the pre-opening with our partner*."

- On Adeptus's April 23, 2015 earnings call, a Morgan Stanley analyst asked, "how should we be thinking of the impact to consolidated EBITDA of the 12 JV facilities [in Colorado]? Will there be a step down at first and then ramp over time as the deal gains traction?" Fielding answered, "We will *not have a step back on our EBITDA going forward. EBITDA should maintain the same as if we were independent this year*."

26

- On Adeptus's April 20, 2016 earnings call, a Stephens analyst asked, "when you're doing the new developments with your joint venture partners, is that – *are you using [Medical Properties Trust – a REIT] in that split roughly 50/50*?"  Fielding answered, "Yes, we absolutely are using MPT . . . . *Those leases are subleased down to the JV level.*"

72.      Analysts reacted favorably to Defendants' statements about Adeptus's JV strategy,

reporting that the JV model would actually *minimize* risk associated with Adeptus's business.  For

example:

- In an October 31, 2014 report, Morgan Stanley analysts revised earnings estimates upwards in response to the Company's announcement of the Arizona JV, reporting, "Joint venture partnerships are becoming a more essential part of the ADPT growth story . . . . [W]e think the company's Dignity partnership mitigates risks tied to hospital operation and new market entry."  These analysts also heralded the JV strategy as a "*safer alternative and supportive of long-term growth*."

- In a December 11, 2014 report, JMP analysts trumpeted the Company's reports of "[o]utstanding facility level economics" and rising EBITDA attributable to its JVs, stating that the JVs "will enhance growth and *lower the company's operating risk*."

73.      Similarly, in a February 20, 2015 report, Dougherty and Company analysts reported

that the JV model would be highly accretive to Adeptus's earnings,

> *[T]he really big story here is the [JV-affiliated] hospitals*.  We think the hospitals will do a lot of good things for ADPT.  First, as noted, they allow the company to accept payment from Medicare, Medicaid and TRICARE, in addition to the commercial insurers (and private pay) they accept now.  This is largely a fixed cost model, so incremental patients with health coverage means incremental revenue *which falls heavily to the bottom line* . . . . The bottom line with ADPT is growth continues to occur here and investors are buying growth.

74.      Analysts were also comforted by Defendants' statements assuring them that the

JV model would enhance earnings and cash flow, rather than choke off Adeptus's liquidity.

Indeed, analysts trumpeted the fact that Adeptus would now be *sharing* the onerous costs of

expansion with its JV partners, significantly minimizing risk while apparently maximizing upside.

For instance:

- Jefferies analysts reported in an August 3, 2015 report (issued while the July 2015 Offering was ongoing and one day before it closed) that one of the most favorable features of the JV

strategy was that the arrangement allowed Adeptus to share costs and risk, and preserve capital: "Hospital JVs should drive patient volumes higher and generate earnings upside . . . . *Hospital partnerships benefit ADPT from financial, patient care and branding standpoints . . . . Lower capital requirements when financial partnership in place - shared staffing and up-front expenses*."

- Stephens analysts issued a July 23, 2015 report rating Adeptus overweight and stating, "JV partnerships with established healthcare systems and ADPT's own hospital development should drive significant volume growth which has *high incremental margins* given the high degree of operating leverage in the FSED model. Further, *the capital efficiency of the development model is starting to bear fruit as ADPT generated solid quarterly cash flow which we expect to persist with minimal capital expenditures*."

75.     Analysts likewise touted the purportedly favorable, low-risk/high-reward terms of Adeptus's agreements with its JV partners.  For instance, Morgan Stanley analysts, in an April 28, 2015 report, stated "Adeptus was able to extract *favorable terms* [in its Colorado JV agreement] due to the company's existing position in the market. . . .  In our view, *the JV strategy mitigates risks associated with hospital operation and new market entry*."

76.     Unfortunately for investors, Defendants' statements were false and misleading.  As discussed further below, unbeknownst to investors, *Adeptus funded 100% of its JVs' working capital and operating losses*, including the cost of building, maintaining, equipping, staffing, and marketing hospitals and FERs, thereby absorbing *all* of the upfront risk associated with JV growth, rather than sharing it with the JV partner.  The JV partner was not obligated to repay the costs absorbed by Adeptus unless and until the JV became cash flow positive.  As Adeptus has stated in bankruptcy filings, however, it takes "more than a year for a hospital to become profitable," if they become profitable at all; indeed, as Adeptus ultimately admitted in its bankruptcy filings, even at the end of the Class Period, "*all of [Adeptus's] Joint Ventures, except for the Colorado JV, have operated at a loss*."  With respect to the Arizona JV alone, for instance, Adeptus expended in excess of $20.1 million to fund the JV's working capital and operating losses during the Class Period, which continued to balloon and remain uncollectible as the JV stayed unprofitable.

77.     Thus, by assuming responsibility for funding all of the JVs' working capital, Adeptus severely strained its liquidity, ultimately leading to the Company's bankruptcy.  As a Jefferies analyst explained after the Class Period, Adeptus's "JV contracts with its hospital partners were **not prudently structured** – [Adeptus] took on **a disproportionate share of working capital risk**, which exacerbated its already-tight liquidity position that was caused by challenges in collecting receivables from managed care companies."   Indeed, Adeptus's own Chairman ultimately acknowledged that Adeptus was "the **sole capital source to these JVs**," which was "**not a position that [Adeptus] should be in**."  Defendants' false and misleading statements claiming Adeptus shared costs with its JV partners, touting the JV model's positive impact on earnings and margins, and trumpeting the success of individual JVs that were, unbeknownst to investors, operating at a loss, concealed these highly material facts from investors.

78.     Indeed, when Adeptus experienced drags on EBITDA or cash flow as a result of its onerous capital outlays in connection with the Company's JVs, it blamed those drags on "seasonality," rather than tell investors the truth.  For instance, on its November 1, 2016 earnings call, Adeptus acknowledged that it had experienced the impact of its JV capital outlays during at least the first and second quarters of 2016.  Yet, on earnings calls for those quarters, Defendants gave a benign explanation for the Company's less than stellar earnings and cash flow.  On Adeptus's first quarter earnings call, a Morgan Stanley analyst asked why positive cash flow "in distributions from JV . . . didn't seem to repeat again this quarter."  Fielding misleadingly attributed the lag in cash flow to "seasonality" and "some signage that we put up" at some of the JV facilities.

79.     Likewise, on Adeptus's second quarter 2016 earnings call, Hall downplayed disappointing earnings, claiming that "we had a good May and then June just got soft for some reason on us . . . [b]ut July has bounced back."  Astonishingly, Hall falsely stated that the JVs were

profitable, including in the second quarter, ***despite the fact that <u>none</u> of them were profitable***, except for the Colorado JV.

### 3.    Defendants Conceal Serious Control Deficiencies In Adeptus's Revenue Cycle Management Process

80.    In addition to Adeptus's undisclosed funding of 100% of the JVs' working capital and operating losses and the Company's inability to obtain reimbursement for overbilled low-acuity patients, Defendants concealed yet another strain on Adeptus's liquidity and earnings.  As Adeptus has now admitted, by at least October 2015, Adeptus's senior management was aware that massive internal control failures in the Company's revenue cycle management, which were resulting in denied claims, "short" payments, and, ultimately, significant loss of revenue.

81.    In October 2015, Adeptus outsourced its revenue collection processes to McKesson – a large health care services and IT company – in order to comply with new HIPAA requirements. According to Adeptus, the Company "did not have the internal expertise within its current structure to meet the [new] coding and billing compliance requirements," so it turned the function over to a reputable third-party vendor.

82.    Following this transition, on Adeptus's fourth quarter and full-year 2015 earnings call, held February 24, 2016, and in its Form 10-K, filed February 29, 2016, Defendants disclosed a single technical control deficiency, amounting to no more than a mere technicality, which failed to alert investors that key aspects of the Company's revenue cycle management process were not being performed.  Specifically, Defendants disclosed that Adeptus was not able to provide its auditor with a Service Organization Control, or "SOC," report – a report that describes the internal controls in place at a third party vendor – from McKesson purely because of the timing of the Company's outsourcing of its revenue collection process.  As Fielding stated on Adeptus's February 24, 2016 earnings call:

In a normal year we would rely on McKesson's Service Organization Control report, commonly referred to as a SOC-1 report, as the internal control over the outsourced coding and billing function.  However, because . . . the testing period [for the SOC-1 report] ended on September 30, [2015] it did not include any of our billing and coding data and, therefore, we could not rely upon it as our internal control that is typically used in an outsourced environment.

Effectively, this was impossible to overcome as there was not sufficient time before December 31 to implement alternative internal controls to compensate for not being able to use the SOC-1 report.  This deficiency is going to be remediated in 2016 as the SOC-1 report will include our coding and billing data and, therefore, can be relied upon by us for internal control purposes.  We do expect to receive a clean audit opinion from our auditors when we file the 10-K on Monday.

83.     In signed certifications pursuant to the Sarbanes-Oxley Act ("SOX") appended to Adeptus's 2015 Form 10-K, and in SOX certifications appended to subsequent SEC filings during the Class Period, Hall and Fielding represented that, apart from the purely technical control deficiency described above, there were no other weaknesses in Adeptus's internal controls. Specifically, Hall and Fielding certified that there were no "significant deficiencies and material weaknesses in the design or operation" of Adeptus's internal controls that had not been disclosed in the Company's filings.   Importantly, despite the increasing difficulty in obtaining reimbursement, Defendants reported a sequential *improvement* in Adeptus's provision for bad debt as a percentage of patient service revenue (16.6% versus 17.7% for the prior quarter).

84.     Analysts were greatly comforted by Defendants' reassuring statements.  For instance, in a February 24, 2016 report, Piper Jaffray analysts stated, "Material Weakness for Internal Control ***NOT an Issue***, in our view . . . .  This issue ***has no bearing or impact on ADPT's financial statements*** and the company expects its auditors to provide a clean opinion when its 10K is filed on Monday (2/29)."  Likewise, in a report issued the next day, Jefferies analysts echoed Defendants statements that any revenue collection issues involving McKesson had already been fixed:   "'***Material weakness' clause on 'controls' is a non-event***.  During the call, mgmt. mentioned that their auditors have noted a 'material weakness' related to 'controls', ***which has***

*since been addressed*."  Analysts and investors were also cheered by Defendants' reports of improving bad debt.  As a Piper Jaffray analyst noted during the Company's fourth quarter 2015 earnings call, "it was good to see the improvement in provision for bad debt."

85.     On its April 20, 2016 first quarter earnings call, while Adeptus was forced to report an increase in the Company's days sales outstanding ("DSO") – the average number of days it takes to collect revenue after services are rendered – Defendants misleadingly characterized the issue as a small hiccup in the Company's transition of services to McKesson that had already been remediated by the time of the earnings call.  Specifically, on that earnings call, Fielding stated, "[w]e are in the early phase of McKesson performing our coding and collection processes, which led to an increase in DSO for the quarter, which we expect to decrease in future quarters."  Later in the call a Jefferies analyst asked, "On the cash flow system, you talked about the McKesson rollout as the reason for the DSOs going up a little bit.  Just in terms of timing on that, how do you expect that to taper off during the course of the year?"  Fielding assured investors that any problems had *already been fixed*:  "in terms of DSO and McKesson, *that conversion today has been completed.  All of our bills are going out on a timely basis.*  But there was a transition when we first converted those guys over, so that [caused] an increase in our DSO."

86.     Moreover, while Adeptus reported a slight increase in its provision for bad debt in the first quarter of 2016 – about 20% of revenue – Fielding blamed the increase on "seasonality," noted that the reported figures did not reflect McKesson's revenue collections data, and assured investors that McKesson's efforts would yield "positive results" with respect to bad debt:

> [W]e've stated in the past that our highest bad debt percentages *are in the first quarter, as deductibles reset*.  Our Q1 2016 bad debt, as a percentage, is still based on our historical averages.  It's just still too early to use McKesson [data as an input for reporting bad debt].  At June 30, we will be able to look at the bad debt using McKesson data, and *we think we should see positive results there*.

32

87.     Analysts were again reassured by these statements.  For instance, in an April 21, 2016 report in which they reiterated their "Outperform" rating of Adeptus stock, JMP analysts echoed management's reassuring statements attributing the slight rise in bad debt to seasonality and noting that management had made *no changes* to their sanguine bad debt guidance for the year: "In the previous earnings call, management guided to 2016 full-year bad debt expense at 16-19% of gross revenues.  *We have confirmed that there is no change to this assumption at this point*."

88.     Defendants continued to issue such reassuring statements throughout the Class Period.  For instance, on the Company's July 21, 2016 earnings call, Defendants once again downplayed any revenue collection issues the Company was having.  Fielding stated, for example, that McKesson was having "growing pains" and "some transition issues," and is "working quickly to optimize their systems and adjust their staffing levels."  Critically, Adeptus continued to report what analysts characterized as *"significantly" improving* bad debt reserves: 16.4% of patient service revenue for the quarter – declining from 20.3% the previous quarter and 16.8% year-over-year.  The improving bad debt reserves led investors to believe that Adeptus would continue to collect revenue at a promising rate, notwithstanding any increase in DSO, which was simply "growing pains" associated with the McKesson transition.  Moreover, as discussed above, Adeptus's Form 10-Q for the second quarter of 2016 included certifications from Hall and Fielding assuring investors that there were no material weaknesses in Adeptus's internal controls, other than the technical deficiency described above.  Finally, the Company signaled that its financial condition was fundamentally sound, falsely stating that July patient volumes are "about where we expected to be or maybe a little bit above," when in fact, and unbeknownst to investors, volumes were only continuing to decline.

89.     Again, analysts were comforted by Defendants' statements.  In a July 22, 2016 report, for example, JMP analysts cited the Company's reported improving bad debt as providing reassurances about Adeptus's cash flow:  "ADPT stated that the third-party collection service recently implemented has helped and could add upside to our estimates . . . . Bad debt expense was 16.4% of gross revenues versus our estimate of 20.1%, which finally breaks the trend of rising bad debt."

90.     The foregoing statements, and others like them, were misleading because they failed to disclose far more grievous internal control deficiencies relating to Adeptus's revenue cycle management process that prevented the Company from collecting reimbursement from payers.  Indeed, Adeptus has now admitted in its bankruptcy filings that "[a]fter retaining McKesson in [October] 2015, [Adeptus's] management learned that *key aspects of its revenue cycle management process were not being performed*," which prevented the Company from collecting receivables.  In other words, Adeptus management knew, but failed to disclose, that the Company's rising DSO was not the product of mere "growing pains" or transitional issues that had already been fixed, it was a symptom of significant, highly material deficiencies in "key" Company controls.  Moreover, Defendants failed to properly account for this gaping hole in its revenue process by increasing Adeptus's bad debt reserves as required by GAAP, thus overstating the Company's net patient service revenue and earnings.  Instead, Defendants continued to report *improvements* in the Company's bad debt, leading investors to believe that Adeptus's ability to collect revenue was not impaired despite rising DSO.

91.     As discussed further below, Adeptus has admitted in post-Class Period bankruptcy filings that these undisclosed material weaknesses resulted in a "significant loss of revenue" and the Company "*will need to write off uncollectible receivables in excess of $27.0 million* related

to accounts receivable from 2015 and 2016," and further disclosed that the JVs "have written off approximately **$54.9 million** in accounts receivable from 2015 and 2016" as a result of these undisclosed control weaknesses.

> **D.      As Adeptus's Stock Soars, Sterling And Other Insiders Sell Off Their Holdings, Reaping Hundreds Of Millions Of Dollars**

92.      Over the Class Period, the price of Adeptus stock soared as a result of Defendants' misstatements and omissions.  Sterling and the Executive Defendants took advantage of Adeptus's inflated stock price to sell hundreds of millions of dollars' worth of their holdings.  Tellingly, as Adeptus's liquidity and cash flow problems began to intensify, Sterling and the Executive Defendants accelerated the volume of their sales.

93.      During the Class Period, Sterling *sold off 78% of its holdings* – 8,141,789 shares – of Adeptus stock, for proceeds of more than **$606.8 million**.  Specifically, Sterling sold stock through the following public offerings:

**Sterling's Insider Sales**

| Offering | Shares Sold | Proceeds | Percent of Holdings |
|----------|-------------|----------|---------------------|
| IPO | 735,000 shares | $16,170,000 | 7% |
| May 2015 Offering | 1,975,179 shares | $125,917,661 | 20% |
| July 2015 Offering | 2,976,374 shares | $312,519,270 | 38% |
| June 2016 Offering | 2,455,236 shares | $152,224,632 | 51% |

94.      During the Class Period, Hall *sold off 71% of his holdings* – 591,208 shares – of Adeptus stock, for proceeds of more than **$48.3 million**.  Specifically, Hall sold stock through the following public offerings:

**Hall's Insider Sales**

| Offering | Shares Sold | Proceeds | Percent of Holdings |
|---|---|---|---|
| May 2015 Offering | 114,000 shares | $7,267,500 | 15% |
| July 2015 Offering | 268,116 shares | $28,152,180 | 40% |
| June 2016 Offering | 209,092 shares | $12,963,704 | 51% |

95.     During the Class Period, Fielding *sold off 66% of his holdings* – 83,528 shares –
of Adeptus stock, for proceeds of more than *$7 million*.  Specifically, Fielding sold stock through
the following public offerings:

**Fielding's Insider Sales**

| Offering | Shares Sold | Proceeds | Percent of Holdings |
|---|---|---|---|
| May 2015 Offering | 18,000 shares | $1,147,500 | 15% |
| July 2015 Offering | 42,080 shares | $4,418,400 | 41% |
| June 2016 Offering | 23,448 shares | $1,453,776 | 37% |

96.     During the Class Period, Cherrington *sold off 69% of his holdings* – 133,615 shares
– of Adeptus stock, for proceeds of more than *$11.1 million*.  Specifically, Cherrington sold stock
through the following public offerings:

**Cherrington's Insider Sales**

| Offering | Shares Sold | Proceeds | Percent of Holdings |
|---|---|---|---|
| May 2015 Offering | 20,000 shares | $1,275,000 | 12% |
| July 2015 Offering | 66,443 shares | $6,976,515 | 44% |
| June 2016 Offering | 47,172 shares | $2,924,664 | 50% |

E.       **The Truth Slowly Emerges**

97.      The truth about the impact of Adeptus's overbilling of low-acuity patients, financing 100% of its JVs' working capital and operating losses, and significant control deficiencies in the Company's revenue management processes were revealed to the market gradually over a series of disclosures, as discussed below.

1.       **An Investigative Report Reveals That Adeptus Overbills Patients For Low-Acuity Conditions**

98.      On November 17, 2015, KUSA aired a report, titled "BuyER Beware," detailing the findings of its months' long investigation into Adeptus's FERs, which revealed the Company's practice of overbilling low-acuity patients.  For example, one patient was charged $3,690 for removal of a splinter.  Another patient who visited an Adeptus FER for shortness of breath was sent home and told that she "needed to relax"; she received a bill for $6,237.  Yet another patient was charged more than $3,000 for the removal of a few stitches for a cut finger.  The report showed that these low-acuity patients and others received bills padded with, among other things, astronomical facility fees, which ranged from $700 to more than $6,200 for a single visit.

99.      The report also included an interview with Dr. Richard Zane, who helped spearhead the Colorado JV.  Astonishingly, Dr. Zane did ***not*** claim that the overbilling of low-acuity patients was an anomaly at Adeptus FERs; instead, he defended the billing practices as in line with routine practice at emergency rooms.

100.     The report further published a statement from Anthem Blue Cross/Blue Shield of Colorado estimating that 60 to 70 percent of their customers who go to freestanding emergency rooms have conditions that could be treated in urgent care.  As discussed above, these data showed that, while the average cost to treat these low-acuity conditions at an urgent care center is

approximately $200, a FER, including Adeptus's FERs, charges nearly $2,300 – *ten times as much* – to treat those same conditions.

101.    In response to KUSA's "BuyER Beware" report, Adeptus stock fell by more than 22% on heavy trading volume, from $59.87 per share to $46.50 per share on November 17, 2015.

102.    Defendants, however, continued to issue misleading statements in the wake of the KUSA report in a successful effort to soothe the market's concern about Adeptus's overbilling of low-acuity patients.  For instance, at the December 1, 2015 Piper Jaffray Healthcare Conference, Hall reiterated that *93% of Adeptus patients were high-acuity*, and, referencing the KUSA report directly, assured investors that Adeptus was "*not seeing a lot of splinter patients, okay.  No.*"

### 2.    Defendants Hall And Fielding Suddenly Depart Adeptus

103.    On July 28, 2016, Adeptus unexpectedly announced that Fielding would leave the Company and that an outsider, Frank Williams, would replace him as CFO.  Fielding's departure came just six weeks after the June 2016 Offering and just one week after the Company had reassured investors about Adeptus's financial condition, including by reporting improving bad debt reserves, on the Company's second quarter earnings call.

104.    The market was surprised by Fielding's sudden departure, and understood that it signaled that the Company's financial condition was more precarious than had been previously disclosed and, in particular, that the "cornerstone" of the Company's plan for growth – the JV strategy – was not having the positive impact the Company had claimed.  In response to this news Adeptus stock fell 3%, from $47.11 to $45.52, on heavy trading volume, that same day.

105.    Then, on September 7, 2016, Adeptus shocked investors by announcing that Hall would also be leaving the Company.  Again, this disclosure partially revealed to investors that the Company's financial condition was more precarious than had been previously disclosed and the JV strategy that Hall had championed throughout the Class Period was not panning out.  In a report

38

issued that same day, for instance, Avondale analysts noted, "This comes just over a month after the announcement of a new CFO.  Needless to say, the timing is less than ideal and leads to uncertainties surrounding the model."  On the news that yet another top executive would be unexpectedly departing from Adeptus, the Company's stock fell by more than 14%, from $42.25 per share to $35.70.  As discussed below, Adeptus later decided to "accelerate" Hall's departure to November 8, 2016 due to "challenges" at the Company.

106.    At the same time, however, Defendants continued to issue false statements that mollified investors.  For instance, at the September 12, 2016 Morgan Stanley Global Healthcare Conference, Hall assured investors that neither his departure nor Fielding's signaled financial or operations difficulties at Adeptus:  "It had nothing to do with some of the receivables questions [*i.e.*, about Adeptus's ability to collect revenue] that we get and all that . . . . [I]t's not a function of, oh, something awful happened and they have a new CFO.  It's just the opposite."

107.    Analysts echoed these reassuring statements.  For instance, Stephens analysts, in a July 28, 2016 report, stated, "While an unexpected change in the CFO role is cause for concern, we think the move is ultimately in the best interest for the longer-term health of the company."  Likewise, KeyBanc analysts noted in a September 7, 2016 report that while "the magnitude of the [decline in Adeptus stock in response to Hall's departure] is an understandable capitulation . . . the most likely risks have been priced in and we believe that the Company maintains a very positive [long-term] growth outlook."

### 3.    After Delaying Third Quarter 2016 Results, Adeptus Discloses That It Is Facing A Liquidity Crisis

108.    Adeptus was originally scheduled to release its third quarter 2016 earnings prior to the opening of the market on November 1, 2016.  Prior to the market open on November 1, however, Adeptus announced that it would delay the release of its third quarter earnings until after

the close of the market that day, and likewise postponed its scheduled 10:00 a.m. conference call
to 5:00 p.m.  Investors anticipated that the revenue collection issues Defendants had previously
downplayed to investors were, in truth, far graver than they had been led to believe, and, as a result,
Adeptus's stock price began to decline.

109.    After the close of the market on November 1, 2016, Adeptus held its third quarter
earnings call.  On that call, Adeptus management disclosed that the Company was facing a stark
liquidity crisis, and that Adeptus had been forced to seek $57.5 million in "incremental financing
to bolster the [C]ompany's liquidity position."

110.    Adeptus management further disclosed, for the first time, that, contrary to
Defendants' prior statements, the Company had paid *100% of the working capital and operating
losses for its JVs*.  Adeptus management blamed these massive outlays for the Company's dire
liquidity problems.   Specifically, Williams, Adeptus's new CFO, stated, "Historically *the
company has funded 100% of the working capital needs [of] the JV partnerships*.  Going forward
we expect to work with our JV partners to help alleviate this impact on our capital resources."  As
Williams further explained, Adeptus "experienced a continued drain of cash caused by funding
working capital needs in both our owned and JV facilities."  Tellingly, Williams also conceded
that Adeptus had not been forthright with investors, citing a "need" at the Company "to deliver
more transparent information and results."

111.    Scott, Hall's replacement as Chairman of the Adeptus Board, echoed Williams'
statements that the Company's financing of 100% of the JVs' working capital and operating losses
drained the Company's cash and dragged down its earnings in prior quarters, leading to the crisis
that it then faced.  For example, Scott stated that Adeptus's status as "*the sole capital source to
these JVs*" was "*not a position that we should be in*," and re-emphasized that "we cannot be the

sole supplier of capital to these joint venture entities."  Scott also conceded that the Company was now "*focused clearly on enhancing our transparency in working with investors going forward*."

112.     Adeptus management also disclosed that the Company's inability to collect reimbursement from payers precipitated the liquidity crisis.  In its November 1, 2016 third quarter earnings press release, Adeptus stated that "collection issues associated with our third party billing agent" contributed to the Company's troubling financial condition.  On the Company's earnings call that same day, Williams elaborated, "As evidenced by the rising DSO, the transition to McKesson has clearly not gone as planned, and that is unacceptable.  We have taken steps to remedy the situation by adding additional internal and external resources to help bring down our DSO and shorten our revenue and cash conversion cycle."

113.     Adeptus told investors that, as a result of these strains on its liquidity, the Company had only $6.1 million in cash and $15.8 million under its credit facility, as of the end of the third quarter.  The Company's liquidity crisis had forced it to engage Goldman Sachs to explore "various financing alternatives to achieve . . . a comprehensive refinancing that provides us with additional financial flexibility."

114.     Investors and analysts were stunned by Adeptus's disclosures.  For example, in a November 2, 2016 report, Stephens analysts downgraded Adeptus stock given the "Lack of Visibility Coupled With Liquidity/Credibility Issues."  In a section of that report entitled "Where did this go wrong?," these analysts reported that "one of the key drains on cash was working capital needs, which ADPT finances 100% for their JV partners," and noted that the JVs' hospitals "are an expense drag on results as they generate pre-opening losses of ~$1.5 million."  Moreover, the Stephens analysts concluded that Defendants must have known about Adeptus's deteriorating financial condition when they sold their shares in the June 2016 Offering.  In a rare rebuke, these

41

analysts stated that "***credibility is tainted given that management/Sterling were selling shares in late May just in advance of a weak 2Q16 which included a very weak June***.  Further, the Company [falsely] indicated on the 2Q call that July volumes were 'about where we expected to be or maybe a little bit above.'"

115.    In response to Adeptus's November 1, 2016 disclosures, Adeptus stock plummeted over 71%, from $30.12 per share at the close of trading on October 31, 2016 to $8.60 per share at the close of the market on November 2, 2016, on extremely high volume.

116.    Nevertheless, Defendants continued to conceal the complete truth about Adeptus's financial condition from investors, including the fact that there were material weaknesses in the Company's internal controls over revenue cycle management – a fact known to Defendants for at least an entire year.  Moreover, on the Company's November 1, 2016 earnings call, Hall continued to reassure investors that management had "a solid grasp on the issues and an achievable plan for overcoming the challenges we are facing."  In addition, Adeptus continued to report improving bad debt – down by 50% from the prior quarter – which gave the market comfort that Defendants would ultimately be able to collect the revenue they reported.

117.    Then, on December 2, 2016, Adeptus fired COO Cherrington, yet another highly placed Adeptus executive whom analysts noted had a "long working relationship with the Company's former CEO [Hall]."  In particular, Cherrington was instrumental in implementing Adeptus's JV strategy.  As analysts stated, "Cherrington was a key person in developing the relationships with the multiple JV partners and sat on the boards of those partnerships."

### 4. Adeptus Discloses Additional Internal Control Failures And Announces That It Expects To Write Down Millions Of Dollars In Previously Reported Assets

118.    On March 2, 2017, the truth about Adeptus's financial condition fully emerged when the Company filed a Form 12b-25, notifying investors that it would delay the filing of its

2016 Form 10-K.  In this Form 12b-25, Adeptus admitted that the Company may need to record hundreds of millions in write-downs in order to correct previously reported financial results and acknowledged that fundamental weaknesses in the Company's internal controls contributed to the Company's liquidity crisis.  Adeptus stated, in pertinent part:

> The Company's delay in filing the Annual Report is due principally to the additional time the Company requires to complete its analysis of impairment of goodwill, intangible assets and investments in unconsolidated subsidiaries and evaluation of the need to write down its deferred tax assets.
>
> *         *         *
>
> In addition, the Company has ***identified material weaknesses with respect to internal control over financial reporting in the areas of revenue recognition, accounts receivable, accounting for a contribution to an unconsolidated joint venture, and accounting for equity in (loss) earnings of unconsolidated joint ventures***.  Related to these areas where material weaknesses have been identified, the Company is evaluating the effect of errors in its condensed consolidated financial statements and consolidated financial statements for prior periods.  An analysis of root causes and remediation plans are still in process.  Also, ***there is substantial doubt about the Company's ability to continue as a going concern absent its securing committed long-term financing***.

119.    In particular, Adeptus disclosed that it anticipated, among other things, taking "a $160 - $200 million non-cash charge for impairment of goodwill, intangible assets and investments in unconsolidated subsidiaries"; "a $27 million charge related to the write-off of uncollectible receivables"; and "a $40 million charge related to the impact of writing-off uncollectible receivables for unconsolidated subsidiaries."

120.    In response to this disclosure, the Company's share price declined $3.76, or over 57.5%, from $6.55 at the close on March 1, 2017 to $2.79 at the close of trading on March 2, 2017.

121.    In all, disclosures of the true facts concerning the risks to Adeptus's cash flow and liquidity, including its financing of 100% of the JVs' working capital, its overbilling of low-acuity patients, and its material weaknesses in revenue cycle management, caused massive losses to

43

investors, with Adeptus shares falling *over 95%*, from $59.87 per share at the close of trading on November 16, 2015, to $2.79 per share at the close of trading on March 2, 2017.

**F.      Post-Class Period Developments**

122.      On April 19, 2017, the Company filed a petition for bankruptcy protection under Chapter 11.  As discussed above, in its "first day filings," Adeptus admitted that, contrary to its statements during the Class Period touting the profitability of its Arizona and Texas JVs (as well as the profitability of the model as a whole), all of its JVs, except for the Colorado JV, operated at a loss.

123.      In addition, Defendants admitted that serious deficiencies in its internal control processes over the Company's revenue cycle management led to the Company's liquidity crisis and, ultimately, its bankruptcy.  Again, contrary to Defendants' statements, Adeptus's inability to collect the patient fees it was booking as revenue was not a product of minor "growing pains" and had never been "fixed," as Fielding had reassured investors.  As discussed above, these undisclosed material weaknesses caused the Company to write-down approximately *$82 million* in previously reported revenue.

**VI.     ADDITIONAL ALLEGATIONS THAT DEFENDANTS KNOWINGLY OR RECKLESSLY MISLED INVESTORS REGARDING ADEPTUS'S TRUE FINANCIAL CONDITION**

124.      Numerous allegations set forth above and summarized below give rise to the strong inference that Defendants knowingly or at least recklessly misled investors about Adeptus's financial condition, including liquidity and cash flow, Adeptus's funding of 100% of the JVs' working capital, the profitability of the JVs, Adeptus's practice of overbilling of low-acuity patients, and material weaknesses in Adeptus's controls over revenue cycle management.  These allegations include the following:

125.   **_First_**, Adeptus has now admitted that since at least October 2015, its senior management knew there were significant deficiencies in the Company's controls over revenue cycle management.  Specifically, in its "first day" bankruptcy filings, Adeptus admitted, "After retaining McKesson in [October] 2015, [Adeptus's] **_management learned that key aspects of its revenue cycle management process were not being performed_**," which prevented the Company from collecting receivables.  In other words, Adeptus admitted that even as its management assured investors that the Company had only a single technical internal control deficiency, that the Company's rising DSO was the product of mere "growing pains" with McKesson that had already been fixed, and that bad debt was **_improving_**, Adeptus's "management" knew these statements were misleading because there were significant, highly material deficiencies in "key" Company controls that were resulting in denied claims, "short" payments, and, ultimately, significant loss of revenue.  In short, Adeptus has admitted that its "management" was aware of facts rendering Defendants' statements misleading – an admission which more than adequately demonstrates Adeptus's scienter (and therefore the liability of its controlling persons, including Sterling) and that the Executive Defendants acted with either knowledge or, at minimum, severe recklessness.

126.   **_Second_**, that Defendants' false and misleading statements concerned the most significant events, initiatives, and issues in Adeptus's business, including its key JV growth strategy; its revenues, billing and collection practices; and its internal controls.  These issues were the subject of countless analyst questions and discussions that dominated Adeptus's earnings calls and investor conferences during the Class Period, which supports an inference that Defendants' misstatements were made knowingly or at least recklessly.  With respect to Defendants' misstatements concerning Adeptus's JVs, Defendants frequently touted the JV strategy as the fundamental blueprint for all Adeptus's future business and the "cornerstone" of Adeptus's

growth.  Indeed, Hall told investors that "the more of these JVs that we can announce with these premier systems, the more we become the gold standard," that "on a go forward basis" Adeptus would "really transform our model" to fit the JV strategy, that the JV strategy was "the path that we need to go down," that the model was "central to the Company's business strategy," that it would be the key to establishing "hundreds and hundreds" of FERs across the country, and that, ultimately, "it wouldn't be inconceivable that five years from now we have few if any facilities" that are not part of a JV.  Further underscoring the significance of this issue, analysts asked questions about the JV model – and its impact on Adeptus's margins, earnings, and capital expenditures – on every earnings call and at every investor conference during the Class Period, including questions on multiple occasions specifically inquiring about the extent to which costs were shared among JV partners.  Given the importance of the JVs to Adeptus, Defendants knew or, at a minimum, were reckless in not knowing that Adeptus was funding 100% of the JVs' working capital and operating losses (a highly material term in the JV agreement), and that all of the JVs, with the exception of the Colorado JV, were operating at a loss.

127.    The subject of Adeptus's patient acuity was also a topic that received outsized attention from Adeptus management, including Hall and Fielding, and from analysts, and was discussed in nearly all of Adeptus's filings, earnings calls, and investor conferences during the Class Period.  Hall and Fielding repeatedly told investors that patient acuity was a foremost concern for the Company's management, that management spent "*a lot of time and energy* making sure that we are not an urgent care," and acknowledged that patient acuity was a critical issue for Adeptus because "*it is really important with our relationship with our payers*."  Indeed, the issue of patient acuity only became more critical after November 2015 when KUSA aired its

46

investigative report concerning Adeptus's overbilling of low-acuity patients, as analysts were now specifically asking Hall and Fielding to refute the report's allegations.

128.    Finally, Adeptus's internal control weaknesses were also a critical issue for the Company.  As noted above, Adeptus has admitted its management was specifically aware of the significant deficiencies in its revenue cycle management controls since October 2015.  Even putting this admission aside, the state of the Company's internal controls (which Defendants Hall and Fielding certified they personally reviewed every quarter), its transition of revenue collection to McKesson, and the symptoms of these undisclosed control weaknesses, including rising DSO, were all subjects of frequent management commentary and investor concern, as discussed in detail above and below.  Moreover, Adeptus has admitted that the undisclosed control weaknesses related to "***key aspects*** of the Company's revenue cycle management process," not arcane or tertiary elements of the Company's internal controls.

129.    Accordingly, Defendants' misstatements concerning these critically important subjects, at a time when they were the focus of immense investor attention and concern, supports an inference of severe recklessness at a minimum.

130.    ***Third***, and relatedly, Defendants' statements during the Class Period make clear that they were deeply involved with, and closely monitored, the subject of their misstatements about the JVs, patient acuity, and Adeptus's internal control weaknesses, and, thus, further support an inference of scienter.  As set forth above and below, on numerous earnings calls and at investor conferences, Hall and Fielding frequently described the details of each of Adeptus's JV agreements, touted the favorable aspects of those agreements – such as Adeptus's earnings preference (where applicable) and management and staffing fees – and even highlighted differences and similarities among the several agreements.  Moreover, Hall and Fielding told

investors that their statements about the JVs were informed by their personal review of the JVs' performance; for instance, Hall stated, "***I am just sitting here looking at it right now***, [the Arizona JV facilities] are absolutely performing at the level we told you before, or above."  Consistent with their individual monitoring of the JVs' performance, Hall and Fielding responded to analyst questions with detailed and specific information about that performance; for instance, in response to one analyst question, Hall purported to recite patient volume figures not just for the Arizona JV in aggregate, but for individual facilities within the JV, stating, the JV was "seeing over 20 patients a day . . . . I will tell you that we have days in the Phoenix market . . . where we may see over 50 or 60 patients a day in one of our facilities."  Hall's and Fielding's detailed knowledge of the JVs' operations is also consistent with Adeptus's statements in its SEC filings that "[t]he Company has contracts to manage [the JVs'] facilities, which results in the Company having an active role in the operations of these facilities and devoting a significant portion of its corporate resources to the fulfillment of these management responsibilities."

131.    Likewise, Defendants repeatedly told investors that they were personally focused on Adeptus's acuity, stating that management devoted "a lot of time and energy making sure that we are not an urgent care," because "it is really important with our relationship with our payers." Again, in response to analyst questions, Hall and Fielding gave detailed, data-laden responses about Adeptus's acuity rates.  For instance, in response to analyst questions, Hall repeatedly told investors that 93% of Adeptus's patients had an acuity level of three or greater; Hall stated that "our typical patient today is about a 3.6 or 3.7" and Fielding immediately clarified "3.7"; Hall additionally told investors, "And at level 4 -- level 3 is like 46% of our patients. Level 4s are 30% of our patients . . . . And then a level 5 [makes up] . . . 17% of our patients."  These detailed

responses to analyst questions demonstrate that Hall and Fielding represented to investors that they were intimately familiar with Adeptus's acuity data.

132.    Similarly, Defendants assured investors that they were personally monitoring Adeptus's internal controls.  As discussed above, Hall and Fielding signed SOX certifications appended to each of Adeptus's periodic reports filed with the SEC that they, along with management, personally "evaluated the effectiveness" of Adeptus's internal controls.  Further, Hall and Fielding assured investors that they were carefully watching Adeptus's DSO, and Fielding, on the Company's second quarter 2016 earnings call, stated that he was personally "going out there" to "sit down" with McKesson.

133.    Yet, while Hall and Fielding were making these assurances to investors about their roles in personally overseeing these critical areas of Adeptus's business, they issued a host of materially false and misleading statements.  Thus, either Hall and Fielding possessed the detailed personal knowledge concerning Adeptus's JVs, acuity levels, and internal controls they claimed to have, in which case they knew their statements on those subjects were false and misleading, or they lacked the knowledge they claimed to have, in which case their repeated statements on those subjects were severely reckless.

134.    **Fourth**, the magnitude of Defendants' misstatements and the duration of the fraud both further support an inference of scienter.  Many of Defendants misstatements concerning the JVs, for instance, were utterly false, and, thus, there could be no doubt about their propensity to mislead.  For example, when asked about whether Adeptus shared preopening costs with its JV partners, Fielding stated, "we do share the pre-opening with our partner."  The exact converse of Fielding's statement, however, was true:  Adeptus did ***not*** "share" preopening costs with its JV partners, but funded all of those costs by itself.  Similarly, Defendants repeatedly touted the JVs

profitability, stating consistently throughout the Class Period that the Arizona JV, for example, "made money for Adeptus Health in Q4 [2015]," was "doing extremely well," was "performing at the level we told you before, or above," and was seeing "over 20 patients a day" on average, and at times "over 50 or 60"; in truth, however, the JV was *operating at loss*.  The egregiousness of these misstatements supports the inference that Defendants intended to mislead investors.  In addition, Defendants misstated the JVs' performance, understated the risks of the JV model, made false statements about Adeptus's billing practices (even in the face of investigative reports impugning those practices), and hid severe internal control deficiencies (even in the face of rising DSO) for *years*.  This fact supports the inference that, at a minimum, Defendants' failure, for years on end, to discover the falsity of their statements about the most significant issues affecting Adeptus was utterly reckless.

135.    *Fifth*, as set forth in Section V.D., above, in less than two years, the Sterling and Executive Defendants sold significant quantities of Adeptus stock at frequent intervals during the Class Period, reaping well over half a billion dollars, with those sales peaking just before the truth began to emerge.  As discussed above, Sterling, for instance, sold off *78% of its Adeptus holdings, reaping $607 million*; Hall dumped *71% of his holdings, for proceeds of more than $48 million*; Fielding sold *66% of his holdings, with proceeds exceeding $7 million*; and Cherrington sold off *69% of his holdings, while reaping more than $11 million*.  Moreover, as Adeptus's liquidity problems began to intensify, the Executive and Sterling Defendants accelerated the volume of their sales.  For instance, while Sterling sold 7% of its holdings in the IPO (735,000 shares), it sold *38% of its holdings* – nearly three million shares – in the July 2015 Offering and *51% of its holdings* – nearly 2.5 million shares – in the June 2016 Offering.  Notably, as the truth began to emerge, analysts, in a rare rebuke, specifically pointed out the suspiciousness of the Executive Defendants'

sales, stating that they must have known about Adeptus's deteriorating financial condition when they sold shares in the June 2016 Offering.  These analysts stated that Adeptus management's "credibility is tainted give that management/Sterling were selling shares in late May just in advance of a weak 2Q16 which included a very weak June."  Accordingly, Defendants' insider sales further bolster the inference of scienter here.

136.   *Sixth*, that all of the Executive Defendants suddenly departed Adeptus within months of each other and just as the truth about the Company was emerging also supports an inference of scienter.  As discussed above, Hall and Fielding suddenly left Adeptus just after dumping their Adeptus shares in the June 2016 Offering (having both sold significant amounts of stock in *two* offerings the previous year) and just weeks before Adeptus disclosed that it was facing a liquidity crisis.  Cherrington, who likewise dumped significant quantities of Adeptus stock throughout the Class Period (including in the June 2016 Offering) was suddenly terminated in December 2016, after the Company brought in new management to replace Hall and Fielding. There was no indication that any of these departures was part of an orderly succession plan.  To the contrary, even when the Company announced Hall's departure, it was still scrambling to find a replacement, and, on November 8, 2016, the Company "accelerated" Hall's departure because of the "recent challenges at the Company."  Likewise, the Company acknowledged that Cherrington's departure was involuntary.  Analysts noted the suspiciousness of Hall's and Fielding's sudden departures, reporting, "This comes just over a month after the announcement of a new CFO.  Needless to say, the timing is less than ideal and leads to uncertainties surrounding the model."

## VII.   ADDITIONAL ALLEGATIONS OF STERLING'S CONTROL OVER ADEPTUS

137.   In addition to the facts detailed above in ¶¶43-49, Sterling's Stockholder Agreement gave it the following rights to control the Company:

- **Board of Directors**.  Sterling has the right to nominate members of Adeptus's board (with the number of nominees determined by Sterling's share ownership), cause Adeptus to recommend and solicit proxies in favor of Sterling's nominees, cause Adeptus to vote for Sterling's nominees, and prevents Adeptus from voting to remove any Sterling-nominated directors other than for cause.

- **Board Committees**.  Sterling has the right to designate a majority of the members of the Board's Corporate Governance Committee and Nominating Committee, and up to two members of any Compensation Committee, as long as it owns 35% of Adeptus's voting securities.

- **Consent Rights With Respect to Major Company Decisions**.  Sterling's approval is required to (1) hire or fire the CEO; (2) consummate a "change in control" (defined broadly to include certain changes in composition of Adeptus's Board); (3) consummate acquisitions or divestitures in excess of $50 million; and (4) issue equity securities (whether by Adeptus or any subsidiary) in excess of $50 million, as long as it owns 35% of Adeptus's voting securities.

- **Access to Non-Public Information**.  So long as Sterling maintains ownership of just 5% of Adeptus's voting stock, it is guaranteed sweeping access to non-public Company information, including (1) direct access to the Company's auditors and officers; (2) the ability to link Sterling's systems into the Company's "general ledger and other systems" to retrieve data on a "real-time basis"; (3) quarter end reports; (4) copies of all materials provided to the Board at the same time they are provided to the Board; (5) access to officers and Directors for consultation about Adeptus's affairs; (6) advance information concerning, and the right to consult with the Company about "any significant corporate actions, including, without limitation, extraordinary dividends, mergers, acquisitions or dispositions of assets, issuances of significant amounts of debt or equity and material amendments to the certificate of incorporation or bylaws"; (7) flash data after the end of each quarter; and (8) operating and capital expenditure budgets and periodic information packages relating to Adeptus's operations and cash flows.

- **Input Into Day-to-Day Company Management**.  In connection with Sterling's right to consult with Adeptus's officers and directors about Adeptus's affairs, Adeptus must "consider, in good faith, the recommendations of the Sterling Entities."

- **Right to Appropriate Non-public Company Information for Sterling's Benefit**.  The Stockholders Agreement gives Sterling the right to receive from Sterling-affiliated directors non-public information they received in their capacity as directors.  The Stockholders Agreement explicitly provides that these directors may provide the information to Sterling not only for the purpose of enabling them to perform their duties to Adeptus, but also to enable Sterling, "as equityholders, to better evaluate the Company's performance and prospects," *i.e.,* to make interested decisions about its investment in Adeptus.

138.    In the IPO Offering documents filed with the SEC, Adeptus acknowledged that Sterling would continue to exercise significant control over the Company after it went public.  In its June 24, 2014 prospectus, Adeptus, characterizing Sterling as the Company's "Sponsor," stated:

> **We rely on our private equity sponsor whose interests may differ from yours and who <u>has the ability to control us</u>**.
>
> We have in recent years **depended on our relationship with our Sponsor** to help guide our business plan . . . [whose] expertise has been available to us through the representatives our Sponsor has had on our board of directors and as a result of our Advisory Services Agreement with an affiliate of our Sponsor.  Pursuant to the stockholders' agreement to be executed in connection with the closing of this offering, **representatives of our Sponsor will have the ability to appoint a majority of the seats on our board of directors**.  In addition, after the consummation of this offering, our Sponsor will beneficially own in the aggregate, approximately 51.1% (or 47.5% if the underwriters exercise in full their option to purchase additional shares of Class A common stock) of the voting interest in Adeptus Health Inc.  **As a result of its ownership, our Sponsor may have the ability to control the outcome of matters submitted to a vote of stockholders and, through our board of directors, the ability to control decision-making with respect to our business direction and policies**.

139.    In that same June 24, 2014 prospectus, and in later SEC filings during the Class Period, including Adeptus's annual reports on Form 10-K, Adeptus acknowledged, "Our Sponsor [Sterling] **will continue to have significant influence over us after this offering**, including in connection with decisions that require the approval of stockholders, which could limit your ability to influence the outcome of key transactions, including a change of control."

140.    Sterling exercised its ability to control Adeptus after its IPO, including by ensuring that its handpicked management team – including Defendants Hall, Fielding and Cherrington – remained in place, and by appointing a majority, if not all the Company's directors.  These directors included Defendants Rosenberg, Hall, Daniel Hosler (a Principal of Sterling during the Class Period); Steven Napolitano (who served as outside legal counsel to Sterling); Gregory Scott, Ronald Taylor, and Jeffrey Vender.

141.    Prior to the IPO, Sterling had also procured a Registration Rights Agreement from Adeptus, which gave Sterling the right to cause Adeptus to register, at the Company's expense, shares of its common stock Sterling received.  Sterling exercised this right and caused Adeptus to register its securities and offer them to the public in connection with each of the Offerings held during the Class Period.  Sterling signed the registration statements pursuant to which these offerings were conducted through its representatives on Adeptus's Board.

## VIII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

142.    During the Class Period, Defendants made a host of materially false and misleading statements and omissions during Adeptus's conference calls with investors and in the Company's SEC filings and press releases.  Defendants' false and misleading statements and omissions generally fall into four categories: (1) misleading statements touting the high acuity level of Adeptus's patients and the concomitant high rate of reimbursement Adeptus received for treating those patients, while failing to disclose Adeptus's widespread practice of overbilling of low-acuity patients and that practice's negative effect on payer reimbursement and thus cash flow; (2) misleading statements touting the economic benefits of the JV model, including its positive impact on earnings and margins, as well as statements that Adeptus shared costs and losses with JV partners, while omitting that Adeptus financed 100% of the JVs' working capital and operating losses; (3) misleading statements reassuring investors that Adeptus had no material weakness in its internal controls, apart from a highly technical and innocuous one, and that any rise in DSO following McKesson's retention was simply a product of the vendor's "growing pains" that had essentially been "fixed" in the first quarter of 2016 and would not impair Adeptus's ability to collect revenue, while omitting that Adeptus had grave material weaknesses in its controls over revenue cycle management that significantly impaired the Company's ability to collect revenue;

and (4) misleading statements purporting to accurately report Adeptus's financial results, including revenue, earnings, and bad debt, but failing to properly account for Adeptus's inability to collect revenue as a result of its overbilling of low-acuity patients and material weaknesses in its revenue cycle management in accordance with GAAP.

### A. Defendants' False And Misleading Statements Concerning The JVs And The JV Strategy

#### 1. Adeptus's Third Quarter 2014 Earnings Call

143.    On October 29, 2014, Adeptus held its third quarter 2014 earnings conference call with investors.  On that call, Defendants touted the economic benefits of Adeptus's JV strategy, and, in particular, the strategy's positive impact on earnings and margins.  Hall stated, "From an investor perspective, we think that the economics will be *better than what our economics are on our standalone First Choice*, and then we also think what it does is opens up a lot of new markets for us. As we grow, many people have seen as I come from the surgery center world, you saw people out there that did the JVs in the surgery center world, and it worked really, really well for them. *We will do the same thing* . . . . *Net/Net, it is a huge positive for us*."  Hall further stated, "The joint venture model will allow us *flexibility in the way we grow*, so that in addition to expanding our First Choice Emergency Room network, we are able to create strategic partnerships that help us bring quality emergency medical care to underserved markets across the country."

144.    Likewise, Defendants assured investors that there was no meaningful drag on the Company's earnings or cash flow associated with the JV model, that the picture of the Company's capital expenditures and costs remained the same under the JV model, and that the Company's facilities continued to achieve cash flow positivity very rapidly.  A Deutsche Bank analyst asked Defendants to "frame for us the amount of earnings or EBITDA that was suppressed because of how quickly you were able to open some in the latter half of the quarter?"  Fielding replied, "we

have gone back and looked at the new facility openings, and ***they are tracking what we have modeled*** in terms of [how] these things ramp. I would refer back to the model, because ***that's what we are seeing with the new facility openings***."

145.    Similarly, a Dougherty & Company analyst asked Defendants whether the Company was "continuing to achieve break even at a ***very rapid pace*** [with] these new openings." Fielding answered, "We said all along that they are cash flow positive in three months, and that's what we continue to see.  After they have ramped they tend to be in the range of $1 million to $2 million of facility EBITDA."

146.    These statements were materially false and misleading when made.  It was misleading for Defendants to state that the economics of the JV model were "better than what our economics are on our standalone First Choice," that Adeptus would follow "the same" model as other healthcare joint ventures, and that the JV model would be "a huge positive" for Adeptus while failing to disclose the significant risks to Adeptus's financial health posed by that model, including that (i) Adeptus was funding 100% of the working capital and operating losses of the JVs; (ii) the JVs were an indefinite drag on the Company's margins, earnings, and cash flow until they became profitable if ever; and (iii) the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.  Likewise, it was misleading for Defendants to state that the JV strategy provided Adeptus with "flexibility in the way we grow" when, in truth, the significant outlay of capital required to implement the JV strategy, coupled with the fact that those costs were not shared with any of the JV partners, severely ***constrained*** Adeptus's liquidity position and its ability to maintain flexibility in its growth plans and left the Company with no extra cash to pursue alternative growth strategies.

147.   For the same reasons, Defendants statement that "the amount of earnings or EBITDA that was suppressed" by the Company's new facilities openings was "tracking with" the Company's historical model and affirming that Adeptus's facilities were continuing to achieve breakeven at "a very rapid pace," and therefore, did not meaningfully pull down earnings and strain the Company's cash, were materially false and misleading when made.  These statements failed to disclose that the JV strategy created new and far more significant strains and stresses on the Company's earnings, margins, and cash flow than its non-HOPD model, and dramatically changed the economics associated with new facility openings because Adeptus was financing 100% of the JVs' working capital and operating losses.

148.   Analysts were encouraged by Defendants' false and misleading statements concerning the JVs, and, as a result of those statements, framed the strategy as a low-risk way for Adeptus to rapidly boost revenue and earnings.  For instance, in an October 29, 2014 report, Piper Jaffray analysts maintained their overweight rating and stated that the JVs would allow Adeptus "to deliver on its growth mission, which will drive *higher EBITDA and earnings over the next 12 months*. . . . Within 3 months, facilities are cash flow positive and reach $1M to $2M EBITDA when they are fully ramped."  In an October 31, 2014 report, Morgan Stanley analysts heralded the JV strategy as a "safer alternative and supportive of long-term growth" that "increases confidence that ADPT can successfully execute its expansion to Arizona," while "mitigat[ing] risks tied to hospital operation and new market entry."  Likewise, JMP Securities analysts issued a December 11, 2014 report rating Adeptus market outperform and stating "it is very important for ADPT to develop JV relationships for its existing FSEDs to enhance admissions, reimbursement*, lower operating costs*, and regulatory risk" and would also "enhance growth and *lower the company's operating risk*."

## 2.    Adeptus's Fourth Quarter And Full-Year 2014 Earnings Call

149.    On February 19, 2015, Adeptus held its fourth quarter and full-year 2014 earnings conference call with investors.  On that call, Defendants made numerous statements assuaging investors' concerns about the strain the JV strategy might have on Adeptus's capital, and, in particular, assured investors that the Company shared these costs with its JV partners.  A Piper Jaffray analyst asked, "with pre-opening expenses with the hospital, do you see maybe a little bit more costs opening up those facilities than you do with the freestanding ER's?"  Hall responded, "With Arizona General, it was our first one, right?  So, we tried to be very careful. This is a long game and so we wanted to make sure we did it right and *I am pleased to tell you it went really well*. That being said, going forward, I expect for us to get better and better at it. *We have more resources now and experience and all of that*."  Fielding further replied, "I would say the hospital is going to be in the $0.75 million range."

150.    Following up on this exchange, a Deutsche Bank analyst specifically asked Defendants, "And to put the $900,000 [in pre-opening costs associated with the Arizona JV hospital] that you are adding back into perspective, does that mean you spent double that amount? So are you bearing all the pre-opening costs or is the partnership bearing that cost? Or did you expend all that before you had the partner?"  Fielding stated that Adeptus shared costs with its JV partners:  "*Yes . . . we do share the pre-opening [costs] with our partner*."

151.    These statements were materially false and misleading when made.  It was misleading for Defendants to state that Adeptus "share[d] the pre-opening [costs] with our [JV] partner[s]," that Adeptus's efforts to minimize the impact of costs associated with the Arizona JV "went really well," and to describe the cost of constructing a JV hospital (without stating that Adeptus, and not the JV, would bear those costs), while failing to disclose that (i) Adeptus did not "share" any costs with its JV partners, but, instead, was funding 100% of the working capital and

operating losses of the JVs; (ii) the JVs were an indefinite drag on the Company's margins, earnings, and cash flow until they became profitable if ever; and (iii) the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.

152.    On that same February 19, 2015 earnings call, Hall assured investors that the fixed-cost nature of the Company's JV model would preserve the high margin character of Adeptus's business:  "[W]e're basically a fixed cost model so once you get above the breakeven even, even at a lower level [of reimbursement], you still – it's profitable for us."

153.    These statements were materially false and misleading when made.  It was misleading for Defendants to assure investors that the fixed-cost nature of the Company's JV model would preserve the high margin character of Adeptus's business, when that model significantly strained Adeptus's margins, earnings, and cash flow because, among other things, Adeptus was funding 100% of the working capital and operating losses of the JVs.

154.    Once again, analysts were encouraged by Defendants' false and misleading statements about the JVs, touting the low-risk, high-margin character of the model.  For instance, in a February 20, 2015 report, Dougherty & Company analysts maintained their buy rating and stated "the really big story here is the hospitals. We think the hospitals will do a lot of good things for ADPT . . . . *This is largely a fixed cost model, so incremental patients with health coverage means incremental revenue which falls heavily to the bottom line*."  Similarly, JMP Securities analysts issued a February 20, 2015 report maintaining their market outperform rating and stating that JVs would "*lower business risk*" for Adeptus.

### 3.    The March 12, 2015 Barclays Healthcare Conference

155.    On March 12, 2015, Hall and Fielding attended Barclays Healthcare Conference on behalf of Adeptus.  At that conference, Hall told investors and analysts that the JV strategy would

yield high operating margins.  Hall stated, the JV model "is a fixed cost business basically. Once you get above our breakeven our marginal costs for patients is about a $100, so even if you are taking a Medicare patient you are getting $500, *that's an 80% margin folks, right*."

156.    This statement was materially false and misleading when made.  It was misleading for Hall to state that the JV model would yield high operating margins of at least 80% (even with respect to Medicare patients), while failing to disclose that, in truth, the JV model significantly strained Adeptus's operating margins because, among other things, it called for Adeptus to fund 100% of the working capital and operating losses of the JVs, and, thus, the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.

157.    Again, analysts echoed Defendants' false and misleading statements.  For instance, Piper Jaffray analysts repeated Defendants characterizations of the JV model as low-risk, high-reward, stating in an April 21, 2015 report, "We do not believe ADPT is giving up meaningful financial or earnings due to this new partnership."

**4.      Adeptus's First Quarter 2015 Earnings Call**

158.    On April 23, 2015, Adeptus held its first quarter 2015 earnings conference call with investors.  On that call, analysts again asked Defendants to clarify the effect Adeptus's investment in the JV strategy would have on the Company's earnings, and, in particular, whether the JVs would hurt the Company's earnings in the period before the facilities ramped up.  Specifically, a Morgan Stanley analyst asked, "[H]ow should we be thinking of the impact to consolidated EBITDA of the 12 JV facilities [in Colorado]?  Will there be a step down at first and then ramp over time as the deal gains traction?"  Fielding responded, "*We will not have a step back on our EBITDA going forward*.  EBITDA should maintain the same as if we were independent this year."

159.    Fielding also touted the financially advantageous aspects of Adeptus's agreements

with its JV partners, assuring investors that Adeptus was capturing the lion's share of the JVs'

economics.  Fielding stated:

> What happened there, as you might imagine, it was fairly complicated to pull this
> joint venture together. What we agreed upon is we agreed upon a water fall . . . .
> How the water fall works is that, this is not a real number so don't quote me on this
> number, for example, if you said the profit was $10 million, what happens on the
> joint venture is we get the first $10 million of earnings . . . . Above that water fall,
> above where we thought we were going to perform this year, then we share that on
> a 50.1[% versus] 49.9[%] basis. Also, we have a management fee much like you've
> seen in the Dignity deal in Arizona, we get paid for managing the business. And we
> are also staffing the business with our national medical professionals which is our
> doctor management group. With this, we're very bullish on this. We are real
> excited.

160.    On that same April 23, 2015 earnings call, Defendants hailed the performance of

the Arizona JV.  Hall stated, "Our joint venture with partner Dignity Health in Arizona. The

hospital has been very well received by the Phoenix community with more than 5,000 patients

being treated in the first quarter. This is above our initial expectations."  Likewise, Cherrington

stated, "Our hospital in Levine is continuing to be very well received in the community.  We are

*seeing good volumes in the emergency room, with acuity what you'd expect at a community-*

*based hospital*."

161.    These statements were materially false and misleading when made.   It was

misleading for Defendants to assure investors that Adeptus would "not have a step back on [its]

EBITDA" as a result of the JV strategy when, in truth, Adeptus was solely responsible for making

the highly significant capital expenditures required to implement the JV strategy, and was

financing 100% of the JVs' working capital and operating losses.  For the same reasons, it was

misleading for Fielding to tout the positive aspects of Adeptus's agreements with its JV partners,

and to assure investors that, as a result of its earnings preference (or "waterfall"), management fee,

and income from staffing, it would receive the lion's share of the JVs' economics, while failing to

disclose the significant risks to Adeptus's financial health posed by those JV agreements, including that (i) Adeptus was funding 100% of the working capital and operating losses of the JVs; (ii) the JVs were an indefinite drag on the Company's margins, earnings, and cash flow until they became profitable if ever; and (iii) the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.  It was likewise misleading for Defendants to tout the success of the Arizona JV, including that it was experiencing "good volumes in the emergency room" with high patient acuity and that its performance was exceeding the Company's expectations, while failing to disclose significant risks to Adeptus's financial health posed by the JV model, and that, indeed, the Arizona JV was actually operating at a loss.

162.    Analysts were encouraged by Defendants' false and misleading statements regarding the performance and economics of the JVs.  For instance, Piper Jaffray analysts issued an April 23, 2015 report, which stated, "The Dignity Health Arizona General Hospital . . . has been well received treating 5,000 patients in Q1, which was better than ADPT's expectations."  In an April 24, 2015 report, Stephens analysts likewise echoed Defendants' statements that not only would the JVs not significantly constrain Adeptus's capital, the strategy would actually allow the Company to deleverage and would be "accretive" to cash flow:  "***From a cash flow perspective***, giving up 50% economics in the business ***is still more accretive to the Company (and its shareholders)***. . . .  [M]anagement expects to be cash flow positive by year end with some modest ***de-leveraging***."  JMP Securities analysts likewise issued an April 27, 2015 report characterizing the JV model as "lower risk."  Finally, Morgan Stanley analysts, in an April 28, 2015 report, trumpeted the highly favorable terms of Adeptus's JV agreements, the performance of the Arizona JV, and the low-risk nature of the JV strategy:

Adeptus was able to extract ***favorable terms*** [in its Colorado JV agreement] due to the company's existing position in the market. . . .  Notably, ***the Arizona hospital is ramping well ahead of management's expectations*** with over 5k patients treated in 1Q15 . . . .  In our view, ***the JV strategy mitigates risks associated with hospital operation and new market entry***.  The JV structure allows ADPT's free standing emergency departments to treat Medicare and Medicaid members expanding the addressable market and reducing bad debt.

### 5.     The June 2, 2015 Jefferies Global Healthcare Conference

163.    On June 2, 2015, Hall and Fielding attended the Jefferies Global Healthcare Conference on behalf of Adeptus.  At that conference, Hall touted Adeptus's aggressive expansion of its JV facilities, stating, "We actually have 12-plus facilities in Colorado.  We'll be rebranding them UCHealth. And the folks are really excited about that.  We'll probably have 25-plus facilities at full buildout in Colorado. We talked at our recent calls about opening a hospital in Colorado Springs and also Denver with them.  And that will allow us to fuel our growth and take all the different payers."

164.    These statements were materially false and misleading when made.   It was misleading for Hall to tout the impact the JV model was having on Adeptus's growth, while failing to disclose that aggressive growth through the JV model significantly imperiled Adeptus's financial health because, among other things, (i) Adeptus was funding 100% of the working capital and operating losses of the JVs; (ii) the JVs were an indefinite drag on the Company's margins, earnings, and cash flow until they became profitable if ever; and (iii) the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.

165.    Analysts responded positively to Defendants' false and misleading statements.  For instance, in a June 17, 2015 Piper Jaffray report, analysts maintained their overweight rating and stated, "We believe ADPT's JV strategy will drive significant growth and earnings power. . . .  We believe ADPT has good visibility on facility expansion over the next few years as the JV strategy

will enable the company to expand into additional states while adding meaningful EBITDA growth." Likewise, Morgan Stanley analysts, in a June 25, 2015 report, stated they were "[r]aising estimates to reflect superior operating performance and earnings growth generated by JVs."

### 6.    Adeptus's Second Quarter 2015 Earnings Call

166.    On July 23, 2015, Adeptus held its second quarter 2015 earnings conference call with investors, attended by Hall, Fielding, and Cherrington.  On that call, Defendants repeatedly touted the success of Adeptus's JVs and the JV model.  Hall stated, "What's very important to note is that our cash flow from operations was $13 million in the quarter.  That is real cash, folks, and demonstrates the profitability that our model is starting to experience."  Hall further stated, "Based on our strong performance in the first half of 2015 and full-year growth plans, we are again raising guidance. We expect to generate system-wide net patient services revenue, which includes revenue from unconsolidated joint ventures, of $400 million to $405 million for the full year 2015. We expect adjusted EBITDA of $69 million to $71 million and adjusted earnings per share of $1.10 to $1.15 for the full year 2015."

167.    Hall further touted the success of the Arizona JV, stating:

> What I would tell you about that is that *our Arizona joint venture is doing very well* for us and we've talked about the hospital (inaudible) performing well . . . . We've had one that's been open for several months and here's what I'll be able to tell you that *we're very pleased with the way it's functioning right now. We're seeing in the 20 plus patients a day* . . . . Well clearly, we only have a data point of one, but when that data point one is performing very well; with our second one that recently opened its performing very well also.  And so when we think about our JVs as we seem them today in the Arizona marketplace . . . . I think we expect our freestanding facilities to see 20 plus patients per day. So we're pretty bullish, we're pretty excited about that and it's growing really well.

168.    Likewise, in response to an analyst's question, Hall told investors that the JVs, and the Arizona JV in particular, were a key driver of the Company's strong second quarter performance:  "Well, I think that when you think about the drivers of the improvement, what we're

seeing is we're seeing a couple of things; *our joint ventures are doing well and so we're seeing really nice performance out of those . . . . Arizona, its doing really well and we're very, very pleased with that*."

169.    Defendants also reassured analysts that Adeptus's continued expansion of its JV program would not significantly add to the Company's capital expenditures.   An Avondale Partners analyst asked, "And then just in terms of CapEx.  I think we talked about an 8 million to 10 million for the year and for the past two quarters I think it's been below 2 million a quarter. Should we be making any adjustments here or is that 8 million to 10 million still the expected range?"  Fielding responded, "I still think the 8 million to 10 million is reasonable."

170.    Likewise, Defendants assured investors that the Company's cash flow would be adequate to meet existing capital expenditure commitments.  An RBC Capital Markets analyst asked, "*So with the cash flow from ops and your CapEx requirements you should be fine on that front*?"  Hall responded, "*Correct*."

171.    These statements were materially false and misleading when made.   It was misleading for Defendants to tout the success of the JVs, to state that the Company's cash flow result "demonstrates the profitability" of the JV model, to highlight the JVs' purportedly strong revenue results as a basis for raising earnings guidance, to state that the Arizona JV was "doing very well" and "seeing 20 plus patients a day," and that the JVs' success was a driver of the Company's strong performance, while failing to disclose that, in fact, the JVs were operating at a loss and were significantly straining Adeptus's margins, earnings, and cash flow because the Company was funding 100% of the working capital and operating losses of the JVs.

172.    Likewise, it was misleading for Defendants to assure investors that the JV model would not further stress Adeptus's capital expenditures and to state that the Company's operating

cash flow would be adequate to meet its capital expenditures, while failing to disclose that, in fact, the JVs were operating at a loss and that the JV strategy posed significant risks to Adeptus's financial health because (i) Adeptus was funding 100% of the working capital and operating losses of the JVs; (ii) the JVs were an indefinite drag on the Company's margins, earnings, and cash flow until they became profitable if ever; and (iii) the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.

173.   Analysts were encouraged by Defendants' false and misleading statements.  For instance, in a July 23, 2015 report, KeyBanc analysts rated Adeptus overweight, highlighting the success of the high-margin JV model and of the Arizona JV in particular:

> ADPT's JV (& hospital hub & spoke model) strategy appears to be tapping into the attractive high-fixed cost economics of its ERs, which we believe will drive higher volumes and a significant margin expansion opportunity . . . .  ADPT noted that its two recently opened ERs in Arizona with partner Dignity health were generating more than double the company average patient visits per day (20+ visits/day) . . . . Management sounded confident that the remaining JV ERs under construction should perform equally as well . . . . Management believes the Arizona joint venture is performing well.

Likewise, Morgan Stanley analysts issued a July 23, 2015 report, in which they "update[d] our [price target] to 114 reflecting better than expected earnings power generated by ADPT's JV FSEDs . . . . [I]n AZ, *performance significantly exceeded expectations as these facilities are seeing 20 patients per day, which management believes is an appropriate run rate for JV facilities going forward*."  In a report issued that same day, Piper Jaffray analysts stated, "Upside relative to our estimates was attributed to *equity in earnings from the unconsolidated JV and lower-than-projected operating costs*.  FY15 guidance was raised meaningfully across the board and we believe ADPT's JV with Dignity Health in Arizona is performing well . . . . *Strong start*

*for JVs.  **The Dignity Health JV in Arizona is performing well*** as the freestanding ER (FER) is

seeing more than 20 patients per day with a payor mix that is more than 50% commercial."

174.    Analysts, swayed by Defendants' false statements, continued to characterize the JV

strategy as a high-return, low-cost model.  For instance, Stephens analysts issued a July 23, 2015

report rating Adeptus overweight and stating, "JV partnerships with established healthcare systems

and ADPT's own hospital development should drive significant volume growth which has ***high***

***incremental margins*** given the high degree of operating leverage in the FSED model. Further, ***the***

***capital efficiency of the development model is starting to bear fruit as ADPT generated solid***

***quarterly cash flow which we expect to persist with minimal capital expenditures***."

175.    Critically, Jefferies analysts reported in an August 3, 2015 report (issued while the

July 2015 Offering was ongoing and one day before it closed) that one of the most favorable

features of the JV strategy was that the arrangement allowed Adeptus to share costs and risk, and

preserve capital:  "Hospital JVs should drive patient volumes higher and generate earnings upside

. . . . ***Hospital partnerships benefit ADPT from financial, patient care and branding standpoints***

. . . . ***<u>Lower capital requirements when financial partnership in place - shared staffing and up-</u>***

***<u>front expenses</u>***."

### 7.    Adeptus's Third Quarter 2015 Earnings Call

176.    On October 22, 2015, Adeptus held its third quarter 2015 earnings conference call

with investors, attended by Hall, Fielding, and Cherrington.  On that call, Hall assured investors

that the JV model would yield high operating margins, even with respect to non-commercially

insured patients, because "once we are above breakeven, the incremental costs and marginal costs

of an incremental patient is about $100. So even if you are getting government pay at whatever

you want to consider it is at, it is still nicely profitable for us."

177.    Hall also stated that the JV model "[t]akes a lot of uncertainty, not that we have a lot of uncertainty, not that we have a lot of uncertainty, but whatever we have it gets rid of, and it just shows a tremendous growth trajectory."

178.    On that same earnings call, Defendants also continued to tout the performance of the Arizona JV.  During the call, a Morgan Stanley analyst asked, "When we're thinking about Arizona, maybe if you could just update us on how that's progressing in terms of profitability, both with the hospital there and the freestandings you're opening. I mean you suggested 20-plus patients a day last quarter. How's that number trending?"  Hall replied, "We have a great brand out there with partner Dignity, and we are very, very pleased and excited to be partnering with Dignity Health. ***But [the Arizona JV] is doing well. The hospital emergency department is very active these days and the freestandings, I am just sitting here looking at it right now, they are absolutely performing at the level we told you before, or above.***"

179.    In response to an analyst's question, Hall blamed the Company's decreased earnings for the quarter on seasonality, stating, "We had a great quarter . . . . The Company is doing really well . . . . [T]he business is going real well. It's just typical seasonality."

180.    These statements were materially false and misleading when made.  It was misleading for Defendants to state that the JV model would yield high operating margins, "even if you are getting government pay," while failing to disclose that, in truth, the JV model significantly strained Adeptus's operating margins because, among other things, it called for Adeptus to fund 100% of the working capital and operating losses of the JVs, and, thus, the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.  Likewise, it was misleading for Defendants to state that the JV strategy "[t]akes a lot of uncertainty" out of Adeptus's business, when, in truth, it

injected significant uncertainty into the business because it called for Adeptus to fund 100% of the working capital and operating losses of the JVs, and, thus, the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.

181.    Additionally, it was misleading for Defendants to tout the performance of the Arizona JV and to blame the decline in quarterly earnings on "seasonality," when, in truth, the JVs, with the exception of the Colorado JV, were operating at a loss and were a drag on the Company's margins, earnings, and cash flow because Adeptus was funding 100% of the working capital and operating losses of the JVs.

182.    Analysts were reassured by Defendants' false and misleading statements.  Analysts continued to believe that the JVs were performing well, that the JV strategy was a high-margin model that was being executed successfully, and that any lags in revenue were just a product of seasonality.  For instance, KeyBanc analysts issued an October 22, 2015 report which stated, "Arizona Facilities Performing Very Well. Management noted that its Arizona facilities are performing at previously described levels (20+ patients/day) or above."  In a report issued that same day, Piper Jaffray analysts stated, "we remain confident in ADPT's hospital JV development strategy which should help accelerate [same store] volume growth in 2016."  RBC Capital Markets analysts likewise noted in an October 23, 2015 report that Adeptus's "JV strategy [is] generating impressive gains."  Jefferies analysts issued an October 23, 2015 report, in which they stated, "The JV strategy is working . . . . *JVs with leading hospitals significantly de-risks the story*."

### 8.    The November 10, 2015 Stephens Fall Investment Conference

183.    On November 10, 2015, Hall and Fielding attended the Stephens Fall Investment Conference on behalf of Adeptus.  At the conference, Hall touted the economic benefits of the JV strategy, telling investors that Adeptus was capturing an outsized share of the JVs' economics:

"When we think about the economics around [the JVs], we would be at 50.1% for us or for the partners, 49.9% for us. We get an 80% management fee and then we also have a company called National Medical Professionals, which does the doctor staffing. So we think of it as we are getting approximately 65% of the profitability coming off of the facilities."  Notably, Hall stated that Adeptus was capturing this benefit despite the fact that the hospital partner was a majority shareholder and owned the JV "facilities."  Hall further stated, "The significance of that [Adeptus capturing 65% of the JVs' economics] is that *our partners are the majority shareholders so it's their facilities*, they are the majority shareholders, it's their brand."

184.    Similarly, an analyst asked, in an effort to clarify Hall's description of the JV model's economics, whether the model was "doubling the cash flow per facility" as a result of increased patient volume.  Defendants Hall and Fielding both confirmed that the JV model was increasing cash flow per facility.  In particular, Defendant Fielding stated, that even though the JV was "*giving away 50.1%, that the pie is bigger and because we are getting approximately 65% of the pie, then our average profitability per facility would be higher*."

185.    These statements were materially false and misleading when made.  It was misleading for Defendants to tout the economic benefits of the JV strategy, to assure investors that Adeptus would receive the lion's share of the JVs' economics despite the fact that the Company was a minority shareholder and did not own the facilities or the brand, and to state that the JV model was increasing cash flow per facility, while failing to disclose that the JVs were operating at a loss, and that the JV model posed significant risks to Adeptus's financial health because, among other things, (i) Adeptus was funding 100% of the working capital and operating losses of the JVs; (ii) the JVs were an indefinite drag on the Company's margins, earnings, and cash flow until they became profitable if ever; and (iii) the JV strategy required Adeptus to absorb 100% of

the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.  It was further misleading for Defendants to state that "our partners are the majority shareholders so it's their facilities," while failing to disclose that Adeptus bore 100% of the cost of those facilities and, indeed, for funding all of the JVs' working capital and operating losses.

### 9.       The December 1, 2015 Piper Jaffray Healthcare Conference

186.     On December 1, 2015, Hall and Fielding attended the Piper Jaffray Healthcare Conference on behalf of Adeptus.  At that conference, Hall touted Adeptus's cash flow and liquidity to investors and analysts.  Hall reassured investors that the Company was expending little capital to expand its FERs, including those that were part of the JVs, while these facilities were contributing significant earnings to the Company, and, thus, the Company was actually *deleveraging* by implementing its JV strategy, rather than constraining cash flow and liquidity. Specifically, Hall stated, "Tim explained to you what the economics were on those freestanding emergency rooms, and they are de novos. And so you can do the math on what you think the EBITDA contribution is, but *it is a pretty significant EBITDA contribution and for a pretty low out-of-pocket capital cost*. And so if anything, our Company is *deleveraging* real-time as our profitability grows."

187.     These statements were materially false and misleading when made.  It was misleading for Defendants to state that Adeptus's expansion of FERs under the JV program made "a pretty significant EBITDA contribution and for a pretty low out-of-pocket capital cost," and thus, "the Company is deleveraging real-time as our profitability grows," when, in truth, the JV strategy was significantly constraining the Company's cash flow and liquidity because, among other things, (i) Adeptus was funding 100% of the working capital and operating losses of the JVs; (ii) the JVs were an indefinite drag on the Company's margins, earnings, and cash flow until they

became profitable if ever; and (iii) the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.

### 10.    Adeptus's Fourth Quarter And Full-Year 2015 Earnings Call

188.    On February 24, 2016, Adeptus held its fourth quarter and full-year 2015 earnings conference call with investors, attended by Hall, Fielding, and Cherrington.   On that call, Defendants continued to assure investors that the Arizona JV was profitable and downplayed analyst concerns regarding a potential decline in earnings.  "From an Adeptus perspective, Arizona in Q4 made money for us, Arizona Hospital. And so, that's kind of interesting, right?  Again, you may wonder, how are you going to run these hospitals, you guys ever make any money on these things?  What's going on?  Arizona General Hospital made money for Adeptus Health in Q4. We're not going to say how much, but it wasn't negative."  Indeed, Hall told investors that the Arizona JV was doing so well that the Company would expand its presence in that market, stating "we're very, very bullish on the Phoenix market, and we see 20-plus facilities out there. And it's doing extremely well."

189.    Likewise, a Morgan Stanley analyst asked, "You had $4.2 million in distributions from JV partners this quarter. Is that just because Arizona turned positive? How should we be thinking about cash flows from the JVs and how that flows through all the statements?"  Fielding responded, "Obviously having to record these as equity investments, the distributions are what flow through our cash flow statement. That's what you see on a quarterly basis. We will make the distributions based upon the cash flow that's running through those joint ventures."  Hall added to Fielding's answer by reaffirming that the JVs were performing exceptionally well – indeed, as well as a hospital outpatient department:  "Probably what we are even more excited about than that, which is hard to imagine, is *how these JVs are performing, basically how an outpatient*

*department of a hospital performs*. We all had speculation around that but we are seeing it first-hand.  We're seeing it in Arizona and we're seeing it in Dallas today.  We are very pleased with what we're seeing."

190.    These statements were materially false and misleading when made.  It was misleading for Defendants to tout the performance of the JVs, to state that the Arizona JV "made money for Adeptus Health in Q4" and was "doing extremely well," and the Arizona JV was performing "how an outpatient department at a hospital performs," when, in truth, Adeptus's JVs, with the exception of the Colorado JV, were all operating at a loss.  It was likewise misleading for Fielding and Hall, in response to a question about "cash flows from the JVs" to tout the performance of the JVs and to state that the JVs will make "distributions based upon the cash flow that's running through those joint ventures," while failing to disclose that Adeptus was funding 100% of the working capital and operating losses of the JVs, and, therefore, for JV distributions to translate into profit for Adeptus, Adeptus would have to recoup an outsized receivable comprising the JV partner's share of costs that had, unbeknownst to investors, been paid by Adeptus; as such, the JVs were an indefinite drag on the Company's margins, earnings, and cash flow until they became profitable if ever, and the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.

191.    Analysts were encouraged by Defendants' false and misleading statements about the success of the JV model and the positive performance of the individual JVs.  For instance, Morgan Stanley analysts issued a February 24, 2016 report stating, "ADPT noted that the Dignity JV continues to perform well, as the freestanding EDs continue to see 20 patients per day and noted that a facility which launched on Jan 22nd has been averaging 35 patients per day in

73

February.  Separately, the AZ hospital has ramped ahead of early expectations and has become

cash flow positive in 4Q which should alleviate investor concerns around hospital profitability . .

. . [T]he early performance of Dignity illustrates the unique value proposition ADPT brings to its

hospital partners and should serve as a catalyst for new partnerships and a potentially expanded

relationship with Dignity."  Likewise, Stephens analysts issued a February 25, 2016 report

reiterating their overweight rating, and trumpeting that the "JV model [was] bearing fruit."

Importantly, these analysts highlighted the capital efficiency of the JV model, stemming from the

cost-sharing feature of the JV arrangement, as making the model a conduit for strong cash flow:

> [The JVs'] ***Capital efficient model*** *beginning to resonate into actual **cash flow***:
> While the revenue and profitability growth have been exceptional, investors were
> still waiting for that to translate to cash flow. 4Q15 provided a glimpse with $7.9
> million in operating cash and $13.1 million for the year. 2015 capex was just $7.4
> million ***demonstrating the efficiency of partnering with capital partners to fund
> new development***.

### 11.    Adeptus's First Quarter 2016 Earnings Call

192.    On April 20, 2016, Adeptus held its first quarter 2016 earnings conference call with

investors, attended by Hall, Fielding, and Cherrington.  On that call, Defendants continued to make

false and misleading statements about the JVs, including that Adeptus shared costs attributable to

the JVs with its partners.  A Stephens analyst asked, "when you're doing the new developments

with your joint venture partners, is that – are you using MPT [Medical Properties Trust – a REIT]

in that ***split roughly 50/50***?"  Fielding answered, "Yes, we absolutely are using MPT . . . . ***Those***

***leases are subleased down to the JV level***."

193.    Similarly, on that same call, a Morgan Stanley analyst asked why positive cash flow

"in distributions from JV . . . didn't seem to repeat again this quarter."  Fielding attributed the lag

in cash flow to "seasonality" and "some signage that we put up" at some of the JV facilities.

194.     These statements were materially false and misleading when made.   It was misleading for Defendants to state that Adeptus shared JV costs with its partners, which were "split roughly 50/50," when, in truth, (i) Adeptus did not "share" any costs with its JV partners, but, instead, was funding 100% of the working capital and operating losses of the JVs; (ii) the JVs were an indefinite drag on the Company's margins, earnings, and cash flow until they became profitable if ever; and (iii) the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.   It was likewise misleading to attribute a lag in "distributions from the JV" to "seasonality" and "some signage that we put up" at some of the JV facilities, while failing to disclose that the JVs, with the exception of the Colorado JV, were all operating at a loss.

195.     Analysts continued to enthusiastically recommend Adeptus stock based on Defendants' statements about the performance of the JVs and the JV model.   For instance, in an April 21, 2016 report, Morgan Stanley analysts stated, "ADPT is expanding capacity at its future sites due to favorable demand trends. Similar to its previous commentary ADPT noted that the Dignity JV continues to perform well and maintained that the freestanding EDs continue to see 20 patients per day, on average."

**12.     The May 10, 2016 Bank Of America Merrill Lynch Health Care Conference**

196.     On May 10, 2016, Hall and Fielding attended the Bank of America Merrill Lynch Health Care Conference on behalf of Adeptus.   At that conference, Hall again trumpeted the economic advantages of the JV strategy and told investors that Adeptus would capture an outsized share of the JVs' profits.   Hall stated, "So we went in and negotiated a joint venture relationship where Dignity owned 50.1%. We own 49.9%. We actually got an 8% management fee for running the operation. And then we staff it with our doctor staffing business. And we charge market rates

for that staffing, and so we make a profit off that. And so what we've told people is we think we

get about 60% to 65%, upward to 70% of the profit coming out of that freestanding network."

197.    In addition, Defendants touted the success of the Arizona JV.  Hall stated:

We have one hospital opened in Phoenix. We also have several facilities in Phoenix, and they are doing ***extremely well*** . . . . What we do know is how we are doing, and Arizona is the one market where we take all patients and we have a brand partner. And we are doing ***extremely well in that market, seeing over 20 patients a day in our facilities***. And to give you some color in what we've said, out of that market, we average about 10 patients a day historically is what we've said . . . . ***I will tell you that we have days in the Phoenix market, and actually where we may see over 50 or 60 patients a day in one of our facilities, to give you some sense for the magnitude***.

198.    These statements were materially false and misleading when made.  It was

misleading for Defendants to tout the economic advantages of the JV strategy, to assure investors

that Adeptus was capturing an outsized share of the JVs' profits – "60% to 65%, upward to 70%

of the profit," and to state that the Arizona JV was "doing extremely well" and seeing 20 patients

a day on average, and at times as many as 50 or 60, while failing to disclose that the JVs, with the

exception of the Colorado JV, were all operating at a loss, and that the JV model posed significant

risks to Adeptus's financial health because, among other things, (i) Adeptus was funding 100% of

the working capital and operating losses of the JVs; (ii) the JVs were an indefinite drag on the

Company's margins, earnings, and cash flow until they became profitable if ever; and (iii) the JV

strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV

partners bore none of the risk, but shared significantly in the upside.

199.    Analysts were reassured by Defendants' false and misleading statements and

continued to heavily recommend Adeptus stock based on the performance of the JVs and the

strength of the JV model.  For instance, in a May 17, 2016 report, Jefferies analysts stated,

"***ADPT's JVs with leading health systems in key markets de-risks the story meaningfully . . .***

***while providing incremental EBITDA growth opportunities*** . . . . JVs should drive EBITDA

acceleration & upside. Our bullish view on ADPT is driven by our belief that hospital partnerships/openings allow it to address the Medicare/Medicaid opportunity and double its addressable market."

### 13.    The June 9, 2016 Goldman Sachs Global Health Care Conference

200.    On June 9, 2016, Hall attended the Goldman Sachs Global Health Care Conference on behalf of Adeptus.  At that conference, Hall stated that the Texas JV had the effect of "de-risking of our business model," and touted the economics of the JV, which included "a waterfall, much like we've talked about in Colorado. And the reason we have a waterfall and what that waterfall is, this is not a real number, but to give you example, if we made $10 million before we do this venture, we will get the first $10 million of profitability out of that market . . . . We have a management agreement, very similar to the one we have in Colorado, where we get to pay the management fee to manage it and then we also staff the positions with our national medical professionals and so we do that."

201.    These statements were materially false and misleading when made.  It was misleading for Defendants to state that the JV strategy was "de-risking [Adeptus's] business model" and to tout the economic benefits of that strategy, while failing to disclose that, far from "de-risking" its business, the JV strategy was significantly constraining the Company's cash flow and liquidity because, among other things, (i) Adeptus was funding 100% of the working capital and operating losses of the JVs; (ii) the JVs were an indefinite drag on the Company's margins, earnings, and cash flow until they became profitable if ever; and (iii) the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.

### 14.   Adeptus's Second Quarter 2016 Earnings Call

202.    On July 21, 2016, Adeptus held its second quarter 2016 earnings conference call with investors, attended by Hall, Fielding, and Cherrington.  On that call, Hall touted the success of the JV model, stating "[a]s a direct result of this JV we recognized $185 million gain on our contribution to the joint venture based upon a third-party evaluation, which we believe further validates our business model."  Fielding likewise touted the performance of the JVs stating, "if you combine those two lines ['equity in earnings' and revenue from management] together you're looking at $17.7 million [in revenue attributable to the JVs] in 2016 compared to $6.4 million in 2015."

203.    These statements were materially false and misleading when made.  It was misleading for Defendants to tout the success of the JV model and to state that the reported performance of the JVs "validates" the JV strategy when, in truth, the JVs, with the exception of the Colorado JV, were all operating at a loss, and that the JV model posed significant risks to Adeptus's financial health because, among other things, (i) Adeptus was funding 100% of the working capital and operating losses of the JVs; (ii) the JVs were an indefinite drag on the Company's margins, earnings, and cash flow until they became profitable if ever; and (iii) the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.

204.    Analysts were reassured by Defendants' false and misleading statements.  For instance, Morgan Stanley analysts continued to echo Defendants' statements trumpeting the JV model's strength, writing in a July 22, 2016 analyst report, "our analysis suggests future JVs can replicate and potentially exceed success in AZ."

### 15.    The September 12, 2016 Morgan Stanley Global Healthcare Conference

205.    On September 12, 2016, Hall and Cherrington attended the Morgan Stanley Global Healthcare Conference on behalf of Adeptus.  At that conference, Defendants continued to tout the benefits of the JV strategy and assure investors the JVs were generating high operating margins. A Morgan Stanley analyst asked Hall, "And I know you mentioned that the majority of your facilities now are going to be JV.  And I think we'd all love to see a not consolidated P&L at some point. But right now it's tough for us to kind of parse out what's happening at the facility level. And how do you think about operating leverage in the model?"  Hall responded,

> [T]he margin expansion is the same [as under the non-HOPD model].  The marginal cost for that incremental patient is $100.  So, if it's a government patient and you're getting $300 or $400, then you have – clearly if it's $400, you have a 75% margin. And if it's a commercial patient, you have a higher margin that than.  And so, *those dynamics really haven't changed even under the JV model*."

206.    These statements were materially false and misleading when made.  It was misleading for Defendants to state that that the JV model did *not* alter the high-margin character of the Company's fixed-cost business, while failing to disclose that the JVs, with the exception of the Colorado JV, were all operating at a loss, and that the JV model severely *constrained* Adeptus's margins, earnings, and cash flow because, among other things, Adeptus was funding 100% of the working capital and operating losses of the JVs, and, thus, the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.

### 16.    Adeptus's SEC Filings

207.    On February 27, 2015, Adeptus filed a Form 10-K with the SEC reporting the Company's fourth quarter and full-year 2014 financial results.  On May 1, 2015, Adeptus filed a Form 10-Q with the SEC reporting the Company's first quarter 2015 financial results.  In both

filings, Adeptus made statements communicating to investors that the Company shared losses and costs with its JV partners according to the partners' *pro rata* interest in the JV.  The Form 10-K stated, "Equity in loss of joint venture consists of ***our 49.9% share of losses*** generated from our non-controlling equity investment in a hospital facility located in Phoenix, Arizona. Our equity in loss of unconsolidated joint venture was approximately $0.9 million for the year ended December 31, 2014."

208.    Likewise, the Form 10-K and the first quarter 2015 Form 10-Q stated, "As a result of our strategy of partnering with Dignity Health for Dignity Health Arizona General Hospital, we do not own a controlling interest in this facility . . . . Similar to our consolidated facilities, this joint venture has debts. With respect to this joint venture, these debts are not included in our consolidated financial statements . . . . ***[T]he total debt on the balance sheet of the joint venture was approximately $0.3 million.  Our ownership in this joint venture was 49.9%*** . . . ."

209.    These statements were materially false and misleading when made.  It was misleading for Defendants to state in Adeptus's February 27, 2015 Form 10-K that Adeptus had a "49.9% share of [its JVs'] losses" and to juxtapose a report of the "total debt" on the Arizona JV's balance sheet with the statement that Adeptus's "ownership in this joint venture was 49.9%," while failing to disclose that, in reality, Adeptus was financing all of the JVs' operating losses and debts.

210.    On May 4, 2015, Adeptus filed a registration statement for the May 2015 Offering with the SEC; the next day, on May 5, 2015 Adeptus filed its prospectus for the May 2015 Offering with the SEC (collectively, the "May 2015 Offering Documents").  On July 20, 2015, Adeptus filed a registration for the July 2015 Offering with the SEC; on July 29, 2015, Adeptus filed a prospectus for the July 2015 Offering (collectively, the "July 2015 Offering Documents").

211.    The May 2015 and July 2015 Offering Documents explicitly incorporated by reference the statements in the Company's 2014 Form 10-K (filed February 27, 2015) and its first quarter 2015 Form 10-Q (filed May 1, 2015), described in ¶¶207-208, above, among others.  These statements were materially false and misleading when made for the reasons stated in ¶209, above

212.    The May 2015 and July 2015 Offering Documents further stated, "We also recently expanded into Arizona through a joint venture with Dignity Health, one of the nation's largest health systems, with the opening of a full-service healthcare hospital facility and includes plans for additional access to emergency medical care in the Phoenix area through freestanding emergency departments of the hospital.  To improve access to high-quality and convenient emergency medical care in the northern Colorado and Denver metro area, we recently partnered with UCHealth."

213.    The May 2015 and July 2015 Offering Documents also incorporated a Form 8-K filed by Adeptus on April 23, 2015, which included an Adeptus press release entitled, "Adeptus Health Reports First Quarter 2015 Results."  That press release stated, "Our momentum continued to build during the first quarter.  We opened seven new emergency rooms and received Medicare certification for Dignity Health Arizona General Hospital, our joint venture with Dignity Health in Phoenix.  Earlier this week, we announced our newest joint venture with University of Colorado Health.  We are excited about this new relationship as it allows us to expand access for our patients to one of the premier healthcare systems within the U.S."

214.    These statements were materially false and misleading when made.  It was misleading for the May 2015 Offering Documents to tout the success of the Arizona JV and the benefits of the JV model, while failing to disclose that the Arizona JV was operating at a loss and

that the JV model posed significant risks to Adeptus's financial health, including that (i) Adeptus was funding 100% of the working capital and operating losses of the JVs; (ii) the JVs were an indefinite drag on the Company's margins, earnings, and cash flow until they became profitable if ever; and (iii) the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.  Moreover, it was misleading for Defendants to tout Adeptus "expan[sion]" into Arizona and Colorado markets "through a joint venture," when, in fact, Adeptus was responsible for financing 100% of that expansion because it was responsible for paying all the working capital and operating losses of its JVs.

215.    On June 2, 2016, Adeptus filed a prospectus for the June 2016 offering, pursuant to its July 20, 2015 shelf registration statement (the "June 2016 Offering Documents").

216.    The June 2016 Offering Documents explicitly incorporated by reference the statements in the Company's 2014 Form 10-K (filed February 27, 2015) and its first quarter 2015 Form 10-Q (filed May 1, 2015), described in ¶¶207-08, above.  These statements were materially false and misleading when made for the reasons stated in ¶209, above.

217.    The June 2016 Offering Documents also incorporated by reference Adeptus's May 16, 2016 Form 8-K, which included a press release touting the Company's Texas JV, and, in particular, the earnings preference for Adeptus under the terms of the JV agreement.  The Form 8-K stated, "On May 11, 2016, Adeptus Health Inc. entered into a joint venture agreement with Texas Health Resources to increase access to high quality, convenient emergency medical care in the Dallas-Fort Worth area . . . . Pursuant to terms of the joint venture agreement, Adeptus Health will receive quarterly preferred returns up to a specified amount on its investment in joint venture prior to proportionate distributions to partners."

218.    These statements were materially false and misleading when made.   It was misleading for the June 2016 Offering Documents to tout the benefits of the Texas JV and the JV model, while failing to disclose that all of the JVs, with the exception of the Colorado JV, were operating at a loss, and that the Texas JV and the JV model posed a grave risk to Adeptus's financial health, including that (i) Adeptus was funding 100% of the working capital and operating losses of the JVs; (ii) the JVs were an indefinite drag on the Company's margins, earnings, and cash flow until they became profitable if ever; and (iii) the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.

**B.      Defendants' False And Misleading Statements Concerning Patient Acuity**

**1.      Adeptus's SEC Filings**

219.    In Adeptus's registration statement on Form S-1, and accompanying prospectus filed June 24, 2014 in connection with the IPO ("IPO Offering Documents"), second quarter 2014 Form 10-Q (filed August 8, 2014); third quarter 2014 Form 10-Q (filed November 7, 2014); 2014 Form 10-K (filed February 27, 2015); first quarter 2015 Form 10-Q (filed May 1, 2015); May 2015 and July 2015 Offering Documents; second quarter 2015 Form 10-Q (filed July 31, 2015); third quarter 2015 Form 10-Q (filed October 30, 2015); 2015 Form 10-K (filed February 29, 2016); first quarter 2016 Form 10-Q (filed April 29, 2016); June 2016 Offering Documents; and second quarter 2016 Form 10-Q (filed July 29, 2016), Defendants made the following statements repeatedly touting the high acuity level of the Company's patients:

- "Our facilities are fully licensed and provide comprehensive, emergency care with *an acuity mix that we believe is comparable to hospital-based emergency rooms*."

- "We operate at the *higher end of the acuity and emergency care spectrum*."

- "Our capabilities and offerings *differ from other care models* as outlined below . . . . We also provide convenient access to *critical, high-acuity care as compared with urgent care centers* and are open 24 hours a day, seven days a week."

220.   The IPO Offering Documents and the 2014 and 2015 Forms 10-K further stated:

- "Given our 24/7 operating hours and ability to handle high-acuity needs, *instead of competing with* community medical practices and *urgent care clinics*, we believe we complement them. *Many of our sites work closely with nearby urgent care facilities to ensure the most appropriate patient care for the community.*"

- "We treat any patient that is emergent, including patients without medical insurance."

- "The Company treats anyone that is emergent."

221.   These statements were false and misleading when made.  It was misleading for Defendants to state that Adeptus "operate[d] at the higher end of the acuity and emergency care spectrum," that the Company's "acuity mix" was "comparable to hospital-based emergency rooms," and to differentiate Adeptus from "other care models" by stating that Adeptus provides "access to critical, high-acuity care as compared with urgent care centers," while failing to disclose Adeptus's widespread practice of overcharging low-acuity patients by seeking fees for emergent care, including substantial facility fees, despite the fact that no emergent care was provided to those patients.  It was also misleading for the Offering Documents to represent that Adeptus would "treat any patient that is emergent" while stating that it was not "competing with…urgent care clinics" and "work[ing] closely with *nearby urgent care facilities to ensure the most appropriate patient care for the community*" – when in reality Adeptus was treating and overbilling low acuity patients.  It was further misleading for Defendants to fail to disclose that Adeptus's practice of overbilling low-acuity patients had a negative effect on payer reimbursement, and thus cash flow.

### 2.      Adeptus's Third Quarter 2014 Earnings Call

222.     On Adeptus's October 29, 2014 earnings call, Hall told investors that despite lower volumes, Adeptus was able to maintain revenues "through our pricing and the acuity levels. As we have seen our acuity go higher and higher . . . . We spend a lot of time and energy making sure that we are not an urgent care . . . . *[I]t is really important with our relationship with our payers and all of that, that we are not seen as milking the system, charging $1,000 for an urgent care person*. We spend a lot of energy on that, educating the patients in the community that we are an emergency room. People appreciate that. It is working out really well for us."  Hall further stated that Adeptus's practice of billing payers for emergency treatment only when emergency care was actually required had a positive effect on the Company's relationship with those payers, stating, "we spend a lot of time and energy making sure that *we are in an emergency room, and we see emergency room patients*. In that world we save the payers a lot of money."

223.     These statements were materially false and misleading when made.  It was misleading for Defendants to tout increases in Adeptus's acuity, emphasize the Company's efforts to "make sure we are not an urgent care, to state that Adeptus was not "milking the system, charging $1,000 for an urgent care person," and to state that these efforts "were saving payers money," while failing to disclose Adeptus's widespread practice of overcharging low-acuity patients by seeking fees for emergent care, including substantial facility fees, despite the fact that no emergent care was provided to those patients.  It was further misleading for Defendants to fail to disclose that Adeptus's practice of overbilling low-acuity patients had a negative effect on payer reimbursement, and thus cash flow.

224.     Analysts echoed Adeptus's statements concerning patient acuity.  For instance, in an October 30, 2014 RBC Capital Markets report, analysts maintained their outperform ratings

and stated, "ADPT has made considerable effort positioning itself as a high acuity emergency room and not an urgent care center."

### 3.     Adeptus's Fourth Quarter And Full-Year 2014 Earnings Call

225.    On Adeptus's February 19, 2015 earnings call, an analyst asked whether a "pick up in acuity" was driving the Company's "strong" pricing for the quarter.  Hall touted the increase in Adeptus's acuity mix, stating, "we're also seeing different acuity levels. One of the things I've talked to folks a lot about is that *we spend a lot of time and energy educating people on the fact we are an emergency room, we are not an urgent care*. I've also mentioned that we have relationships with urgent cares where we refer patients to them. So with that . . . the acuity goes up, revenue per patient goes up . . . ."  Hall further stated on that call, "*when we see people they are emergent. They need to be seen*."

226.    These statements were materially false and misleading when made.  It was misleading for Defendants to tout the high acuity of Adeptus's patients, and to state that "when we see people they are emergent," while failing to disclose Adeptus's widespread practice of overcharging low-acuity patients by seeking fees for emergent care, including substantial facility fees, despite the fact that no emergent care was provided to those patients.  It was further misleading for Defendants to fail to disclose that Adeptus's practice of overbilling low-acuity patients had a negative effect on payer reimbursement, and thus cash flow.

227.    Analysts echoed Defendants' false and misleading statements concerning patient acuity.  For instance, RBC Capital Markets analysts issued a February 23, 2015 report, in which they maintained their outperform rating and stated, "management attributed [higher reimbursement rates] to . . . higher acuity as the company focuses on educating patients upfront that its facilities are full-service ERs (and not urgent care centers)."

### 4.     The March 12, 2015 Barclays Healthcare Conference

228.    At the March 12, 2015 Barclays Healthcare Conference, Defendants continued to tout the high acuity of Adeptus's patients.  Hall stated that Adeptus was "not an urgent care . . . we're real emergency room."  Hall further stated:

> [I]f you are an urgent care patient and you don't need to be seen by us, *we are going to refer you [to an] urgent care* because you're going to get the kind of care you need, but you also only can get charged $200. You don't need to come to see us for the sniffles and get a bill for $1,000 for it. And as an example that and you'll see in the slide *we are [in-]network for the major payers* and one of our payers is Blue Cross Blue Shield Texas and I would say, we spend a lot of energy flows on making sure that if you're an urgent care we sent you to a right place to get hyper care that you need, because *if we start charging $1500 for urgent care patients [o]ur contracts could be in jeopardy*, [if] we don't do it [refrain from charging emergency fees for non-emergent care.]  [W]e spent a lot of energy and a lot of focus on that.

229.    These statements were materially false and misleading when made.  It was misleading for Defendants to tout the high acuity of Adeptus's patients, to state that Adeptus was "going to refer" non-emergent patients to an "urgent care," and that as a result of its purported practice of refraining from charging emergency fees for non-emergent care, Adeptus was "[in]-network for the major payers" and maintained a favorable relationship with those payers, while failing to disclose Adeptus's widespread practice of overcharging low-acuity patients by seeking fees for emergent care, including substantial facility fees, despite the fact that no emergent care was provided to those patients – a practice which even Hall acknowledged would jeopardize Adeptus's relationship with payers.  It was further misleading for Defendants to fail to disclose that Adeptus's practice of overbilling low-acuity patients had a negative effect on payer reimbursement, and thus cash flow.

230.    Analysts echoed Defendants' statements touting the high acuity of Adeptus's patients and, in particular, the Company's strict policies against seeing low-acuity patients.  In an April 21, 2015 report, Avondale Partners stated, for instance, "Though FSEDs and Urgent Care

centers cater to completely different acuity mixes, this distinction does not stop patients seeking non-emergency treatment after traditional business hours from visiting an FSED and becoming outraged when their bill is higher than at an Urgent Care Center. ***ADPT understands this issue and has a policy of referring all non-emergent patients to Urgent Care Centers or PCPs***."

### 5.   Adeptus's First Quarter 2015 Earnings Call

231.    On Adeptus's April 23, 2015 earnings call, Defendants continued to trumpet the high acuity of the patients treated at the Company's FERs.  Hall stated,

> I talk about this all the time, ***we spend a lot of energy educating people that we are not an urgent care***. It cost us. ***We could easily see those patients and charge them $1,000, or whatever, and make a lot of money. But we don't think it is the right thing to do.*** We think it is important that we give the right quality care to the folks that need it, and we have relationships with urgent cares and we actually send people over to them.

Hall further stated, "***We don't charge more*** [than urgent care for low-acuity treatment]. It is not where we are charging people more."

232.    On that same call, Fielding likewise stated, "[W]e've done a lot of education of folks on the fact that we are not an urgent care, and we continue to do that . . . . Because of that we are seeing the acuity go up.  Our average acuity goes up.  When your average acuity goes up, your average revenue per patient is going to go up."

233.    These statements were materially false and misleading when made.  It was misleading for Defendants to tout the high acuity of Adeptus's patients, to state that Adeptus does not "see those [low-acuity] patients and charge them $1,000, or whatever, and make a lot of money," and that Adeptus does not "charge more" than urgent care for low-acuity treatment, while failing to disclose Adeptus's widespread practice of overcharging low-acuity patients by seeking fees for emergent care, including substantial facility fees, despite the fact that no emergent care was provided to those patients.  It was further misleading for Defendants to fail to disclose that

Adeptus's practice of overbilling low-acuity patients had a negative effect on payer reimbursement, and thus cash flow.

234.    Analysts were encouraged by Defendants' false and misleading statements about Adeptus's high patient acuity.  For instance, in an April 23, 2015 Piper Jaffray report, analysts stated, "The increase in [same store] revenues was driven by higher acuity patients as the company continues to refer lower acuity patients to urgent care and other appropriate providers." Similarly, in their April 24, 2015 report, Stephens analysts stated, "Adeptus significantly topped consensus estimates across the board and raised guidance meaningfully higher. Organic revenue increased over 11% despite a 10.5% volume decline. This was driven by better pricing on higher acuity patients which we think is a clear indication that consumer understanding of the difference between an FSED and an urgent care center is evolving."  Finally, in an April 27, 2015 report, Avondale Partners highlighted Adeptus's "focus on attracting higher intensity cases which require treatment in an ER setting, benefiting net patient revenue per case, while directing lower acuity cases to more appropriate sites of care, such as urgent care."

### 6.    Adeptus's Second Quarter 2015 Earnings Call

235.    On Adeptus's July 23, 2015 earnings call, Defendants continued to tout the high acuity of the patients treated at the Company's facilities.  Hall told investors that, as in the first quarter of 2015, "pricing was being driven by acuity, change in acuity, as *we had a higher acuity level because as we continue to focus on the fact that we're emergency room, we're not an urgent care*."

236.    These statements were materially false and misleading when made.  It was misleading for Defendants to tout the high acuity of Adeptus's patients as a driver of the Company's positive financial results, and to state that Adeptus is an "emergency room, we're not an urgent care," while failing to disclose Adeptus's widespread practice of overcharging low-

89

acuity patients by seeking fees for emergent care, including substantial facility fees, despite the fact that no emergent care was provided to those patients.  It was further misleading for Defendants to fail to disclose that Adeptus's practice of overbilling low-acuity patients had a negative effect on payer reimbursement, and thus cash flow.

### 7.    Adeptus's Third Quarter 2015 Earnings Call and November 10, 2015 Stephens Fall Investment Conference

237.    On Adeptus's October 22, 2015 earnings call, Hall stated, "If you think about acuity, our acuity has risen . . . .  But basically levels three, four and five make up 93% of our patients today. And they're all what you would consider to be emergency room patients." Similarly, a Bank of America Merrill Lynch analyst, after noting that "acuity level . . . seems to be what some people are obviously worried about," asked how Adeptus's acuity compares to a hospital-based emergency room's.  Hall responded, "We are actually above them. Our average acuity is above them."

238.    Also, at the November 10, 2015 investor conference, Hall touted the high acuity of Adeptus's patients, stating, "93% of our patients are level III or higher."

239.    These statements were materially false and misleading when made.  It was misleading for Defendants to tout the high acuity of Adeptus's patients as a driver of the Company's positive financial results, to state that 93% of Adeptus's patients were "emergency room patients," and that Adeptus's acuity mix was "actually above" hospital-based emergency rooms, while failing to disclose Adeptus's widespread practice of overcharging low-acuity patients by seeking fees for emergent care, including substantial facility fees, despite the fact that no emergent care was provided to those patients.  It was further misleading for Defendants to fail to disclose that Adeptus's practice of overbilling low-acuity patients had a negative effect on payer reimbursement, and thus cash flow.

240.     Analysts continued to echo Defendants' reassuring statements touting the high acuity of patients treated at Adeptus's facilities.   For instance, in an October 22, 2015 report, Avondale Partners analysts rated Adeptus market outperform and stated, "ADPT continued to deliver strong pricing metrics as acuity continued to increase with 90% of the acuity in the level 3 and above category.   ADPT also noted that matched up against their JV partners data, FSEDs volumes carry higher acuity than hospitals."   Likewise, Stephens analysts reported on October 23, 2015 that "[a]cuity level color should help alleviate some investor concerns: Management disclosed that 93% of their patient visits meet one of the levels of the Emergency Severity Index as defined by the Agency for Healthcare Research and Quality."

### 8.     The December 1, 2015 Piper Jaffray Healthcare Conference

241.     At the December 1, 2015 Piper Jaffray Healthcare Conference, Hall touted the high acuity of the patients treated at Adeptus's facilities, and specifically denied the facts reported in KUSA's November 16, 2015 investigative report, "BuyER Beware."   Hall stated, "And so the acuity level – we are seeing higher levels of acuity. I mentioned that to you before. About 93% of our patients are Level III, IV, and V. I have talked about what those patients are, what they look like, and *they are true emergent patients that need to be in an emergency room*. And so that has had a positive impact on us."   Referring to the KUSA investigative report, an analyst asked, "So you're not seeing a whole lot of splinter patients come into your facility?"   Hall responded, "*No. We are not seeing a lot of splinters, okay. No*."   Hall further stated, "Our average acuity level is actually higher than the hospital with our partners."

242.     These statements were materially false and misleading when made.   It was misleading for Defendants to tout the high acuity of Adeptus's patients, state that Adeptus's patients "are true emergent patients that need to be in an emergency room," and to deny the findings of the KUSA report and state that Adeptus was "not seeing a lot of [patients with]

splinters," while failing to disclose Adeptus's widespread practice of overcharging low-acuity patients by seeking fees for emergent care, including substantial facility fees, despite the fact that no emergent care was provided to those patients.  It was further misleading for Defendants to fail to disclose that Adeptus's practice of overbilling low-acuity patients had a negative effect on payer reimbursement, and thus cash flow.

243.    Analysts were comforted by Defendants' reassuring statements about Adeptus's high patient acuity.  For instance, in a December 1, 2015 report, Piper Jaffray reaffirmed its overweight rating of Adeptus stock, stating, "Despite some media scrutiny about the high cost of freestanding ERs, management provided some details about patient acuity levels as 93% of patients are level 3, 4 or 5 (the highest acuity levels). The company is also trying to educate the public about freestanding ERs and somewhat surprisingly, the No. 1 referral source for patients last quarter came from urgent care clinics."

### 9.    Adeptus's Fourth Quarter And Full-Year 2015 Earnings Call

244.    On Adeptus's February 24, 2016 earnings call, Defendants also assured investors that the acuity of Adeptus's patients remained high.  In response to an analyst's question asking "about [Adeptus's] acuity and how that's been holding up," Hall stated, "[A]cross our portfolio the acuity levels continue to hold, if not even tweak up a little bit."  Fielding further responded, "In Q4 the acuity level 3, 4 and 5, they were at 93% of our business."

245.    These statements were materially false and misleading when made.  It was misleading for Defendants to tout the high acuity of Adeptus's patients, and to state that "acuity levels continue to hold, if not even tweak up a little bit," while failing to disclose Adeptus's widespread practice of overcharging low-acuity patients by seeking fees for emergent care, including substantial facility fees, despite the fact that no emergent care was provided to those

patients.  It was further misleading for Defendants to fail to disclose that Adeptus's practice of overbilling low-acuity patients had a negative effect on payer reimbursement, and thus cash flow.

246.    Analysts continued to be reassured by Defendants' statements concerning Adeptus's high patient acuity.  In their February 25, 2016 report, Jefferies analysts stated, "ADPT delivered strong pricing metrics as acuity continued to increase with 93% of the acuity in the level 3 and above category. The acuity level has been very similar across all payor classes and ADPT believes that these levels are sustainable."

### 10.    Adeptus's First Quarter 2016 Earnings Call

247.    On Adeptus's April 20, 2016 first quarter earnings call, Defendants continued to tout the high acuity of the Company's patients.  In response to a Goldman Sachs analyst's question, Hall stated "our acuity mix has stayed very consistent.  As we continue to grow, it stays right in historical norms we've had. So it remains very consistent."  The analyst followed-up, "So that the ones and twos [in acuity level] are still below 5%?"  Hall responded, "Oh, yes, absolutely. We've spent a lot of energy on that, Matthew."

248.    These statements were materially false and misleading when made.  It was misleading for Defendants to tout the high acuity of Adeptus's patients, to state that Adeptus's acuity mix was consistently high, that less than 5% of the Company's patients were low-acuity, while failing to disclose Adeptus's widespread practice of overcharging low-acuity patients by seeking fees for emergent care, including substantial facility fees, despite the fact that no emergent care was provided to those patients.  It was further misleading for Defendants to fail to disclose that Adeptus's practice of overbilling low-acuity patients had a negative effect on payer reimbursement, and thus cash flow.

249.    Analysts continued to enthusiastically recommend Adeptus stock based on Defendants' statements about the Company's high patient acuity.  For instance, in an April 21,

2016 report, Avondale Partners wrote, "Acuity Mix Unchanged. While it's difficult to predict emergencies, ADPT acuity level given all of its marketing and educating of the consumer remains high, with lower acuity levels (1 and 2's) making up only about 5%. The acuity level has been similar across payor classes and markets and we believe are sustainable going forward."

### 11.    The May 10, 2016 Bank Of America Merrill Lynch Health Care Conference

250.    At the May 10, 2016 Bank of America Merrill Lynch Health Care Conference, Defendants continued to tout the high acuity of Adeptus's patients.  Hall stated, "*Our average acuity level is actually higher than our hospital and higher than our hospital partners*. But there's a reason for that. And the reason is *we don't see the low-end folks*. So it's a mathematical equation. So if you don't see 1s and 2s, by definition your average goes up – and so as we push those urgent care patients into urgent care. But we absolutely see trauma patients . . . . [W]e see that our typical patient today is about a 3.6 or 3.7."

251.    Indeed, Hall stated that while Adeptus had previously treated a significant volume of urgent care patients, it no longer did.  Hall stated, "when I took over the business 4.5 years ago, we saw a lot of urgent care. The contracts were different and all that. And my belief, for right or wrong, is that *charging $1,000 for urgent care business is not a sustainable business model*. *That that's just not going to work; you're not going to have a good relationship with payers*. You're not going to have -- it's going to be very problematic. And so we've put a lot of time and energy into educating patients that we are an emergency room. *We are not in urgent care*."

252.    These statements were materially false and misleading when made.  It was misleading for Defendants to tout the high acuity of Adeptus's patients, to state that Adeptus's "average acuity level is actually higher than our hospital and higher than our hospital partners" because "we don't see the low-end [acuity] folks," to state that Adeptus did not "charg[e] $1,000

for urgent care business" and that Adeptus's relationship with payers was not damaged thereby, while failing to disclose Adeptus's widespread practice of overcharging low-acuity patients by seeking fees for emergent care, including substantial facility fees, despite the fact that no emergent care was provided to those patients.  It was further misleading for Defendants to fail to disclose that Adeptus's practice of overbilling low-acuity patients had a negative effect on payer reimbursement, and thus cash flow.

### C.   Defendants' False And Misleading Statements Concerning Adeptus's Internal Controls

#### 1.   Adeptus's SEC Filings

253.   In connection with Adeptus's October 30, 2015 Form 10-Q, Defendants Hall and Fielding signed certifications pursuant to SOX.  These certifications stated that Adeptus's Form 10-Q disclosed "All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."  The certifications further stated that Adeptus's internal controls "were effective at a reasonable assurance level."

254.   These statements were materially false and misleading when made because, as Adeptus admitted after the Class Period, management had been aware since October 2015 that there were massive internal control failures in the Company's revenue cycle management that were resulting in denied claims, "short" payments, and, ultimately, significant loss of revenue, which deficiencies were not disclosed in Adeptus's filing.  Accordingly, Adeptus's internal controls were not "effective at a reasonable assurance level."

255.   In Adeptus's 2015 Form 10-K (filed February 29, 2016), first quarter 2016 Form 10-Q (filed April 29, 2016), and second quarter 2016 Form 10-Q (filed July 29, 2016), Adeptus

identified only a single, merely technical, deficiency in its internal controls.  Adeptus's 2015 Form

10-K stated:

> As of December 31, 2015, we had one material weakness in our internal control
> over financial reporting . . . .  The Company's risk assessment process failed to
> design and implement appropriate process level and monitoring controls over
> revenue billing transactions and related accounts receivable performed by a third-
> party service provider on our behalf as of December 31, 2015 . . . . The third-party
> service provider is used by the Company to code claims and bill payors using ICD-
> 10 code sets.  As of December 31, 2015, the internal control report provided by the
> service organization in assessing the effectiveness of its internal control over
> financial reporting was not sufficient for our purposes since the scope of the report
> did not include our transactions and data in the environment that was subject to the
> audit.  To address this issue, the Company plans to obtain an appropriate internal
> control report from the service organization to meet its reporting needs for the year
> ended December 31, 2016.

256.    Adeptus's first and second quarter 2016 Forms 10-Q stated, "Other than the

controls related to material weakness described [in the 2015 Form 10-K, described above], there

were no changes in our internal control over financial reporting . . . that have materially affected,

or are reasonably likely to materially affect, our internal control over financial reporting."

257.    Importantly, in SOX certifications appended to the 2015 Form 10-K and first and

second quarter 2016 Forms 10-Q, Hall and Fielding represented that, apart from the purely

technical control deficiency described above, there were no other weaknesses in Adeptus's internal

controls.  Specifically, Hall and Fielding certified that there were no "significant deficiencies and

material weaknesses in the design or operation" of Adeptus's internal controls that had not been

disclosed in these filings.

258.    Adeptus's 2015 Form 10-K and first quarter 2016 Form 10-Q were incorporated by

reference into the June 2016 Offering Documents.

259.    These statements were materially false and misleading when made.  It was

misleading for Defendants to state that there were no material weaknesses in Adeptus's internal

controls apart from the purely technical control deficiency described above, when, in truth, there

were massive internal control failures in the Company's revenue cycle management that were resulting in denied claims, "short" payments, and, ultimately, significant loss of revenue.

## 2. Fourth Quarter And Full-Year 2015 and First Quarter 2016 Earnings Calls

260.    On Adeptus's February 24, 2016 earnings call, Defendants disclosed only a single control deficiency, amounting to no more than a mere technicality.  Specifically, Defendants disclosed that Adeptus was not able to provide its auditor with a Service Organization Control, or "SOC," report – a report that describes the internal controls in place at a third party vendor – from McKesson purely because of the timing of the Company's outsourcing of its revenue collection process.  Fielding stated:

> In a normal year we would rely on McKesson's Service Organization Control report, commonly referred to as a SOC-1 report, as the internal control over the outsourced coding and billing function.  However, because . . . the testing period [for the SOC-1 report] ended on September 30, [2015] it did not include any of our billing and coding data and, therefore, we could not rely upon it as our internal control that is typically used in an outsourced environment.

> Effectively, this was impossible to overcome as there was not sufficient time before December 31 to implement alternative internal controls to compensate for not being able to use the SOC-1 report.  This deficiency is going to be remediated in 2016 as the SOC-1 report will include our coding and billing data and, therefore, can be relied upon by us for internal control purposes.  We do expect to receive a clean audit opinion from our auditors when we file the 10-K on Monday.

261.    On Adeptus's April 20, 2016 first quarter earnings call, Defendants continued to assure investors that its internal controls were sound in all essential respects.  Defendants misleadingly characterized a rise in the Company's DSO as a small hiccup in the Company's transition of services to McKesson that had already been remediated by the time of the earnings call.  Specifically, on that earnings call, Fielding stated, "[w]e are in the early phase of McKesson performing our coding and collection processes, which led to an increase in DSO for the quarter, which we expect to decrease in future quarters."

262.    On that same April 20, 2016 call, a Jefferies analyst asked, "On the cash flow system, you talked about the McKesson rollout as the reason for the DSOs going up a little bit. Just in terms of timing on that, how do you expect that to taper off during the course of the year?" Fielding assured investors that any problems had *already been fixed*:  "[I]n terms of DSO and McKesson, *that conversion today has been completed.  All of our bills are going out on a timely basis.* But there was a transition when we first converted those guys over, so that [caused] an increase in our DSO."

263.    These statements were materially false and misleading when made.  It was misleading for Defendants to state that there were no material weaknesses in Adeptus's internal controls apart from the purely technical control deficiency described above, that any issues driving increased DSO and potentially affecting cash flow had already been fixed, that the "conversion [to McKesson] has been completed" and "[a]ll of our bills are going out on a timely basis," when, in truth, there were massive internal control failures in the Company's revenue cycle management that were resulting in denied claims, "short" payments, and, ultimately, significant loss of revenue.

264.    Analysts were comforted by Defendants' reassuring statements about Adeptus's internal controls.  In a February 25, 2016 report, Stephens analysts stated:

> *Material Weakness for Internal Control NOT an Issue, in our view*. ADPT management mentioned that its internal control evaluation led to a material weakness for internal controls. This issue was attributable to the outsourcing of coding to McKesson and because of timing, MCK's auditor's SOC 1 (Service Organization Controls) report, previously known as a SAS70 report, did not have information provided by ADPT. The company previously never needed an internal control report and the only reason it changed this year is because the company surpassed the $700 million market cap level last summer, which makes it an accelerated filer and it is no longer an emerging growth company. *This issue has no bearing or impact on ADPT's financial statements and the company expects its auditors to provide a clean opinion when its 10K is filed on Monday (2/29)*.

265.    Likewise, Jefferies analysts issued a February 25, 2016 report, in which they rated Adeptus a buy and stated that the "'*Material weakness' clause on 'controls' is a non-event*.

During the call, mgmt. mentioned that their auditors have noted a 'material weakness' related to 'controls', ***which has since been addressed*."

266.    Similarly, Stephens analysts issued an April 20, 2016 report stating, "ADPT also called out that the transition of its billing to McKesson [] caused a 3-day drag (~$9 million) on the DSO. We expect this to normalize in 2Q as the transition (started Oct 1) is now complete."  These analysts specifically noted that Defendants had "reiterated the target for free cash of $25 million" as a signal that any issues with McKesson were not impacting cash flow.  Likewise, in a report issued that same day, KeyBanc analysts noted, "Management commented that the [slight] increase [in DSO from 57 days to 63 days] was temporary and was driven by the implementation of a McKesson billing system."

### 3.    Second And Third Quarter 2016 Earnings Calls

267.    On the Company's July 21, 2016 earnings call, Defendants once again reassured investors that the Company's internal controls were sound and downplayed a reported increase in DSO.  Fielding stated, "While a portion of the increase [in DSO] is due to increased payment plans the remainder is due to our new third-party revenue cycle companies experiencing growing pains. They are working quickly to optimize their systems and adjust their staffing levels."

268.    On November 1, 2016, Adeptus held its third quarter earnings call with investors, attended by Hall and Cherrington.  On that call, Defendants disclosed that Adeptus was facing a liquidity crisis driven by "collection issues associated with our third party billing" and the Company's funding of 100% of the working capital of its JVs.  However, Hall continued to reassure investors that management had "a solid grasp on the issues and an achievable plan for overcoming the challenges we are facing."

269.    These statements were materially false and misleading when made.  It was misleading for Defendants to state that there were no material weaknesses in Adeptus's internal

controls apart from the purely technical control deficiency described above, and any increase in DSO was merely a product of McKesson's "growing pains" and "some transition issues," and that McKesson was "working quickly to optimize their systems and adjust their staffing levels," when, in truth, the Company's rising DSO was not the product of mere "growing pains" or transitional issues that had already been fixed, it was a symptom of significant, highly material deficiencies in "key" Company controls over revenue cycle management that were resulting in denied claims, "short" payments, and, ultimately, significant loss of revenue.

**D.    Defendants' False And Misleading Statements Concerning Adeptus's Liquidity, Cash Flow, And Financial Performance**

**1.    Adeptus's SEC Filings**

270.    In its IPO Offering Documents, Adeptus reported the following financial results:

| Financial Metric | $$ (In millions) |
| --- | --- |
| **Net Patient Services Revenue** | $38.78 |
| **Bad debt** | $5.75 |
| **Net Income** | ($2.77) |
| **Adjusted EBITDA** | $5.09 |

271.    In its second and third quarter 2014 Forms 10-Q (filed August 8, 2014 and November 7, 2014, respectively), Adeptus reported the following financial results (all results presented in millions except share data):

| Financial Metric | Second Quarter Form 10-Q $$ | Third Quarter Form 10-Q $$ |
| --- | --- | --- |
| **Net Patient Services Revenue** | $44.24 | $57.60 |
| **Bad debt** | $7.71 | $8.93 |
| **Net Income** | ($2.02) | ($1.60) |

| Financial Metric | Second Quarter Form 10-Q $$ | Third Quarter Form 10-Q $$ |
|---|---|---|
| EPS | ($0.21) | ($0.16) |
| Adjusted EPS | ($0.22) | ($0.01) |
| Adjusted EBITDA | $5.94 | $7.00 |

272.   In its February 27, 2015 Form 10-K, Adeptus reported the following financial results (all results presented in millions except share data):

| Financial Metric | 4Q14 | Full-Year 2014 |
|---|---|---|
| Net Patient Services Revenue | $70.06 | $210.67 |
| Bad debt | $10.23 | $32.62 |
| Net Income | $0.26 | ($3.35) |
| EPS | $0.03 | ($0.34) |
| Adjusted EPS | $0.09 | $0.04 |
| Adjusted EBITDA | $10.20 | $28.20 |

273.   In its May 1, 2015 Form 10-Q, Adeptus reported the following financial results:

| Financial Metric | $$ (In millions, except share data) |
|---|---|
| Net Patient Services Revenue | $80.96 |
| Systemwide Net Patient Services Revenue | $83.96 |
| Bad debt | $14.95 |
| Net Income | $0.59 |
| EPS | ($0.06) |
| Adjusted EPS | ($0.16) |
| Adjusted EBITDA | $13.26 |

274.   In the July 2015 Offering Documents, Adeptus reported the following second quarter 2015 financial results:

| Financial Metric | $$ (In millions, except share data) |
|---|---|
| Net Patient Services Revenue | $86.85 |
| Systemwide Net Patient Services Revenue | $104.51 |
| Bad debt | $17.51 |
| Adjusted EBITDA | $22.94 |
| Equity in earnings (loss) of unconsolidated joint ventures | $3.62 |

275.   In its second and third quarter 2015 Forms 10-Q (filed July 31, 2015 and October 30, 2015, respectively), Adeptus reported the following financial results (all results presented in millions except share data):

| Financial Metric | 2Q15 Form 10-Q | 3Q15 Form 10-Q |
|---|---|---|
| Net Patient Services Revenue | $86.85 | $83.35 |
| Systemwide Net Patient Services Revenue | $104.51 | $109.04 |
| Bad debt | $17.51 | $17.91 |
| Net Income | $10.63 | $0.67 |
| EPS | $0.97 | $0.05 |
| Adjusted EPS | $0.44 | $0.31 |
| Adjusted EBITDA | $22.94 | $18.64 |
| Equity in earnings (loss) of unconsolidated joint ventures | $3.62 | $4.54 |

276.   The statements described in ¶¶270-75 were materially false and misleading when made.  Contrary to GAAP, Defendants' statements purporting to report Adeptus's bad debt failed

to account for uncollectible emergency fees billed for non-emergency treatment, and, consequently, Adeptus's reported revenues and earnings were inflated and were also misstated. Moreover, Adeptus failed to adequately identify the risks and uncertainties associated with revenue and earnings attributable to these uncollectible fees, including that Adeptus was charging patients for emergency care even though they were not provided with such care and payers were refusing to pay these charges.

277.   In its 2015 Form 10-K, filed February 29, 2016, Adeptus reported the following financial results (all results presented in millions except share data):

| Financial Metric | 4Q15 | Full-Year 2015 |
|---|---|---|
| Net Patient Services Revenue | $99.34 | $350.49 |
| Systemwide Net Patient Services Revenue | $127.80 | $425.26 |
| Bad debt | $19.75 | $70.12 |
| Net Income | $1.31 | $13.22 |
| EPS | $0.09 | $1.09 |
| Adjusted EPS | $0.45 | $1.37 |
| Adjusted EBITDA | $21.10 | $75.91 |
| Equity in earnings (loss) of unconsolidated joint ventures | N/A | $8.93 |

278.   In its first and second quarter 2016 Forms 10-Q (filed April 29, 2016 and July 29, 2016, respectively), Adeptus reported the following financial results, including improving bad debt in the second quarter of 2016 – down by 50% from the prior quarter – which gave the market

comfort that Defendants would ultimately be able to collect the revenue they reported (all results presented in millions except share data):

| Financial Metric | 1Q16 Form 10-Q | 2Q16 Form 10-Q |
|---|---|---|
| Net Patient Services Revenue | $84.92 | $61.82 |
| Systemwide Net Patient Services Revenue | $142.38 | $143.40 |
| Bad debt | $16.67 | $8.36 |
| Net Income | $86.95 | $8.09 |
| EPS | $5.80 | ($0.49) |
| Adjusted EPS | $0.48 | $0.06 |
| Adjusted EBITDA | $22.50 | $9.67 |
| Equity in earnings (loss) of unconsolidated joint ventures | $2.44 | ($8.50) |

279.    The statements described in ¶¶277-78 were materially false and misleading when made.  Contrary to GAAP, Defendants' statements purporting to report Adeptus's bad debt failed to account for (i) uncollectible emergency fees billed for non-emergency treatment; and (ii) the impact of massive internal control weaknesses in Adeptus's revenue cycle management that were resulting in denied claims, "short" payments, and, ultimately, significant loss of revenue, and, consequently, Adeptus's reported revenues and earnings were inflated and were also misstated. Moreover, Adeptus failed to adequately identify the risks and uncertainties associated with revenue and earnings attributable to these uncollectible fees, including that (i) Adeptus was charging patients for emergency care even though they were not provided with such care and payers were refusing to pay these charges; (ii) Adeptus had massive internal control weaknesses in its revenue

cycle management that were resulting in denied claims, "short" payments, and, ultimately, significant loss of revenue.

280.    Adeptus's 2014 and 2015 Forms 10-K, first, second, and third quarter 2015 Forms 10-Q, and first and second quarter 2016 Forms 10-Q, stated, "We believe that cash we expect to generate from operations, the availability of borrowings under the Senior Secured Credit Facility and funds available under the MPT Agreement will be sufficient to meet liquidity requirements, including any payments made under the tax receivable agreement, anticipated capital expenditures and payments due under our Senior Secured Credit Facility and MPT Agreement for at least 12 months."

281.    These statements were materially false and misleading when made.  It was misleading for Defendants to state their expectation that Adeptus will be able "to meet liquidity requirements . . . for at least 12 months" without disclosing significant risks to Adeptus's cash flow and liquidity, including the Company's financing of 100% of the JVs' working capital and losses, its massive internal control weaknesses over revenue cycle management, and its overbilling of low-acuity patients.

## 2.      Fourth Quarter And Full-Year 2015 Earnings Call

282.    On Adeptus's February 24, 2016 fourth quarter and full-year 2015 earnings call, Defendants reassured investors that Adeptus would continue to collect the vast majority of the revenue it reported, and that no upwards revision of the Company's bad debt was required.  A Goldman Sachs analyst asked, "I was hoping you could update and touch on bad debt for a moment. It looked pretty in line at 16%. But is that high-teens range where you see it settling out as you move through 2016? Any changes in the composition there?"  Fielding responded, "Yes, I think that's accurate. I think it's what's what we expected we would see in Q4, is that it would come down from Q3. I think Q3 was 17.7%, so it came down a point."

283.   These statements were materially false and misleading when made.   It was misleading for Defendants to tout Adeptus's improving bad debt and to state that Adeptus's bad debt would remain in the same favorable range for the remainder of the year, while failing to disclose that Adeptus's bad debt failed to account for (i) uncollectible emergency fees billed for non-emergency treatment; and (ii) the impact of massive internal control weaknesses in Adeptus's revenue cycle management that were resulting in denied claims, "short" payments, and, ultimately, significant loss of revenue.

### 3.     First Quarter 2016 Earnings Call

284.   While Adeptus reported a slight increase in its provision for bad debt in the first quarter of 2016 – about 20% of revenue, on the Company's April 20, 2016 first quarter earnings call, Fielding blamed the increase on "seasonality," noted that the reported figures did not reflect McKesson's revenue collections data, and assured investors that McKesson's efforts would yield "positive results" with respect to bad debt.

> [W]e've stated in the past that our highest bad debt percentages *are in the first quarter, as deductibles reset*. Our Q1 2016 bad debt, as a percentage, is still based on our historical averages. It's just still too early to use McKesson [data as an input for reporting bad debt]. At June 30, we will be able to look at the bad debt using McKesson data, and *we think we should see positive results there*.

285.   These statements were materially false and misleading when made.   It was misleading for Defendants to attribute the rise in Adeptus's bad debt to "seasonality" and that bad debt would improve when McKesson's data was included, while failing to disclose that Adeptus's ability to collect reported revenue was severely constrained by (i) massive internal control weaknesses in the Company's revenue cycle management that were resulting in denied claims, "short" payments, and, ultimately, significant loss of revenue; and (ii) Adeptus's practice of

charging patients for emergency care even though they were not provided with such care, which charges payers were refusing to pay.

286.    Also on that April 20, 2016 earnings call, Defendants assured investors that Adeptus's cash flow remained strong.  A Bank of America Merrill Lynch analyst asked, "And then in terms of the cash, also appreciate the commentary around the way you're driving the, I guess, weaker operating cash flow. So is that right to say that these still stand by your prior comments around the outlook for free cash flow for the year, around $25 million, $35 million range there?" Fielding responded, "Yes, that's correct. We will reaffirm that."

287.    These statements were materially false and misleading when made.  It was misleading for Defendants to "reaffirm" that Adeptus's cash flow would remain strong, while failing to disclose significant risks to Adeptus's cash flow and liquidity, including the Company's financing of 100% of the JVs' working capital and losses, its massive internal control weaknesses over revenue cycle management, and its overbilling of low-acuity patients.

288.    Analysts were comforted by Defendants statements that the Company's uptick in bad debt was simply a function of seasonality.  In an April 21, 2016 report, for instance, JMP analysts stated, "Management commented that 1Q is the highest quarter for bad debt expense due to patients having not met deductibles in the New Year. In the previous earnings call, management guided to 2016 full-year bad debt expense at 16-19% of gross revenues. We have confirmed that there is no change to this assumption at this point."

### 4.    Second Quarter 2016 Earnings Call

289.    On Adeptus's July 21, 2016 second quarter earnings call, Defendants reassured investors concerned about the Company's quarterly performance, telling them that the Company was fundamentally sound and was already bouncing back from an anomalous lag in patient volumes in June.  Hall stated, "April was good. It was in line. May was good. June got soft on us,

out of nowhere. It's the craziest business. Now July is back to about where we expected [it] to be or maybe a little bit above where we expected to be."

290.    This statement was materially false and misleading when made.  It was misleading for Defendants to state that "July is back to about where we expected [it] to be or maybe a little bit above where we expected to be," when, in fact, patient volumes were continuing to decline and never "bounced back" at all.

291.    Also, on the Company's July 21, 2016 earnings call, Defendants touted Adeptus's supposedly improving bad debt.  In response to an analyst's question, Fielding stated, "in terms of the bad debt, the improvement there that you're seeing, it really comes down to the change that we've seen with our new third-party billing company in terms of our payment plans. So we've seen our payment plans go up significantly compared to what we've had in the past."

292.    These statements were materially false and misleading when made.  It was misleading for Defendants to tout Adeptus's supposedly improving bad debt, while failing to disclose that Adeptus's ability to collect reported revenue was severely constrained by, and that the Company's reported bad debt failed to account for, (i) massive internal control weaknesses in the Company's revenue cycle management that were resulting in denied claims, "short" payments, and, ultimately, significant loss of revenue; and (ii) Adeptus's practice of charging patients for emergency care even though they were not provided with such care, which charges payers were refusing to pay.

293.    Analysts were reassured by Defendants' false and misleading statements.  For instance, Morgan Stanley analysts, writing in a July 22, 2016 analyst report, repeated Defendants' false statements reassuring investors that the Company's dropoff in patient volume had bounced back in July:  "The company noted that volume trends in July bounced back."  Analysts also took

comfort from Defendants' positive statements concerning bad debt.  For example, JMP analysts reported on July 22, 2016, "ADPT stated that the third-party collection service recently implemented has helped and could add upside to our estimates . . . . Bad debt expense was 16.4% of gross revenues versus our estimate of 20.1%, which finally breaks the trend of rising bad debt."

### 5.    September 12, 2016 Morgan Stanley Global Healthcare Conference

294.    On September 12, 2016, Hall and Cherrington attended the Morgan Stanley Global Healthcare Conference on behalf of Adeptus.  At that conference, Hall assured investors that neither his departure nor Fielding's signaled financial or operations difficulties at Adeptus.  Hall stated, "It had nothing to do with some of the receivables questions [*i.e.*, about Adeptus's ability to collect revenue] that we get and all that . . . . [I]t's not a function of, oh, something awful happened and they have a new CFO.  It's just the opposite."

295.    These statements were materially false and misleading when made.  It was misleading to state that Hall's and Fielding's departures "had nothing to do with" the issues concerning the Company's ability to collect revenue or that they were unrelated to serious problems at Adeptus.  In truth, both executives' departures were motivated by serious problems with Adeptus's cash flow and liquidity, including those attributable to the failure of the "cornerstone" of the Company's plan for growth – the JV strategy and the serious deficiencies in the Company's internal controls over revenue cycle management.

### E.    False And Misleading Omissions In Adeptus's SEC Filings

296.    Adeptus's SEC filings, described above, failed to disclose information required to be disclosed therein by Items 303 (17 C.F.R. §299.303).  These filings include the IPO Offering Documents, second quarter 2014 Form 10-Q (filed August 8, 2014); third quarter 2014 Form 10-Q (filed November 7, 2014); 2014 Form 10-K (filed February 27, 2015); first quarter 2015 Form 10-Q (filed May 1, 2015); May 2015 and July 2015 Offering Documents; second quarter 2015

Form 10-Q (filed July 31, 2015); third quarter 2015 Form 10-Q (filed October 30, 2015); 2015 Form 10-K (filed February 29, 2016); first quarter 2016 Form 10-Q (filed April 29, 2016); June 2016 Offering Documents; and second quarter 2016 Form 10-Q (filed July 29, 2016).

297.    Item 303 of Regulation S-K specifically highlights commitments, demands, events, trends, or uncertainties reasonably likely to affect the registrant's liquidity as one of the key items requiring comprehensive disclosure.  Specifically, Item 303 requires the disclosure of "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."

298.    Item 303 also singles out the registrant's capital commitments and resources for particularly comprehensive disclosure.  Item 303 requires disclosure of "the registrant's material commitments for capital expenditures as of the end of the latest fiscal period, and indicate the *general purpose of such commitments* and the *anticipated source of funds* needed to fulfill such commitments."  Item 303 further requires disclosure of "any known material trends, favorable or unfavorable, in the registrant's capital resources."

299.    Additionally, Item 303 also requires disclosure of trends or uncertainties specifically affecting revenue and income.  Specifically, Item 303 requires disclosure of "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected."  Item 303 further requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

300.     Finally, Item 303 calls out the registrant's "off-balance-sheet arrangements," such as Adeptus's arrangements with the JVs, for fulsome and comprehensive disclosure.  With respect to such arrangements, Item 303 requires disclosures of "off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on the registrant's financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors."

301.     Importantly, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company . . . with particular emphasis on the registrant's prospects for the future."  See Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).  Thus, "material-forward looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  See Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (December 29, 2003).

302.     Each of the several Item 303 disclosure obligations cited above required disclosure of information relating to (i) Adeptus's financing of 100% of the JVs' working capital and operating costs; (ii) the fact that all of the JVs, with the exception of the Colorado JV, were operating at a loss; (iii) Adeptus's overbilling of low-acuity patients on claims reimbursements; and (iv) material weaknesses in the Company's controls over revenue cycle management that were resulting in denied and short payments for claims, because, as alleged in detail above, each of these commitments, demands, events, trends, or uncertainties was reasonably likely to affect Adeptus's

cash flow, liquidity, capital commitments, earnings and net revenue, among other elements of the Company's financial condition and performance.  Adeptus's SEC filings failed to disclose such information.  Thus, Adeptus's SEC filings abjectly failed to satisfy numerous requirements of Item 303 of Regulation S-K, and the Exchange Act Defendants are liable for these omissions under Sections 10 and 20(a) of the Exchange Act.

## IX.   LOSS CAUSATION

303.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.  Throughout the Class Period, Adeptus's stock price was artificially inflated as a result of Defendants' materially false and misleading statements and omissions.

304.   Multiple separate disclosures revealed to the market on a piecemeal basis the false and misleading character of Defendants' statements and omissions. *First*, on November 17, 2015, KUSA aired a report, titled "BuyER Beware," detailing the findings of its months' long investigation into Adeptus's FERs, which revealed the Company's practice of overbilling low-acuity patients.  This report partially revealed the truth concealed by Defendants' misstatements, as the market understood that Defendants' ability to collect on reported revenue was impugned by its practice of overbilling low-acuity patients.  In response to KUSA's "BuyER Beware" report, Adeptus stock fell by more than 22% on heavy trading volume, from $59.87 per share to $46.50 per share on November 17, 2015

305.   However, the November 17, 2015 disclosure did not reveal the full truth to investors.  Defendants continued to mislead investors, thus preventing the market from learning the complete truth about Adeptus's financial condition, including its cash flow and liquidity.  Among other things, Defendants continued to tout the high acuity of Adeptus's patients, trumpet the success of the JV strategy, and to report low and, even improving, bad debt.

306.    *Second*, on July 28, 2016 and on September 7, 2016 Adeptus announced the surprise departures of its CFO and CEO, respectively.  These announcements revealed to the market that the Company's financial condition was more precarious than had been previously disclosed and, in particular, that the "cornerstone" of the Company's plan for growth – the JV strategy – was not having the positive impact the Company had claimed.  Accordingly, on July 28, 2016, Adeptus stock fell 3%, from $47.11 to $45.52, on heavy trading volume in reaction to the Company's surprise announcement of Fielding's departure; on September 7, 2016, in response to the Company's announcement of Hall's departure, Adeptus stock fell by more than 14%, from $42.25 per share to $35.70.

307.    As before, however, Adeptus's disclosures failed to reveal the full truth to investors.  Defendants reassured investors that the surprise departures did not augur negative news about Adeptus.  For instance, Hall told investors that these departures had "nothing to do with some of the receivables questions [*i.e.*, about Adeptus's ability to collect revenue] that we get and all that . . . . [I]t's not a function of, oh, something awful happened and they have a new CFO.  It's just the opposite."

308.    *Third*, on November 1, 2016, prior to the opening of the market Adeptus announced that it would delay the release of its third quarter earnings until close of the market that day.  After the close of the market on November 1, 2016, Adeptus held its third quarter earnings call.  On that call, Adeptus management disclosed that the Company was facing a stark liquidity crisis.  Adeptus management further disclosed, for the first time, that, contrary to Defendants' prior statements, the Company had paid 100% of the working capital and operating losses for its JVs.  Adeptus management further disclosed that the Company was unable to collect reimbursement from payers.  Adeptus management blamed these issues for the Company's dire liquidity problems.

309.    In response to Adeptus's November 1, 2016 disclosures, Adeptus stock plummeted 72%, from $30.12 per share at the close of the market on October 31, 2016 to $18.27 per share at the close of the market on November 2, 2016, on extremely high volume.

310.    Again, however, the market did not learn the complete truth about the cash flow and liquidity risks Defendants had concealed from investors.  In the wake of Adeptus's November 1, 2016 disclosures, Defendants made false and misleading statements that failed to disclose the material weaknesses in the Company's internal controls over revenue cycle management, and reassured investors that management had "a solid grasp on the issues and an achievable plan for overcoming the challenges we are facing."  In addition, Adeptus continued to report improving bad debt.

311.    *Fourth*, on March 2, 2017, Adeptus notified investors that it would delay the filing of its 2016 Form 10-K, and admitted that the Company may need to record hundreds of millions of dollars in write-downs in order to correct previously reported financial results.  Moreover, the Company admitted that fundamental weaknesses in the Company's internal controls contributed to the Company's liquidity crisis.  In response to this disclosure, the Company's share price declined $3.76, or over 57.5%, to close at $2.79 that same day.

312.    In all, disclosures of the true facts concerning the risks to Adeptus's cash flow and liquidity, including its financing of 100% of the JVs' working capital, its overbilling of low-acuity patients, and its material weaknesses in revenue cycle management, caused massive losses to investors, with Adeptus shares falling *over 95%*, from $59.87 per share at the close of trading on November 16, 2015, to $2.79 per share at the close of trading on March 2, 2017.

313.    It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of Adeptus securities.

114

It was also foreseeable to Defendants that the revelation of the truth about Adeptus's cash flow and liquidity, including its financing of 100% of the JVs' working capital, its overbilling of low-acuity patients, and its material weaknesses in revenue cycle management, would cause the price of the Company's securities to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed.  Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## X.   PRESUMPTION OF RELIANCE

314.   At all relevant times, the market for Adeptus's securities was efficient for the following reasons, among others:

> (a)   Adeptus's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;
>
> (b)   As a regulated issuer, Adeptus filed periodic reports with the SEC and NYSE;
>
> (c)   Adeptus regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and
>
> (d)   Adeptus was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales forces and certain customers.  Each of these reports was publicly available and entered the public market place.

315.   As a result of the foregoing, the market for Adeptus stock promptly digested current information regarding Adeptus from all publicly available sources and reflected such information in Adeptus's stock price.  Under these circumstances, all purchasers of Adeptus securities during the Class Period suffered similar injury through their purchase of Adeptus securities at artificially inflated prices, and a presumption of reliance applies.

316.   In addition, Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

## XI.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

317.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Complaint. Many of the specific statements described herein were not identified as "forward-looking" when made.  To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or that the forward-looking statement was authorized and/or approved by an executive officer of Adeptus who knew that those statements were false or misleading when made.

## XII.   CLASS ACTION ALLEGATIONS

318.   Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Adeptus securities between June 25, 2014 and March 1, 2017, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of Adeptus at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

319.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Adeptus common shares were actively traded on the

NYSE.  As of July 2016, Adeptus had 16,280,397 shares of common stock outstanding.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members of the proposed Class.  Class members who purchased Adeptus common shares may be identified from records maintained by Adeptus or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

320.    Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

321.    Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

322.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about Adeptus, including its reported financial results; the JV strategy and its impact on the Company's financial condition; the extent to which Adeptus's ability to collect reported revenue was compromised by the Company's practice of overbilling low-acuity patients; and the adequacy of the Company's internal controls;

(c)    whether Defendants acted with scienter; and

(d)    to what extent the members of the Class have suffered damages, as well as the proper measure of damages.

323.     A class action is superior to all other available methods for the fair and efficient

adjudication of this action because joinder of all Class members is impracticable.  Additionally,

the damage suffered by some individual Class members may be relatively small so that the burden

and expense of individual litigation makes it impossible for such members to individually redress

the wrong done to them.  There will be no difficulty in the management of this action as a class

action.

## XIII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE
10b-5 PROMULGATED THEREUNDER
(Against The Executive Defendants)**

324.     Plaintiffs repeat and re-allege each and every allegation set forth above as if fully

set forth herein.

325.     This Count is asserted on behalf of all members of the Class against the Executive

Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-

5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

326.     During the Class Period, Defendants disseminated or approved the false statements

specified below, among others, which Defendants knew or deliberately disregarded were

misleading in that they contained misrepresentations and failed to disclose material facts necessary

in order to make the statements made, in light of the circumstances under which they were made,

not misleading.

327.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material

facts or omitted to state material facts necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading; and/or (c) engaged in acts,

practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Adeptus common stock during the Class Period. As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to, Adeptus's revenue, earnings, and bad debt; the JV strategy's impact on the Company's financial condition; the extent to which Adeptus's ability to collect reported revenue was compromised by the Company's practice of overbilling low-acuity patients; and the adequacy of the Company's internal controls.

328.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Adeptus securities, which were intended to, and did: (a) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, Adeptus's revenue, earnings, and bad debt; the JV strategy's impact on the Company's financial condition; the extent to which Adeptus's ability to collect reported revenue was compromised by the Company's practice of overbilling low-acuity patients; and the adequacy of the Company's internal controls; (b) artificially inflate and maintain the market price of Adeptus securities; and (c) cause Plaintiffs and other members of the Class to purchase Adeptus securities at artificially inflated prices and suffer losses when the true facts became known.

329.     As described above, Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

330.     Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Adeptus securities, which inflation was removed from the stock when the true facts became known.  Plaintiffs and the Class would not have purchased Adeptus securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' false and misleading statements.

331.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases of Adeptus securities during the Class Period.

## COUNT II

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against All Exchange Act Defendants)

332.     Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

333.     This Count is asserted on behalf of all members of the Class against all Exchange Act Defendants – the Executive Defendants and the Sterling Defendants – for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

334.     As alleged in detail above, throughout the Class Period, Sterling was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of its voting power, ownership, rights as against Adeptus, and/or specific acts, Sterling had the power

to control Adeptus's operations and its decision-making processes.  Specifically, (i) throughout the Class Period, Sterling maintained a controlling interest in both Adeptus's common stock and in its voting securities; (ii) Sterling had the power to appoint, and did appoint, a majority of the Board's directors, which included Rosenberg and Hosler, who were both senior personnel at Sterling, and Napolitano, who was Sterling's outside counsel; (iii) Sterling hand-picked Adeptus's senior executive team, including the Executive Defendants; (iv) Sterling caused Adeptus to enter into the Stockholders Agreement, which, among other things, gave Sterling the right to: nominate directors to Adeptus's Board and cause Adeptus to solicit proxies in favor of, and vote for, those nominees, while preventing Adeptus from acting to remove any of Sterling's nominees except for cause; designate a majority of the members of the key Board committees; prevent Adeptus from making significant business decisions – such as hiring and firing a CEO, selling assets, or issuing securities – without Sterling's consent; access Adeptus's non-public information; provide input into Adeptus's day-to-day management, in addition to the influence it wielded through its controlling share ownership and majority Board representation; and appropriate non-public information for its own benefit;  (v) Sterling caused Adeptus to enter into the Advisory Agreement, whereby Sterling provided "advice and assistance concerning any and all aspects of the operations, planning and financing of the Company and its subsidiaries"; (vi) Sterling had the power to cause Adeptus to register and offer securities for sale to the public; and (vii) Sterling was instrumental in helping Adeptus obtain credit.

335.    Sterling exercised its control over Adeptus to cause the Company to issue public statements (including issuing the false and misleading registration statements and prospectuses pursuant to which the Offerings were conducted, as well as Adeptus's false and misleading 2014 and 2015 Forms 10-K, which were all signed by Sterling's representatives on the Adeptus Board),

and register and sell securities to the investing public on Sterling's behalf.  As discussed above, Sterling also had the power to cause Adeptus to enter into contracts, and Sterling exercised that power with respect to the Stockholders Agreement, Advisory Agreement, and the Executive Defendants' employment agreements, among others.

336.    As alleged above, in its public filings during the Class Period, Adeptus readily acknowledged Sterling's power to control the Company's operations and decision-making process. Among other things, Adeptus acknowledged that Sterling "***has the ability to control us***," and "***will continue to have significant influence over us after this offering [the IPO]***."   In particular, Adeptus acknowledged that Sterling, as a controlling shareholder, "may have the ability to control the outcome of matters submitted to a vote of stockholders," and, through its control of the Board, Sterling had "***the ability to control decision-making with respect to our business direction and policies***."

337.    During their tenures as officers and/or directors of Adeptus, each of the Executive Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Adeptus, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.

338.    As more fully described above, in their capacities as senior corporate officers of the Company, the Executive Defendants had direct involvement in the day-to-day operations of the Company, in negotiating and approving Adeptus's agreements with its JVs, in testing and reviewing the Company's internal controls, and in issuing Adeptus's public statements concerning its cash flow, liquidity, the performance of and risks associated with the JVs, its internal control

122

weaknesses, and the acuity mix of its patients. The Executive Defendants made numerous false and misleading statements on Adeptus's behalf at investor conferences, in SEC filings, and on earnings calls.

339. Defendants Hall and Fielding signed the Company's SEC filings during the Class Period. Defendant Cherrington, as Adeptus's COO, as Chairman of the board of each of the JVs, and as a spokesperson to investors on Adeptus's behalf was directly involved in disseminating Adeptus's false and misleading statements during the Class Period. Each of the Executive Defendants owned Adeptus stock during the Class Period, and Defendant Hall was a member of the Board, serving as its Chairman from January 2015 until November 2016. As a result of the foregoing, the Executive Defendants, as a group and individually, were controlling persons of Adeptus within the meaning of Section 20(a) of the Exchange Act.

340. Adeptus violated Section 10(b) of the Exchange Act by its acts and omissions, as alleged in this Complaint. By virtue of their positions as controlling persons of Adeptus, Sterling and the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally to Plaintiffs and the other members of the Class who purchased or otherwise acquired Adeptus common stock.

341. As a direct and proximate result of Sterling's and the Executive Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Adeptus securities.

## **PART TWO**
## XIV.  SECURITIES ACT ALLEGATIONS

342. In Counts Three through Five below (the "Securities Act Claims"), Plaintiffs assert strict liability and negligence claims based on Sections 11, 12(a)(2), and 15 of the Securities Act. Plaintiffs incorporate the above factual allegations by reference, but expressly disclaim any

allegations of scienter or fraud for these Securities Act claims, except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief.

343.    The Securities Act Claims arise out of Adeptus's $411 million August 4, 2015 offering of 3.91 million shares at $105 per share ("July 2015 Offering"); and its $175 million June 8, 2016 offering of 2.82 million shares at $62 per share ("June 2016 Offering") (collectively, the "Offerings").

344.    The July 2015 Offering was conducted pursuant to a July 20, 2015 shelf registration statement and July 29, 2015 prospectus (collectively, the "July 2015 Offering Documents").  The July 2015 Offering Documents explicitly incorporated by reference the statements in the Company's 2014 Form 10-K, filed February 27, 2015; first quarter 2015 Form 10-Q, filed May 1, 2015; and April 23, 2015 Form 8-K, among others.

345.    The June 2016 Offering was conducted pursuant to a June 2, 2016 prospectus, pursuant to Adeptus's July 20, 2015 shelf registration statement (the "June 2016 Offering Documents").  The June 2016 Offering Documents explicitly incorporated by reference the statements in the Company's 2014 Form 10-K (filed February 27, 2015); its first quarter 2015 Form 10-Q (filed May 1, 2015); its 2015 Form 10-K (filed February 29, 2016); its first quarter 2016 Form 10-Q (filed April 29, 2016); and its May 16, 2016 Form 8-K, among others.  By operation of law, the June 2016 Offering Documents also incorporated by reference the statements in Adeptus's second and third quarter 2015 Forms 10-Q (filed July 31, 2015 and October 30, 2015, respectively).

346.    The July 2015 Offering Documents and June 2016 Offering Documents are collectively referred to herein as the "Offering Documents."

347.    Each of the Offerings was a "firm commitment" offering, pursuant to which the Underwriter Defendants, as defined below, purchased shares from Adeptus and distributed them to the investing public.

348.    This action was brought within one year after the discovery of the untrue statements and omissions (and within one year after such discovery should have been made in the exercise of reasonable diligence) and within three years of the Offerings.

## A.    The Securities Act Plaintiffs

349.    Lead Plaintiff ACERA is the retirement pension plan for public employees in Alameda County, California and currently has $7.6 billion of assets under management.  As set forth in the amended certification attached as Exhibit B hereto, ACERA purchased approximately 30,846 shares of Adeptus common stock traceable to the IPO on numerous occasions between August 2014 and February 2015.  Also, as set forth in ACERA's certification, it purchased 28,074 shares of Adeptus common stock in and traceable to the July 2015 Offering:  these shares were purchased from Defendant Goldman, Sachs & Co. ("Goldman Sachs"), at the exact offering price of $105 per share, in a transaction that settled on August 4, 2015 (the date the July 2015 Offering closed).  ACERA paid no commissions on its purchase of 28,074 shares of Adeptus common stock in the July 2015 Offering, which would have been impossible had the purchases been made in the aftermarket.

350.    Additional named plaintiff Miami is a public pension fund with approximately $141 million in assets under management.  As set forth in the certification attached hereto as Exhibit C, Miami purchased 125 shares of Adeptus common stock in and traceable to the June 2016 Offering:  these shares were purchased from Goldman Sachs, at the exact offering price of $62.00 per share, in a transaction that settled on June 8, 2016 (the date the June 2016 Offering closed).  Miami paid no commissions on its purchase of 125 shares of Adeptus common stock in

the June 2016 Offering, which would have been impossible had the purchases been made in the aftermarket.

## B.      The Securities Act Defendants

### 1.      The Sterling Defendants

351.    Defendant Sterling Partners is a Chicago-based private equity firm.   Sterling Partners and its affiliated funds acquired 75% of Adeptus in 2011.  As discussed extensively below, Sterling Partners and its affiliated funds – including the following Delaware limited partnerships: SC Partners III, L.P.; SCP III AIV THREE-FCER Conduit, L.P.; and SCP III AIV THREE-FCER, L.P. – (collectively, "Sterling") had the power to control, and did control Adeptus, at the time of each of the Offerings.

### 2.      Defendants Hall and Fielding

352.    Defendant Thomas S. Hall served as Adeptus's CEO from March 2012 until his sudden "resignation" on November 8, 2016, just as the truth about Adeptus was beginning to emerge.  Hall also served as Adeptus's President from March 2012 until January 1, 2015.  Hall was a member of Adeptus's Board throughout his tenure at the Company, and served as its Chairman from January 1, 2015 until November 1, 2016.  Hall signed the registration statements pursuant to which each of the Offerings were conducted.

353.    Defendant Timothy L. Fielding served as Adeptus's CFO and Principal Financial and Accounting Officer from January 2013 until his sudden "resignation," announced July 28, 2016, which became effective September 30, 2016.  Fielding signed the registration statements pursuant to which each of the Offerings were conducted.

### 3.      The Director Defendants

354.    Defendant Richard Covert co-founded Adeptus and served as Chairman of the Board from 2012 until January 2015, at which point he became Vice-Chairman of the Board.

Covert was a Director at the time of each of the Offerings and signed the registration statements pursuant to which each of the Offerings were conducted.

355.    Defendant Daniel W. Rosenberg was a Managing Director of Sterling from 2006 through February 2017.  Rosenberg joined Adeptus's Board in 2011, and resigned from the Adeptus Board, effective immediately, on May 10, 2017.  Rosenberg was a Director at the time of each of the Offerings and signed the registration statements pursuant to which each of the Offerings were conducted.

356.    Defendant Steven V. Napolitano served as Sterling's outside legal counsel.  Napolitano was a Director of Adeptus from 2014 until his resignation, effective immediately, on May 25, 2017.  According to his law firm's website, Napolitano served as counsel to Adeptus – which the website described as "a portfolio company of Sterling Partners" – in connection with "the acquisition, development and JV formation of Dignity General Hospital (Arizona) and University of Colorado General Hospital (Colorado)."  Napolitano was a Director at the time of each of the Offerings and signed the registration statements pursuant to which each of the Offerings were conducted.

357.    Defendant Ronald L. Taylor joined the Adeptus Board in 2012 and served as a Director throughout the Class Period, including as a member of the Audit Committee.  Taylor was a Director at the time of each of the Offerings and signed the registration statements pursuant to which each of the Offerings were conducted.

358.    Defendant Gregory W. Scott joined the Adeptus Board in 2013 and served as a Director throughout the Class Period.  Scott was a Director at the time of each of the Offerings and signed the registration statements pursuant to which each of the Offerings were conducted.  On

November 1, 2016, Adeptus announced Scott would replace Hall as Chairman of Adeptus's Board. A week later, on November 8, 2016, Adeptus announced that Scott would replace Hall as CEO.

359.    Defendant Jeffrey S. Vender joined the Adeptus Board in 2011 and served as a Director throughout the Class Period.  Vender was a Director at the time of each of the Offerings and signed the registration statements pursuant to which each of the Offerings were conducted.

360.    Defendant Stephen M. Mengert joined the Adeptus Board in June 2015 and served as a Director throughout the remainder of the Class Period.  Mengert was a Director at the time of the July 2015 and June 2016 Offerings, and signed the registration statement pursuant to which these Offerings were conducted.

### 4.    The Underwriter Defendants

361.    Defendant Goldman, Sachs & Co. ("Goldman Sachs") served as a lead Underwriter in each of the Offerings.  Goldman Sachs was a lead Underwriter in the July 2015 Offering, and was the sole Underwriter of the June 2016 Offering.

362.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") served as a lead Underwriter in connection with the July 2015 Offering.

363.    Defendant Evercore Group L.L.C. ("Evercore") was a lead Underwriter in the IPO, and an Underwriter of the July 2015 Offering.

364.    Defendant Piper Jaffray & Co. ("Piper Jaffray") was an Underwriter in the July 2015 Offering.

365.    Defendant Dougherty & Company LLC ("Dougherty") was an Underwriter in the July 2015 Offering.

366.    Defendant BMO Capital Markets Corp. ("BMO") served as a lead Underwriter in the July 2015 Offering.

### C.     Non-Party Adeptus

367.     Adeptus, Inc. is a Delaware corporation that purports to be the largest operator of freestanding emergency rooms in the United States.  The Company went public on June 25, 2014 and, less than three years later, on April 19, 2017, Adeptus filed for bankruptcy protection under Chapter 11of the United States Bankruptcy Code.

### D.     Background To The Securities Act Claims

368.     Plaintiffs reallege the factual allegations set forth above, but expressly disclaim any allegations of scienter or fraud for these Securities Act claims, except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief.  Among other things, Plaintiffs disclaim those allegations of scienter or fraud set forth in Sections V and VI, above.

369.     As detailed below, the Offering Documents contained untrue statements of material fact, including misrepresentations touting the success and profitability of the JV strategy, the high acuity of Adeptus's patients, and the integrity of the Company's internal controls.  They also omitted material facts required to be stated therein or to make the statements therein not misleading, including omissions of material facts about Adeptus's cash flow and liquidity, including Adeptus's funding of 100% of the JVs' working capital and operating losses, and its inability to collect revenue as a result of material control weaknesses and predatory billing.

370.     Indeed, Defendants' own admissions demonstrate that the Offering Documents contained material misrepresentations, including Defendant's admissions that they funded 100% of the JVs' working capital and operating losses, that Adeptus had grave material weaknesses in its controls over revenue cycle management since at least October 2015, and Defendants' write-down of tens of millions of dollars in accounts receivable booked for 2015 and 2016 (which

confirms that the Offering Documents understated Adeptus's bad debt and overstated its revenue and earnings).

371.    The Underwriter Defendants acted as underwriters of the Offerings by selling and distributing the Adeptus common stock offered to the investing public.  They were obligated under federal securities laws to conduct a reasonable investigation into the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Documents. Any reasonable investigation would have entailed a review of (i) the terms of Adeptus's agreements with the JVs – Adeptus's most significant business strategy at the time of each of the Offerings; (ii) the Company's internal controls; and (iii) the acuity of Adeptus's patients, which the Company frequently touted, and the extent to which the Company's requests for reimbursement were denied or significantly underpaid because of low patient acuity.  Such a review, in turn, would have revealed that the Offering Documents contained false and misleading statements, as alleged below.  None of the Underwriter Defendants made a reasonable investigation into the truthfulness and accuracy of the Offering Documents.

**1.    False And Misleading Omissions In The Offering Documents**

372.    As discussed below, the Offerings Documents contained numerous materially false and misleading misstatements and omissions of material fact.  Among these omissions, the Offering Documents failed to disclose information required to be disclosed therein by Items 303 (17 C.F.R. §299.303) and 503 (17 C.F.R. §299.503) of SEC Regulation S-K, and Rule 408 of SEC Regulation C (17 C.F.R. § 230.408).

373.    Item 303 of Regulation S-K specifically highlights commitments, demands, events, trends, or uncertainties reasonably likely to affect the registrant's liquidity as one of the key items requiring comprehensive disclosure.  Specifically, Item 303 requires the disclosure of "any known trends or any known demands, commitments, events or uncertainties that will result in or that are

reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."

374.    Item 303 also singles out the registrant's capital commitments and resources for particularly comprehensive disclosure.  Item 303 requires disclosure of "the registrant's material commitments for capital expenditures as of the end of the latest fiscal period, and indicate the *general purpose of such commitments* and the *anticipated source of funds* needed to fulfill such commitments."  Item 303 further requires disclosure of "any known material trends, favorable or unfavorable, in the registrant's capital resources."

375.    Additionally, Item 303 also requires disclosure of trends or uncertainties specifically affecting revenue and income.  Specifically, Item 303 requires disclosure of "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected."  Item 303 further requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

376.    Finally, Item 303 calls out the registrant's "off-balance-sheet arrangements," such as Adeptus's arrangements with the JVs, for fulsome and comprehensive disclosure.  With respect to such arrangements, Item 303 requires disclosures of "off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on the registrant's financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors."

377.    Importantly, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and

long-term analysis of the business of the company . . . with particular emphasis on the registrant's prospects for the future."  See Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Thus, "material-forward looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  See Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (December 29, 2003).

378.   Each of the several Item 303 disclosure obligations cited above required disclosure of information relating to (i) Adeptus's financing of 100% of the JVs' working capital and operating costs; (ii) the fact that all of the JVs, with the exception of the Colorado JV, were operating at a loss; (iii) Adeptus's overbilling of low-acuity patients on claims reimbursements; and (iv) material weaknesses in the Company's controls over revenue cycle management that were resulting in denied and short payments for claims, because, as alleged in detail above, each of these commitments, demands, events, trends, or uncertainties was reasonably likely to affect Adeptus's cash flow, liquidity, capital commitments, earnings and net revenue, among other elements of the Company's financial condition and performance.  The Offering Documents failed to disclose such information.  Thus, as alleged below, the Offering Documents abjectly failed to satisfy numerous requirements of Item 303 of Regulation S-K, and the Securities Act Defendants are liable for these omissions under Sections 11 and 12(a)(2) of the Securities Act.

379.   The Offering Documents were also materially false and misleading because they omitted information required to be disclosed under Item 503 of Regulation S-K.  Item 503 required the Offering Documents to include among other things, a "discussion of the most significant

factors that make the offering speculative or risky."  The Offering Documents failed to include the following highly significant factors making the Offerings speculative or risky:  (i) Adeptus was funding 100% of the working capital and operating losses of the JVs, and thus the JVs were an indefinite drag on the Company's margins, earnings, and cash flow until they became profitable if ever, and  the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside; (ii) all of the JVs, with the exception of the Colorado JV, were operating at a loss; (iii) Adeptus had a widespread practice of overcharging low-acuity patients by seeking fees for emergent care, including substantial facility fees, despite the fact that no emergent care was provided to those patients, which practice had a negative effect on payer reimbursement, and thus cash flow, liquidity, earnings and net revenue, among other things; and (iv) there were massive internal control failures in the Company's revenue cycle management that were resulting in denied claims, "short" payments, and, ultimately, significant loss of revenue.

380.    The Offering Documents were further materially false and misleading because they failed to disclose the information required by Rule 408 of SEC Regulation C.  Rule 408 requires that, "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading." Rule 408 required the Offering Documents to disclose information relating to (i) Adeptus's financing of 100% of the JVs' working capital and operating costs; (ii) the fact that all of the JVs, with the exception of the Colorado JV, were operating at a loss; (iii) the impact of Adeptus's overbilling of low-acuity patients on claims reimbursements; and (iv) material weaknesses in the Company's controls over revenue cycle management that were resulting in denied and short

payments for claims in order to make those Offering Documents not misleading.  The Offering

Documents, however, omitted these highly material facts, rendering them materially false and

misleading.

> **2.      False And Misleading Statements In The Offering Documents Concerning Patient Acuity**

381.      The Offering Documents repeatedly touted the high acuity level of Adeptus'

patients.  The Offering Documents stated:

- "Our facilities are fully licensed and provide comprehensive, emergency care with *an acuity mix that we believe is comparable to hospital-based emergency rooms*."

- "We operate at the *higher end of the acuity and emergency care spectrum*."

- "Our capabilities and offerings *differ from other care models* as outlined below . . . . We also provide convenient access to *critical, high-acuity care as compared with urgent care centers* and are open 24 hours a day, seven days a week."

382.      The 2014 and 2015 Forms 10-K that were incorporated by reference into the

Offering Documents further stated:

- "Given our 24/7 operating hours and ability to handle high-acuity needs, *instead of competing with* community medical practices and *urgent care clinics*, we believe we complement them.  *Many of our sites work closely with nearby urgent care facilities to ensure the most appropriate patient care for the community.*"

- "We treat any patient that is emergent, including patients without medical insurance."

- "The Company treats anyone that is emergent."

383.      These statements were materially false and misleading when made.  It was

misleading for the Offering Documents to tout the high acuity of Adeptus's patients, to state that

Adeptus "operate[s] at the higher end of the acuity and emergency care spectrum," that

Adeptus's acuity-mix is "comparable to hospital-based emergency rooms," and to differentiate

Adeptus from "other care models" by stating that Adeptus provides "access to critical, high-acuity

care as compared with urgent care centers," while failing to disclose Adeptus's widespread practice of overcharging low-acuity patients by seeking fees for emergent care, including substantial facility fees, despite the fact that no emergent care was provided to those patients.  It was also misleading for the Offering Documents to represent that Adeptus would "treat any patient that is emergent" while stating that it was not "competing with…urgent care clinics" and "work[ing] closely with **nearby urgent care facilities to ensure the most appropriate patient care for the community**" – when in reality Adeptus was treating and overbilling low acuity patients.  It was further misleading for the Offering Documents to fail to disclose that Adeptus's practice of overbilling low-acuity patients had a negative effect on payer reimbursement, and thus cash flow.

### 3.      False And Misleading Statements In The Offering Documents Concerning The JVs And The JV Model

384.   The July 2015 Offering Documents stated, "We also recently expanded into Arizona through a joint venture with Dignity Health, one of the nation's largest health systems, with the opening of a full-service healthcare hospital facility and includes plans for additional access to emergency medical care in the Phoenix area through freestanding emergency departments of the hospital.  To improve access to high-quality and convenient emergency medical care in the northern Colorado and Denver metro area, we recently partnered with UCHealth."

385.   This statement was materially false and misleading when made.  It was misleading to tout Adeptus's "expan[sion]" into the Arizona and Colorado markets "through a joint venture," when, in fact, Adeptus was responsible for financing 100% of that expansion because it was responsible for paying all the working capital and operating losses of its JVs.

386.     The July 2015 Offering Documents incorporated by reference Adeptus's April 23, 2015 Form 8-K, which included an Adeptus press release entitled, "Adeptus Health Reports First Quarter 2015 Results."  That press release stated, "Our momentum continued to build during the first quarter.  We opened seven new emergency rooms and received Medicare certification for Dignity Health Arizona General Hospital, our joint venture with Dignity Health in Phoenix.  Earlier this week, we announced our newest joint venture with University of Colorado Health.  We are excited about this new relationship as it allows us to expand access for our patients to one of the premier healthcare systems within the U.S."

387.     These statements were materially false and misleading when made.   It was misleading to tout the success of the Arizona JV and the benefits of the JV model, while failing to disclose that the Arizona JV was operating at a loss and that the JV model posed significant risks to Adeptus's financial health, including that (i) Adeptus was funding 100% of the working capital and operating losses of the JVs; (ii) the JVs were an indefinite drag on the Company's margins, earnings, and cash flow until they became profitable if ever; and (iii) the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.

388.     Adeptus's 2014 Form 10-K and its first quarter 2015 Form 10-Q, which were incorporated by reference into the Offering Documents, made statements communicating to investors that the Company shared losses and costs with its JV partners according to the partners' *pro rata* interest in the JV.  The 2014 Form 10-K stated, "Equity in loss of joint venture consists of ***our 49.9% share of losses*** generated from our non-controlling equity investment in a hospital facility located in Phoenix, Arizona.  Our equity in loss of unconsolidated joint venture was approximately $0.9 million for the year ended December 31, 2014."

389.    Likewise, Adeptus's 2014 Form 10-K and its first quarter 2015 Form 10-Q stated, "As a result of our strategy of partnering with Dignity Health for Dignity Health Arizona General Hospital, we do not own a controlling interest in this facility . . . . Similar to our consolidated facilities, this joint venture has debts.  With respect to this joint venture, these debts are not included in our consolidated financial statements . . . . **[T]he total debt on the balance sheet of the joint venture was approximately $0.3 million.  Our ownership in this joint venture was 49.9%**."

390.    These statements were materially false and misleading when made.  It was misleading for the Offering Documents to state that Adeptus had a "49.9% share of [its JVs'] losses" and to juxtapose a report of the "total debt" on the Arizona JV's balance sheet with the statement that Adeptus's "ownership in this joint venture was 49.9%," while failing to disclose that, in reality, Adeptus was financing all of the JVs' operating losses and debts.

391.    Adeptus's June 2016 Offering Documents incorporated by reference the Company's May 16, 2016 Form 8-K, which included a press release touting the Company's Texas JV, and, in particular, the earnings preference for Adeptus under the terms of the JV agreement. The Form 8-K stated, "On May 11, 2016, Adeptus Health Inc. entered into a joint venture agreement with Texas Health Resources to increase access to high quality, convenient emergency medical care in the Dallas-Fort Worth area . . . . Pursuant to terms of the joint venture agreement, Adeptus Health will receive quarterly preferred returns up to a specified amount on its investment in joint venture prior to proportionate distributions to partners."

392.    These statements were materially false and misleading when made.  It was misleading for the June 2016 Offering Documents to tout the benefits of the Texas JV and the JV model, while failing to disclose that all of the JVs, with the exception of the Colorado JV, were

operating at a loss, and that the Texas JV and the JV model posed a grave risk to Adeptus's financial health, including that (i) Adeptus was funding 100% of the working capital and operating losses of the JVs; (ii) the JVs were an indefinite drag on the Company's margins, earnings, and cash flow until they became profitable if ever; and (iii) the JV strategy required Adeptus to absorb 100% of the risk that the strategy would fail, while the JV partners bore none of the risk, but shared significantly in the upside.

### 4. False And Misleading Statements In The Offering Documents Concerning Adeptus's Internal Controls

393. Adeptus's June 2016 Offering Documents contained false and misleading statements about the Company's internal controls.  In its 2015 Form 10-K and first quarter 2016 Form 10-Q, which were incorporated by reference into the June 2016 Offering Documents, Adeptus identified only a single, merely technical, weakness in its controls.  The Form 10-K stated:

> As of December 31, 2015, we had one material weakness in our internal control over financial reporting . . . .  The Company's risk assessment process failed to design and implement appropriate process level and monitoring controls over revenue billing transactions and related accounts receivable performed by a third-party service provider on our behalf as of December 31, 2015 . . . . The third-party service provider is used by the Company to code claims and bill payors using ICD-10 code sets.  As of December 31, 2015, the internal control report provided by the service organization in assessing the effectiveness of its internal control over financial reporting was not sufficient for our purposes since the scope of the report did not include our transactions and data in the environment that was subject to the audit.  To address this issue, the Company plans to obtain an appropriate internal control report from the service organization to meet its reporting needs for the year ended December 31, 2016.

394. Adeptus's first quarter 2016 Form 10-Q stated, "Other than the controls related to material weakness described [in the 2015 Form 10-K, described above], there were no changes in our internal control over financial reporting . . . that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

395.    Importantly, in SOX certifications appended to the 2015 Form 10-K and first quarter 2016 Form 10-Q, Hall and Fielding represented that, apart from the purely technical control deficiency described above, there were no other weaknesses in Adeptus's internal controls. Specifically, Hall and Fielding certified that there were no "significant deficiencies and material weaknesses in the design or operation" of Adeptus's internal controls that had not been disclosed in the Company's 2015 Form 10-K and first quarter 2016 Form 10-Q.

396.    These statements were materially false and misleading when made.   It was misleading for the June 2016 Offering Documents to state that there were no material weaknesses in Adeptus's internal controls apart from the purely technical control deficiency described above, when, in truth, there were massive internal control failures in the Company's controls over revenue cycle management that were resulting in denied claims, "short" payments, and, ultimately, significant loss of revenue.

**5.    False and Misleading Statements In The Offering Documents Concerning Adeptus's Liquidity, Cash Flow, and Financial Performance**

397.    The Offering Documents reported the following financial results, incorporated by reference from the Company's 2014 Form 10-K:

| Financial Metric | 4Q14 $$ (In millions, except share data) | 2014 $$ (In millions, except share data) |
| --- | --- | --- |
| Net Patient Services Revenue | $70.06 | $210.67 |
| Bad debt | $10.23 | $32.62 |
| Net Income | $0.26 | ($3.35) |
| EPS | $0.03 | ($0.34) |
| Adjusted EPS | $0.09 | $0.04 |

| | | |
|---|---|---|
| **Adjusted EBITDA** | $10.20 | $28.20 |

398.    The Offering Documents reported the following financial results, incorporated by reference from the Company's first quarter 2015 Form 10-Q:

| Financial Metric | $$ (In millions, except share data) |
|---|---|
| **Net Patient Services Revenue** | $80.96 |
| **Systemwide Net Patient Services Revenue** | $83.96 |
| **Bad debt** | $14.95 |
| **Net Income** | $0.59 |
| **EPS** | ($0.06) |
| **Adjusted EPS** | ($0.16) |
| **Adjusted EBITDA** | $13.26 |

399.    The Offering Documents reported the following second quarter 2015 financial results for Adeptus:

| Financial Metric | $$ (In millions) |
|---|---|
| **Net Patient Services Revenue** | $86.85 |
| **Systemwide Net Patient Services Revenue** | $104.51 |
| **Bad debt** | $17.51 |
| **Adjusted EBITDA** | $22.94 |
| **Equity in earnings (loss) of unconsolidated joint ventures** | $3.62 |

400.    The June 2016 Offering Documents reported the following financial results, incorporated by reference from Adeptus's third quarter 2015 Form 10-Q (filed October 30, 2015);

2015 Form 10-K (filed February 29, 2016); and first quarter 2016 Form 10-Q (filed April 29,

2016):

| Financial Metric | 3Q15 $$ (In millions, except share data) | 4Q15 $$ (In millions, except share data | 2015 $$ (In millions, except share data) | 1Q16 $$ (In millions, except share data) |
|---|---|---|---|---|
| Net Patient Services Revenue | $83.35 | $99.34 | $350.49 | $106.24 |
| Systemwide Net Patient Services Revenue | $109.04 | $127.80 | $425.26 | $140.36 |
| Bad debt | $17.91 | $19.75 | $70.12 | $27.05 |
| Net Income | $0.67 | $1.31 | $13.22 | $4.53 |
| EPS | $0.05 | $0.09 | $1.09 | $0.32 |
| Adjusted EPS | $0.31 | $0.45 | $1.37 | $0.47 |
| Adjusted EBITDA | $18.64 | $21.10 | $75.91 | $21.74 |
| Equity in earnings (loss) of unconsolidated joint ventures | $4.54 | N/A | $8.93 | $2.50 |

401.     The statements described in ¶¶397-400, *supra*, were materially false and misleading

when made.  Contrary to GAAP, Defendants' statements purporting to report Adeptus's bad debt

failed to account for (i) uncollectible emergency fees billed for non-emergency treatment; and (ii)

the impact of massive internal control weaknesses in Adeptus's revenue cycle management that

were resulting in denied claims, "short" payments, and, ultimately, significant loss of revenue,

and, consequently, Adeptus's reported revenues and earnings were inflated and were also

misstated.  Moreover, Adeptus failed to adequately identify the risks and uncertainties associated with revenue and earnings attributable to these uncollectible fees, including that (i) Adeptus was charging patients for emergency care even though they were not provided with such care and payers were refusing to pay these charges; (ii) Adeptus had massive internal control weaknesses in its revenue cycle management that were resulting in denied claims, "short" payments, and, ultimately, significant loss of revenue.

402.    The Forms 10-K and 10-Q, including the 2014 and 2015 Forms 10-K and first quarter 2015 and 2016 Forms 10-Q. incorporated into the Offering Documents, stated, "We believe that cash we expect to generate from operations, the availability of borrowings under the Senior Secured Credit Facility and funds available under the MPT Agreement will be sufficient to meet liquidity requirements, including any payments made under the tax receivable agreement, anticipated capital expenditures and payments due under our Senior Secured Credit Facility and MPT Agreement for at least 12 months."

403.    These statements were materially false and misleading when made.  It was misleading for the June 2016 Offering Documents to state that Adeptus will be able "to meet liquidity requirements . . . for at least 12 months" without disclosing significant risks to Adeptus's cash flow and liquidity, including the Company's financing of 100% of the JVs' working capital and losses, its massive internal control weaknesses over revenue cycle management, and its overbilling of low-acuity patients.

      **E.**      **Claims For Relief Under The Securities Act**

<div align="center">

**<u>COUNT</u> III**

FOR **VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT**

</div>

**(Against Hall, Fielding, The Director Defendants,**
**And The Underwriter Defendants)**

404.    Plaintiffs reallege every allegation contained above as if fully set forth herein, only to the extent, however, that such allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

405.    This Count is based on Defendants' statutory liability for false and materially misleading statements or omissions in the Offering Documents.  This Count does not sound in fraud, and any allegations of knowing or reckless misrepresentations and/or omissions in the Offering Documents are excluded from this Count, except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made at the time of the Offerings.

406.    This Count is asserted against Hall and Fielding, the Director Defendants (with respect to Offerings occurring during their tenures as a Director), and the Underwriter Defendants (with respect to Offerings underwritten by them) for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons who acquired shares of Adeptus common stock pursuant to the Offering Documents.

407.    As alleged above, the Offering Documents contained untrue statements and omissions of material fact concerning, among other things, Adeptus's revenue, earnings, and bad debt; the JV strategy and its impact on the Company's financial condition; the extent to which Adeptus's ability to collect reported revenue was compromised by the Company's practice of overbilling low-acuity patients; and the adequacy of the Company's internal controls.

408.    None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering

Documents were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

409.    Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements identified above not misleading when they purchased or acquired the registered securities.  As a direct and proximate result of the acts and omissions of the Defendants named in this Count in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of Adeptus common stock sold through the Offerings.

410.    This claim is brought within one year of discovery of the untrue statements and omissions in the Offering Documents and within three years of their effective dates.

411.    By reason of the foregoing, the Defendants named in this Count are liable under Section 11 of the Securities Act to members of the Class who purchased or otherwise acquired the securities sold pursuant and/or traceable to the Offering Documents.

## COUNT IV

### FOR VIOLATIONS OF SECTION 12(a)(2) OF THE SECURITIES ACT
### (Against The Underwriter Defendants)

412.    Plaintiffs reallege every allegation contained above as if fully set forth herein, only to the extent, however, that such allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

413.    This Count is based on Defendants' statutory liability for false and materially misleading statements or omissions in the Offering Documents.  This Count does not sound in fraud, and any allegations of knowing or reckless misrepresentations and/or omissions in the Offering Documents are excluded from this Count, except that any challenged statements of

opinion or belief are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Offerings.

414.    This Count is asserted against the Underwriter Defendants (with respect to Offerings underwritten by them) for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all persons who acquired shares of Adeptus common stock pursuant to the Offering Documents.

415.    The Underwriter Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the Registration Statements.

416.    As alleged above, the Offering Documents contained untrue statements and omissions of material fact concerning, among other things, Adeptus's revenue, earnings, and bad debt; the JV strategy and its impact on the Company's financial condition; the extent to which Adeptus's ability to collect reported revenue was compromised by the Company's practice of overbilling low-acuity patients; and the adequacy of the Company's internal controls.

417.    By means of the Offering Documents (as well as instruments of transportation and communication in interstate commerce and the mails), Defendants named in this Count, through the Offerings, which were public offerings, solicited and sold Adeptus common stock to members of the Class.

418.    None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects.   Had they exercised reasonable care, these Defendants would have known of the material misstatements and omissions alleged herein.

419.    Class Members purchased Adeptus stock pursuant to the materially untrue or misleading Offering Documents.  Class members did not know, nor in the exercise of reasonable

diligence could they have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements identified above not misleading when they purchased such securities.

420.    This action is brought within one year of the date when Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based, and within three years of the date that the securities upon which this Count is brought were sold to the public.

421.    By reason of the foregoing, the Underwriter Defendants are liable for violations of §12(a)(2) of the Securities Act to Class members who purchased securities sold pursuant to the Offering Documents.   Such Class members also have the right to rescind and recover the consideration paid for such securities upon tender of their stock to the Underwriter Defendants, and to recover rescissory damages to the extent they have already sold such securities.

## COUNT V

### FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT
### (Against Hall, Fielding And Defendant Sterling)

422.    Plaintiffs reallege every allegation contained above as if fully set forth herein, only to the extent, however, that such allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

423.    This Count is based on Defendants' statutory liability for false and materially misleading statements or omissions in the Offering Documents.  This Claim does not sound in fraud, and any allegations of knowing or reckless misrepresentations and/or omissions in the Offering Documents are specifically excluded from this Count, except that any challenged statements of opinion or belief made in connection with the Offerings is alleged to have been a materially misstated statement of opinion or belief when made and at the time of the Offerings.

424.    This Count is asserted against Hall, Fielding, and Sterling Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all persons who acquired shares of Adeptus common stock pursuant to the Offering Documents.

425.    Adeptus is strictly liable under §§ 11 and 12(a)(2) for untrue statements and omissions of material fact in the Offering Documents.

426.    Hall, Fielding, and the Sterling Defendants, by virtue of their positions, voting power, ownership, rights as against Adeptus, and/or specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Adeptus within the meaning of § 15 of the Securities Act.  These Defendants also had the power and influence, and exercised the same, to cause Adeptus to engage in the acts described herein, including by causing Adeptus to conduct the Offerings pursuant to the Offering Documents.

427.    Specifically, with respect to Sterling, (i) throughout the Class Period, Sterling maintained a controlling interest in both Adeptus's common stock and in its voting securities; (ii) Sterling had the power to appoint, and did appoint, a majority of the Board's directors, which included Rosenberg and Hosler, who were both senior personnel at Sterling, and Napolitano, who was Sterling's outside counsel; (iii) Sterling hand-picked Adeptus's senior executive team, including the Executive Defendants; (iv) Sterling caused Adeptus to enter into the Stockholders Agreement, which, among other things, gave Sterling the right to: nominate directors to Adeptus's Board and cause Adeptus to solicit proxies in favor of, and vote for, those nominees, while preventing Adeptus from acting to remove any of Sterling's nominees except for cause; designate a majority of the members of the key Board committees; prevent Adeptus from making significant business decisions – such as hiring and firing a CEO, selling assets, or issuing securities – without Sterling's consent; access Adeptus's non-public information; provide input into Adeptus's day-to-

day management, in addition to the influence it wielded through its controlling share ownership and majority Board representation; and appropriate non-public information for its own benefit; (v) Sterling caused Adeptus to enter into the Advisory Agreement, whereby Sterling provided "advice and assistance concerning any and all aspects of the operations, planning and financing of the Company and its subsidiaries"; (vi) Sterling had the power to cause Adeptus to register and offer securities for sale to the public; and (vii) Sterling was instrumental in helping Adeptus obtain credit.

428.    Sterling exercised its control over Adeptus to cause the Company to conduct the Offerings and its representative(s) on the Adeptus Board signed all of the registration statements pursuant to which the Offerings were conducted.

429.    As alleged above, in its public filings during the Class Period, Adeptus readily acknowledged Sterling's power to control the Company's operations and decision-making process. Among other things, Adeptus acknowledged that Sterling "***has the ability to control us***," and "***will continue to have significant influence over us after this offering [the IPO]***."   In particular, Adeptus acknowledged that Sterling, as a controlling shareholder, "may have the ability to control the outcome of matters submitted to a vote of stockholders," and, through its control of the Board, Sterling had "***the ability to control decision-making with respect to our business direction and policies***."

430.    During their tenures as officers and/or directors of Adeptus, Hall and Fielding were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  By reason of their positions of control and authority as officers and/or directors of Adeptus, these Defendants had the power and authority to direct the management and activities of the Company

and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.

431.    As more fully described above, Hall and Fielding caused Adeptus to conduct the Offerings and signed the registration statements pursuant to which the Offerings were conducted. Moreover, in their capacities as senior corporate officers of the Company, Hall and Fielding had direct involvement in the day-to-day operations of the Company, in negotiating and approving Adeptus's agreements with its JVs, in testing and reviewing the Company's internal controls, and in issuing Adeptus's public statements concerning its cash flow, liquidity, the performance of and risks associated with the JVs, its internal control weaknesses, and the acuity mix of its patients. Hall and Fielding each owned Adeptus stock during the Class Period, and Defendant Hall was a member of the Board, serving as its Chairman from January 2015 until November 2016.  As a result of the foregoing, Hall and Fielding, together and individually, were controlling persons of Adeptus within the meaning of Section 15 of the Securities Act.

432.    By virtue of the conduct alleged herein, Hall, Fielding and the Sterling Defendants are liable for the aforesaid wrongful conduct and are liable to members of the Class who purchased Adeptus common stock pursuant and/or traceable to the Offering Documents.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages and equitable relief in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct, in an amount to be proven at trial, including interest thereon;

(c)    As to the Claims alleged under the Securities Act, awarding rescission or a recissionary measure of damages as appropriate;

(d)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(e)     Such other and further relief as the Court may deem just and proper.

## XVI.   JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated:  September 25, 2018

<div style="margin-left:40%">

  /s/  Clyde M. Siebman
Clyde M. Siebman
Texas Bar No. 18341600
Elizabeth S. Forrest
Texas Bar No. 24086207
**SIEBMAN FORREST BURG & SMITH, LLP**
Federal Courthouse Square
300 N. Travis Street
Sherman, Texas  75090
Tel: (903) 870-0070
clydesiebman@siebman.com
elizabethforrest@siebman.com

*Additional Counsel for Lead Plaintiff ACERA and Arkansas Teacher*

George L. McWilliams
Texas Bar No. 13877000
**LAW OFFICES OF GEORGE L. MCWILLIAMS, P.C.**
P.O. Box 58
Texarkana, Texas-Arkansas 75504
Tel: (870) 772-2055
Fax: (870) 772-0513
glmlawoffice@gmail.com

*Liaison Counsel for Lead Plaintiff ACERA and Arkansas Teacher*

Jeremy P. Robinson (*pro hac vice*)
Abraham Alexander (*pro hac vice*)

</div>

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
jeremy@blbglaw.com
abe.alexander@blbglaw.com

*Counsel for Lead Plaintiff ACERA and Arkansas
Teacher and Co-Lead Counsel for the Class*

Gregory M. Castaldo (*pro hac vice*)
Richard A. Russo, Jr.(*pro hac vice*)
**KESSLER TOPAZ MELTZER
& CHECK, LLP**

280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
gcastaldo@ktmc.com
rrusso@ktmc.com

*Counsel for Lead Plaintiff ACERA and Arkansas
Teacher, Named Plaintiff Miami, and Co-Lead
Counsel for the Class*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on this 25th day of September, 2018, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(a)(3).  Any other counsel of record will be served by a facsimile transmission and/or first class mail.

/s/ Clyde M. Siebman
Clyde M. Siebman