**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM, Individually And On Behalf Of All Others Similarly Situated, | Case No. 4:17-CV-0449-ALM |
| Plaintiff, | Judge Amos L. Mazzant, III |
| vs. | |
| ADEPTUS HEALTH INC., *et al.*, | |
| Defendants. | |

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF**
**CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION**
**AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT ................................................................................................................................ 4

I.     THE PROPOSED SETTLEMENT MEETS THE STANDARD FOR FINAL
APPROVAL UNDER RULE 23(e) ...................................................................................... 4

     A.     Plaintiffs and Lead Counsel Have Adequately Represented the Settlement
Class   5

     B.     The Settlement Was Negotiated at Arm's-Length and There Was No
Fraud or Collusion ................................................................................................... 6

     C.     The Settlement is Fair and Adequate in Light of the Costs and Delay of
Further Litigation .................................................................................................... 7

     D.     The Stage of the Proceedings Warrants Final Approval of the Settlement ............ 9

     E.     The Settlement is Fair and Reasonable in Light of the Risks of Further
Litigation ............................................................................................................... 10

     F.     The Settlement is Well Within the Range of Reasonableness ............................... 15

     G.     Lead Counsel, Plaintiffs, and Settlement Class Members Support Final
Approval of the Settlement .................................................................................... 17

     H.     The Other Factors Set Forth in Rule 23(e)(2) Support Final Approval of
the Settlement ........................................................................................................ 19

     1.     The Proposed Method of Distributing Settlement Proceeds is Effective ............. 19

     2.     The Requested Fees and Expenses are Fair and Reasonable ................................ 19

     3.     The Supplemental Agreement Does Not Affect the Fairness of the
Settlement .............................................................................................................. 20

     4.     The Settlement Treats Settlement Class Members Equitably ................................ 21

II.     THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE
AND SHOULD BE APPROVED ........................................................................................ 21

III.     NOTICE TO THE SETTLEMENT CLASS SATISFIED RULE 23 AND DUE
PROCESS ............................................................................................................................ 24

CONCLUSION.................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011), *aff'd*, 688 F. 3d 713 (11th Cir.
 2012) ........................................................................................................................9

*Billitteri v. Sec. Am., Inc.*,
 2011 WL 3586217 (N.D. Tex. Aug. 4, 2011) ....................................................7, 15

*In re Chicken Antitrust Litig. Am. Poultry*,
 669 F.2d 228 (5th Cir. 1982) ............................................................................15, 21

*In re China Sunergy Sec. Litig.*,
 2011 WL 1899715 (S.D.N.Y. May 13, 2011) ........................................................16

*City of Providence v. Aeropostale, Inc.*,
 2014 WL 1883494 (S.D.N.Y. May 9, 2014) .........................................................18

*Comcast Inc. v. Behrend*,
 569 U.S. 27 (2013) .................................................................................................14

*In re Deepwater Horizon*,
 739 F.3d 790 (5th Cir. 2014) ...................................................................................4

*In re Dell Inc., Sec. Litig.*,
 2010 WL 2371834 (W.D. Tex. June 11, 2010), *aff'd*, 669 F.3d 632 (5th Cir.
 2012) ...................................................................................................8, 19, 20, 21

*Erica P. John Fund, Inc. v. Halliburton Co.*,
 2018 WL 1942227 (N.D. Tex. Apr. 25, 2018) .........................................7, 15, 21

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*,
 4 F. Supp. 3d 94 (D.D.C. 2013) .............................................................................16

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
 851 F. Supp. 2d 1040 (S.D. Tex. 2012) ......................................................7, 8, 10

*In re Katrina Canal Breaches Litig.*,
 628 F.3d 185 (5th Cir. 2010) .................................................................................24

*Klein v. O'Neal*,
 705 F. Supp. 2d 632 (N.D. Tex. 2010) ....................................................................8

*Maher v. Zapata Corp.*,
 714 F. 2d 436 (5th Cir. 1983) ................................................................................24

*Manchaca v. Chater*,
　927 F. Supp. 962 (E.D. Tex. 1996) ...................................................................10

*Marcus v. J.C. Penney Co., Inc.*,
　2017 WL 6590976 (E.D. Tex. Dec. 18, 2017), *report and recommendation
　adopted*, 2018 WL 307024 (E.D. Tex. Jan. 4, 2018) ........................................17

*In re Microstrategy, Inc. Sec. Litig.*,
　148 F. Supp. 2d 654 (E.D. Va. 2001) ................................................................24

*Nathenson v. Zonagen Inc.*,
　267 F.3d 400 (5th Cir. 2001) .............................................................................15

*Newby v. Enron Corp.*,
　394 F.3d 296 (5th Cir. 2004) ...............................................................................4

*In re OCA, Inc. Sec. & Derivative Litig.*,
　2009 WL 512081 (E.D. La. Mar. 2, 2009) .............................................8, 10, 19

*Reed v. General Motors Corp.*,
　703 F.2d 170 (5th Cir. 1983) ..................................................................*passim*

*Schwartz v. TXU Corp.*,
　2005 WL 3148350 (N.D. Tex. Nov. 8, 2005) ..........................................*passim*

*In re Waste Mgmt., Inc. Sec. Litig.*,
　2002 WL 35644013 (S.D. Tex. May 10, 2002), *amended*, 2003 WL 27380802
　(S.D. Tex. July 31, 2003) ...................................................................................23

**RULES**

Fed. R. Civ. P. 23(c)(2)(B) .................................................................................24, 25

Fed. R. Civ. P. 23(e) ...............................................................................................1, 4

Fed. R. Civ. P. 23(e)(1) ............................................................................................24

Fed. R. Civ. P. 23(e)(2) ...................................................................................*passim*

**OTHER AUTHORITIES**

Stefan Boettrich & Svetlana Starykh, *Recent Trends in Securities Class Action
　Litigation: 2018 Full-Year Review* .....................................................................16

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs, Alameda County Employees' Retirement Association ("ACERA") and Arkansas Teacher Retirement System ("ATRS" and, together with ACERA, "Lead Plaintiffs"), and additional named plaintiff Miami Fire Fighters' Relief and Pension Fund ("Miami" and, together with Lead Plaintiffs, "Plaintiffs"), on behalf of themselves and the Settlement Class, hereby respectfully move for final approval of the proposed settlement of this action (the "Action") for $44,000,000 in cash (the "Settlement"), and for approval of the proposed plan for allocating the proceeds of the Settlement (the "Plan of Allocation" or "Plan").[1]

## PRELIMINARY STATEMENT

Subject to the Court's approval, Plaintiffs have agreed to settle all claims in the Action in exchange for a cash payment of $44 million for the benefit of the Settlement Class.[2]  Plaintiffs respectfully submit that the proposed Settlement represents a substantial and favorable recovery for the Settlement Class and readily satisfies the standards for final approval under Rule 23(e)(2).

The proposed Settlement is the result of three years of hard-fought litigation between the Parties.  As detailed in the Joint Declaration, the litigation efforts in this case were extensive and included, among other things, (i) a thorough investigation of the claims against Defendants; (ii) the filing of two detailed complaints; (iii) two rounds of motions to dismiss briefing; (iv) full briefing on Plaintiffs' motion for class certification ("Motion to Certify"); (v) extensive discovery, including depositions of 27 fact witnesses, analysis of over 2.7 million pages of documents

---

[1]     Unless otherwise noted, capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated November 26, 2019 (ECF No. 275-2) (the "Stipulation") or in the Joint Declaration of Jeremy P. Robinson and Richard A. Russo, Jr. in Support of: (A) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Joint Declaration" or "Joint Decl."), filed herewith. Citations to "¶ __" refer to paragraphs in the Joint Declaration and citations to "Ex. __" refer to exhibits to the Joint Declaration.

[2]     The Settlement Amount has been deposited into the Escrow Account and is earning interest.

produced by Defendants and numerous third parties, and consultation with various experts; and (vi) arm's-length negotiations between the Parties under the supervision of former United States District Judge Layn R. Phillips, a highly-experienced mediator.  This substantial work gave Plaintiffs and Plaintiffs' Counsel a thorough understanding of the strengths and weaknesses of the claims and defenses asserted in the Action.  Plaintiffs respectfully submit that the Settlement represents an excellent recovery in the circumstances of this case, is fair, reasonable, adequate, and in the best interests of the Settlement Class, and should be finally approved.

The $44 million Settlement is a particularly beneficial result for Settlement Class Members in light of the risks of the litigation and the other circumstances of this case, including the fact that Adeptus (the issuer of the securities at issue in the Action) filed for bankruptcy in April 2017, less than six months after the case began.  Adeptus's bankruptcy eliminated an important potential source of recovery and made success in this litigation significantly more challenging.  Plaintiffs and Plaintiffs' Counsel took steps to maximize the potential recovery for the Settlement Class under these circumstances by vigorously pursuing available claims against other entities, such as the Sterling Defendants and the Underwriter Defendants, and seeking to maximize recovery against the Executive Defendants and the Director Defendants.  But there can be no doubt that Adeptus's bankruptcy materially heightened the risk of recovering nothing in this litigation.

The Settlement is also an excellent result in light of the risks of continued litigation.  When the Settlement was reached, two key motions were still pending—Plaintiffs' Motion to Certify and Defendants' motions to dismiss the Second Amended Consolidated Class Action Complaint ("SAC" or "Complaint")—and an adverse ruling on either of those motions could have resulted in a significantly smaller recovery or no recovery at all.

Even if Plaintiffs succeeded on both motions, however, they still faced significant risk in

proving liability and damages.   Indeed, Defendants vigorously contested their liability for Plaintiffs' securities law claims and would have continued to do so through summary judgment, trial, and even through post-trial and appellate proceedings.   Plaintiffs therefore faced substantial risks in proving that Defendants had made materially false statements, in defeating the Underwriter Defendants' due diligence defense to Plaintiffs' Securities Act claims, and in proving scienter for their Exchange Act claims.   Even if Plaintiffs surmounted these challenges, Defendants pursued a litany of attacks on Plaintiffs' ability to establish loss causation and damages.   In light of all these risks, discussed in further detail below and in the Joint Declaration, Plaintiffs believe the Settlement is an excellent result for members of the Settlement Class.

Additionally, Plaintiffs request that the Court approve the Plan of Allocation, which was set forth in the Notice mailed to potential Settlement Class Members.   The Plan, which was developed by Lead Counsel in consultation with Plaintiffs' damages expert, provides a reasonable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims based on the damages they suffered and the different categories of claims they possessed.

As detailed further below, Plaintiffs and Lead Counsel respectfully submit that the Settlement and Plan of Allocation are fair, reasonable, and adequate and warrant final approval by the Court.   Plaintiffs also respectfully submit that the Court should finally certify the Settlement Class for purposes of effectuating the Settlement pursuant to Rules 23(a) and (b)(3), as nothing has changed to alter the propriety of the Court's findings on certification of the Settlement Class in its Preliminary Approval Order.   *See* ECF No. 277, ¶¶ 2-3.[3]

---

[3]      Plaintiffs' motion and memorandum in support of preliminary approval of the Settlement (ECF No. 275), and the reasons supporting certification of the Settlement Class set forth therein, are incorporated herein by reference.

## ARGUMENT

### I.   THE PROPOSED SETTLEMENT MEETS THE STANDARD FOR FINAL APPROVAL UNDER RULE 23(e)

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class action claims.  *See* Fed. R. Civ. P. 23(e).  A class action settlement should be approved if the court finds it "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  The Fifth Circuit has recognized a strong public policy in favor of pretrial settlements of class action lawsuits.  *See In re Deepwater Horizon*, 739 F.3d 790, 807 (5th Cir. 2014) (noting a public interest favoring class action settlements).

Rule 23(e)(2) provides that, in determining whether a class action settlement is fair, reasonable, and adequate, the Court should consider whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. Rule 23(e)(2) (as amended on December 1, 2018).

Courts in this Circuit also consider the following six factors in determining whether a class action settlement is fair, reasonable, and adequate:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.

*Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983); *see also Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004) (applying *Reed* factors to proposed settlement of securities class

action).[4]

For the reasons discussed herein, the proposed Settlement readily meets the criteria set forth by Rule 23(e)(2) and the Fifth Circuit.  It should be approved.

### A.    Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class

In determining whether to approve a class action settlement, the Court should consider whether Plaintiffs and Lead Counsel "have adequately represented the class."  Fed. R. Civ. P. 23(e)(2)(A).  Here, Plaintiffs, which are sophisticated institutional investors, vigorously litigated this Action on behalf of the Settlement Class for three years.  Even before their appointment as lead plaintiffs, Lead Plaintiffs had investigated the facts and claims at issue and had even retained experienced bankruptcy counsel to protect the Settlement Class's interests in Adeptus's bankruptcy proceedings.  Each Plaintiff produced documents in response to Defendants' extensive document requests, appeared for depositions, responded to written discovery, and consulted with Lead Counsel on litigation strategy, case developments, and the Settlement.  In addition, Plaintiffs have claims that are typical of other Settlement Class Members and have no conflict of interests with other members of the Settlement Class.  Accordingly, and as discussed further in Plaintiffs' Motion to Certify, Plaintiffs have adequately represented the Settlement Class in litigating the claims in this Action and in reaching the Settlement.  *See* ECF No. 182, at 7-8.

Lead Counsel, along with the other Plaintiffs' Counsel, likewise have adequately represented the Settlement Class throughout the litigation.  Among other things, Lead Counsel:

---

[4]    The factors set forth in Rule 23(e)(2), which were added by amendment effective December 1, 2018, are not intended to "displace any factor" traditionally used by the Courts of Appeal to assess final settlement approval, but rather to focus on core concerns to guide the approval decision. *See* Fed. R. Civ. P. 23, 2018 Advisory Committee Notes. The factors in amended Rule 23(e)(2) are entirely consistent with the factors used by the Fifth Circuit to assess final settlement approval and each are addressed in the sections below.

(i) conducted an extensive investigation of the claims asserted in the Action, including interviews with numerous former Adeptus employees; (ii) researched and drafted two detailed complaints; (iii) navigated Adeptus's bankruptcy filing and its implications for the Action with the assistance of experienced bankruptcy counsel; (iv) largely defeated Defendants' first round of motions to dismiss; (v) engaged in extensive and far-reaching discovery, which involved obtaining and reviewing more than 2.7 million pages of documents produced by Defendants, Adeptus, and other third parties; (vi) took, defended, or actively participated in 37 depositions; (vii) fully briefed Plaintiffs' Motion to Certify, which included the exchange of expert reports and the depositions of the Parties' experts; (viii) fully briefed Defendants' motions to dismiss certain allegations in the SAC; (ix) consulted with various experts; and (x) engaged in hard-fought, arm's-length settlement negotiations facilitated through Judge Phillips, including a formal mediation involving extensive written submissions.  ¶¶ 35-115.  As a result of the enormous time, effort, and resources that Plaintiffs and Lead Counsel dedicated to litigating this Action, Plaintiffs and Lead Counsel had a detailed and well-developed understanding of the strengths and weaknesses of the Action, which informed their determination that the Settlement is fair, reasonable, and adequate. Accordingly, this factor supports final approval of the Settlement.

**B.     The Settlement Was Negotiated at Arm's-Length and There Was No Fraud or Collusion**

Rule 23(e)(2)(B) and the first *Reed* factor also support final approval because the Settlement was negotiated after substantial discovery and there is no evidence of fraud or collusion. On the contrary, the Settlement was reached only after extensive arm's-length negotiations by experienced counsel with the assistance of Judge Phillips, an experienced and well-respected mediator.  ¶¶ 117-21.  The Parties engaged in a formal in-person mediation session with Judge Phillips in April 2019, which included the exchange of detailed mediation statements.  ¶ 117.  The

Settlement was reached only after an additional six months of negotiations following the mediation, which continued to be facilitated by Judge Phillips.  Judge Phillips even had to make an interim mediator's recommendation that the Parties agree to negotiate within a given range before the Settlement was reached.  Each side accepted this recommendation – but, even then, spent several additional weeks engaged in vigorous arm's-length negotiations before the Parties ultimately reached agreement on the $44 million Settlement.  *See* Declaration of Layn R. Phillips, attached to the Joint Decl. as Exhibit 3, at ¶¶ 9-12; *see also* Joint Decl. ¶ 120.

The extensive arm's-length negotiations and involvement of an experienced mediator demonstrate that the Settlement is procedurally fair and is not the product of fraud or collusion. *See, e.g.*, *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1063-65 (S.D. Tex. 2012) (approving settlement where parties engaged in arm's-length negotiations with the benefit of discovery to gauge the strengths and weaknesses of the case); *Billitteri v. Sec. Am., Inc.*, 2011 WL 3586217, at *10 (N.D. Tex. Aug. 4, 2011) (finding no fraud or collusion in settlement reached through counsel's diligent arm's-length negotiations before a neutral mediator); *Erica P. John Fund, Inc. v. Halliburton Co.*, 2018 WL 1942227, at *4 (N.D. Tex. Apr. 25, 2018) (noting that "the settlement was not the result of improper dealings" where it "was obtained through formal mediation before U.S. District Judge Layn R. Phillips").  Thus, this factor powerfully supports final approval.

### C.    The Settlement is Fair and Adequate in Light of the Costs and Delay of Further Litigation

Rule 23(e)(2)(C)(i) and the second *Reed* factor further support final approval of the Settlement.  Continued litigation of the Action would involve complex and costly pre-trial, trial, and post-trial proceedings that would delay the ultimate resolution of the claims without any guarantee of recovery for the Settlement Class.  "When the prospect of ongoing litigation threatens

to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened."  *Klein v. O'Neal*, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010); *see also Heartland*, 851 F. Supp. 2d at 1064 (approving settlement and noting that litigating case to trial would be "time consuming, and '[i]nevitable appeals would likely prolong the litigation, and any recovery by class members, for years.'"); *In re Dell Inc., Sec. Litig.*, 2010 WL 2371834, at *7 (W.D. Tex. June 11, 2010) (noting that "[s]ecurities litigation on the whole is 'notoriously difficult and unpredictable' . . . . [t]hus the complexity, expense, and likely duration of the suit weighs in favor of the settlement."), *aff'd*, 669 F.3d 632 (5th Cir. 2012).

Continuing to litigate this Action would have required substantial additional time and expense, in the face of serious risks and with no guarantee of success.  In the absence of the Settlement, this would have included the completion of expert discovery, prevailing on class certification, surviving Defendants' second round of motions to dismiss and anticipated motions for summary judgment, and then achieving a litigated verdict at trial, which would have required substantial fact and expert testimony.  Defendants made serious arguments vigorously contesting key issues such as the falsity of Defendants' alleged misstatements, materiality, and scienter.  Even if Plaintiffs and Lead Counsel overcame all of those arguments, Defendants still had significant arguments on loss causation and damages.  While Lead Counsel were prepared to rebut those arguments, it is clear that achieving a litigated verdict would have required a substantial investment of time and resources, and carried significant risk of a materially lower recovery – or none at all.

Moreover, if Plaintiffs did succeed at trial, it is virtually certain that Defendants would appeal, further delaying the receipt of any recovery by the Settlement Class.  *See In re OCA, Inc. Sec. & Derivative Litig.*, 2009 WL 512081, at *11 (E.D. La. Mar. 2, 2009) ("After trial, the parties could still expect years of appeals."); *Schwartz v. TXU Corp.*, 2005 WL 3148350, at *19 (N.D.

Tex. Nov. 8, 2005) (noting that even "if Plaintiffs were to succeed at trial, they still could expect a vigorous appeal by Defendants and an accompanying delay in the receipt of any relief").  Further, there is always a risk that a verdict could be reversed by the trial court or on appeal.  *See, e.g.*, *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (overturning jury verdict in favor of plaintiffs and granting judgment for defendants as a matter of law), *aff'd*, 688 F. 3d 713 (11th Cir. 2012).  All of the foregoing would pose substantial expense for the Settlement Class and delay the ability to recover damages – assuming, of course, that Plaintiffs were ultimately successful on their claims.

In contrast, the Settlement provides an immediate, substantial, and certain cash recovery of $44 million, without exposing the Settlement Class Members to the risk, expense, and delay of continued litigation.  Accordingly, this factor supports final approval of the Settlement.

### D.     The Stage of the Proceedings Warrants Final Approval of the Settlement

The third *Reed* factor also weighs in favor of final approval of the Settlement.  The Settlement was reached after the Parties engaged in extensive and comprehensive litigation efforts over the course of three years.  This included a detailed investigation by Lead Counsel, two rounds of thorough briefing on Defendants' motions to dismiss, full briefing on Plaintiffs' Motion to Certify, and extensive fact and expert discovery into the claims and defenses at issue in the Action. As noted above, Plaintiffs' discovery efforts included, among other things: (i) the review and analysis of more than 2.7 million pages of documents produced by Defendants, Adeptus, and other third parties; (ii) 27 depositions of key fact witnesses, including two-day depositions of each of the Executive Defendants, as well as depositions of various Director Defendants, and representatives of the Sterling Defendants and the Underwriter Defendants; (iii) the depositions of the Parties' experts, as well as depositions of the Plaintiffs and their investment advisors, in connection with class certification; and (iv) consultation with experts in financial economics,

healthcare economics, due diligence, accounting, and damages.  ¶¶ 35-115.

As previously noted, the Parties also engaged in months of hard-fought, arm's-length settlement negotiations conducted under the supervision of Judge Phillips.   ¶¶ 117-123. Accordingly, Plaintiffs and Lead Counsel had "a full understanding of the legal and factual issues surrounding this case," including the strengths and weaknesses, when negotiating and evaluating the proposed Settlement.  *Manchaca v. Chater*, 927 F. Supp. 962, 967 (E.D. Tex. 1996); *see also Heartland*, 851 F. Supp. 2d at 1064 ("Under [this] factor, the key issue is whether 'the parties and the district court possess ample information with which to evaluate the merits of the competing positions'").  Based on the information developed, Plaintiffs and Lead Counsel were able to make an informed appraisal of the case, and they believe that the Settlement represents a resolution that is highly favorable to the Settlement Class without the substantial risk, uncertainty, and delay of continued litigation.  ¶ 148.  Thus, this factor further supports approval of the Settlement.

### E.    The Settlement is Fair and Reasonable in Light of the Risks of Further Litigation

Rule 23(e)(2)(C)(i) and the fourth *Reed* factor further support final approval of the Settlement.  Plaintiffs recognize that, although they believed that substantial evidence supported their claims, there were also substantial risks in establishing Defendants' liability and damages at summary judgment, trial and any appellate proceedings.  Weighing these risks against the certain and substantial recovery for the Settlement Class demonstrates that the Settlement is fair, reasonable, and adequate.  *See, e.g., OCA*, 2009 WL 512081, at *13 (settlement approval favored where plaintiffs faced substantial risks in establishing elements of securities law violations); *Schwartz*, 2005 WL 3148350, at *18 ("plaintiffs' uncertain prospects of success through continued litigation" supported approval of securities class action settlement).

Here, Adeptus's bankruptcy in April 2017 materially heightened the risk that there would be substantially less or no recovery at all in this Action.  ¶¶ 33,130-131 .  The bankruptcy, which occurred less than six months after the case began, stayed this Action against Adeptus and prevented Adeptus from being a potential source of any recovery for the Settlement Class.  ¶ 16. While Plaintiffs and Lead Counsel took steps to maximize the potential recovery for the Settlement Class under the circumstances by hiring experienced bankruptcy counsel to pursue claims on behalf of the class in the bankruptcy proceedings and vigorously pursuing available claims against other entities, there can be no doubt that Adeptus's insolvency made achieving a substantial recovery in this Action significantly more challenging.  *Id*.  Plaintiffs also faced competition for the limited funds available from other claimants, including a large investor who asserted fraud claims against many of the same defendants in Texas state court, and Adeptus's bankruptcy trustee who likewise asserted claims against overlapping defendants.  ¶ 130.

Plaintiffs would have also faced a number of substantial risks in proving Defendants' liability and establishing damages if the Action had continued.  While Plaintiffs had largely prevailed at the initial motion to dismiss stage, they still faced substantial risks that the Court would grant Defendants' second round of motions to dismiss or their forthcoming motions for summary judgment, or that Defendants might prevail at trial.

***First***, Plaintiffs faced substantial risks in proving that Defendants made materially false and misleading statements—an essential element of both their Exchange Act and Securities Act claims.  From the outset of the litigation, Defendants had vigorously asserted a "truth on the market" defense to the materiality of these alleged misstatements—*i.e.,* that their alleged misstatements were not material because the truth about Adeptus's allegedly-concealed liquidity issues and price-gouging practices were actually known to the marketplace throughout the Class

Period.  ¶ 134.  For instance, Defendants argued that investors were well aware of Adeptus's funding arrangements with its joint venture partners because the Company publicly filed one of its joint venture contracts with the SEC.  ¶ 134.  Likewise, while Plaintiffs alleged that Defendants failed to disclose Adeptus was primarily treating patients who did not require emergency treatment, Defendants pointed to several news articles and analyst reports published before and during the Class Period which, they contend, adequately disclosed that Adeptus treated such "low-acuity" patients.  ¶ 135.  In addition, Defendants also argued that Adeptus had disclosed its revenue collection and internal control problems by making statements discussing the "growing pains" the Company was experiencing with its third-party revenue cycle management vendor.  *Id.*

Similarly, in their second round of motions to dismiss, Defendants argued that certain of their statements allegedly omitting facts relating to Adeptus's price increases during the Class Period were not false, and that Adeptus's price increases were well-known to investors.  ¶ 136. Those motions to dismiss were still pending at the time the proposed Settlement was reached.  *Id.* While Plaintiffs believe they have meritorious responses to Defendants' arguments, they nevertheless faced significant challenges in litigating these issues.  ¶ 137.

**Second**, even if Plaintiffs succeeded in proving that the statements in the offering documents were false, the Underwriter Defendants could still have escaped liability by showing that they exercised "reasonable care" in conducting due diligence of the offerings and Adeptus's operations.  The Underwriter Defendants would have argued that their actions easily satisfied what they believe is a fairly low standard of care.  ¶ 138.

**Third**, Defendants argued that Plaintiffs would be unable to establish scienter in connection with their Exchange Act claims and that, at best, Plaintiffs could make out a case of negligence or "mismanagement" against Defendants.  Defendants argued that they acted in good faith at all times

and that the facts allegedly withheld from investors were either thoroughly disclosed to the market, or else did not have a material impact on Adeptus's liquidity and cash flow until the very end of the Class Period, at which time Defendants made the appropriate disclosures.   Again, while Plaintiffs believed they had meritorious responses to these arguments, they recognized that it was far from certain that either the Court or the jury would accept their counterarguments.   If Defendants had persuaded the Court or a jury to accept their scienter arguments, the Settlement Class's damages would be significantly reduced, if not eliminated entirely.   ¶ 140.

*Fourth*, Plaintiffs faced significant risks in proving loss causation.   In order to establish loss causation, Plaintiffs would be required to show that the stock declines that give rise to their damages were caused by the revelation of the truth that had previously been concealed by Defendants' alleged misstatements.   Plaintiffs bore the burden of proving loss causation in connection with their Exchange Act claims, while the Securities Act Defendants would have asserted the absence of loss causation as an affirmative defense.

At summary judgment and trial, Defendants would have likely argued, as they did in their opposition to class certification, that Plaintiffs would not be able to tie the relevant stock declines to the revelation of the truth.   ¶¶ 142-144.   For instance, Defendants argued that a significant portion of Plaintiffs' damages arise from stock declines on November 1 and 2, 2016, when the Complaint alleged the Company disclosed the truth concerning its risky financing arrangement with its joint ventures, its internal control problems, and liquidity issues arising from uncollectible receivables.   ¶ 143.   Defendants argued that on those same dates the Company also announced poor quarterly earnings.   Thus, according to Defendants, Plaintiffs were required to "disaggregate" the portion of the stock decline attributable to revelation of the alleged fraud from the portion of the decline attributable to the poor quarterly earnings.   *Id.*   Had Defendants succeeded on their loss

13

causation challenges, they could have drastically reduced—or completely eliminated—recoverable damages.  ¶ 145.

Likewise, Plaintiffs alleged that some of their damages arose from stock declines on July 28 and September 7, 2016, when Adeptus announced the sudden departure of two senior executives.  ¶ 144.  Defendants argued that Plaintiffs could not establish loss causation for either date because there was no statistically significant decline on the former date, and, with respect to the latter date, there was no evidence that the market connected the decline to any of the information Defendants allegedly misstated or failed to disclose.  *Id*.  While, again, Plaintiffs believed they had meritorious responses to these arguments, Plaintiffs recognize that it was far from certain the trier of fact would appreciate and adopt Plaintiffs' view of the complex and technical facts relating to loss causation here.  If Defendants succeeded in persuading either the Court or a jury that Plaintiffs had not established a viable loss causation theory with respect to any of the alleged corrective disclosure dates, let alone with respect to multiple dates, the Settlement Class's damages would be significantly reduced or eliminated.

In sum, the Parties were deeply divided on several key factual issues central to the litigation, and there was no guarantee that Plaintiffs' position on these issues would prevail at either summary judgment or at trial.  If Defendants had succeeded on any of these substantial defenses, Plaintiffs and the Settlement Class would have recovered nothing at all or, at best, would likely have recovered far less than the Settlement Amount.

Plaintiffs and the Settlement Class also faced risks that the litigation class would not be certified by the Court.  Defendants had vigorously opposed Plaintiffs' Motion to Certify, arguing that: (i) Plaintiffs failed to articulate a damages methodology consistent with their liability case, as required by *Comcast Inc. v. Behrend*, 569 U.S. 27 (2013); (ii) the class could not be certified

because investors were aware of the allegedly concealed facts; (iii) Plaintiffs had not established market efficiency (and, thus, class-wide reliance) for portions of the Class Period; and (iv) certification was inappropriate because individualized standing issues would predominate.  ¶ 147. While Plaintiffs believe that they have strong arguments to overcome each of these challenges, if Defendants prevailed on any of their arguments and defeated certification (or even succeeded in reducing the size of the class or length of the Class Period), then class-wide damages would have been significantly reduced or eliminated entirely.  *Id.*

### F.    The Settlement is Well Within the Range of Reasonableness

Rule 23(e)(2)(C)(i) requires the Court to consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" and the fifth *Reed* factor considers "whether the terms of the settlement 'fall within *a reasonable range of recovery*, given the likelihood of the plaintiffs' success on the merits.'"  *Billitteri*, 2011 WL 3586217, at *12 (emphasis in original).  In assessing the reasonableness of a proposed settlement under both these analyses, the inquiry "should contrast settlement rewards with likely rewards if [the] case goes to trial."  *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 239 (5th Cir. 1982); *see also Erica P. John Fund*, 2018 WL 1942227, at *5 ("In ascertaining whether a settlement falls within the range of possible approval, courts will compare the settlement amount to the relief the class could expect to recover at trial, *i.e.*, the strength of the plaintiffs' case.").  As part of this inquiry, courts recognize the uncertainty of securities litigation and the potential difficulty of proving liability and damages at trial.  *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412 (5th Cir. 2001) (recognizing the complexity of securities fraud class action claims).

Here, the Settlement is well within the range of reasonableness given the multiple risks associated with further litigation of the Action.  Under any measure, $44 million in cash is a substantial recovery, and is especially so in light of the circumstances of this case (including that

the issuer of the securities forming the basis for the Action declared bankruptcy) and when weighed against the risks of continued litigation.  Indeed, the Settlement Class might have recovered substantially less or nothing at all had this Court, the Fifth Circuit, or a jury credited even some of Defendants' arguments concerning liability and damages.

Plaintiffs' damages expert has estimated the maximum *theoretical* aggregate damages in this Action to be approximately $850 million. ¶ 186.  Using this theoretical number, the Settlement represents approximately 5.2% of the conceivable maximum damages.  This is over ***three times or 300%*** more than the median recovery obtained in recent securities class actions in which a similar damages amount was at issue.[5]

But even this favorable comparison does not account for the fact that Adeptus was bankrupt and thus not a potential source of recovery.  And, significantly, the maximum damages analysis assumes that Plaintiffs would be able to prove damages based on *all five* of the alleged corrective disclosures and that Plaintiffs would be able to recover the full amount of losses on each of those days (*i.e.*, that Plaintiffs would not need to disaggregate confounding non-fraud related information on *any* of those dates).  In fact, however, Plaintiffs faced risk in proving all of those alleged corrective disclosures if the Action had continued.  Indeed, Defendants argued that *none* of the alleged corrective disclosures caused damages arising from the alleged fraud—and vigorously argued that Plaintiffs could not establish that at least four of the alleged corrective disclosures

---

[5]     *See* Stefan Boettrich & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review*, NERA Economic Consulting, Jan. 29, 2019 ("NERA Report"), at 35 (finding median settlement between 1996 and 2018 in securities cases with investor losses between $600 million and $999 million recovered 1.6% of investor losses). A copy of the NERA Report is attached to the Joint Declaration as Exhibit 6.  *See also In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94, 103 (D.D.C. 2013) (settlement approximating "4-8% of the 'best case scenario' potential recovery" deemed reasonable); *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) (noting that the average settlement in securities class actions range from 3% to 7% of the class's total estimated losses).

caused Plaintiffs' (and the Settlement Class's) losses.  If Defendants succeeded in having one or more of the alleged corrective disclosures dismissed at summary judgment, or succeeded in proving that Plaintiffs had to disaggregate purportedly confounding information, maximum recoverable damages could be much smaller or even zero.  For example, if Defendants had prevailed in their argument that four out of the five alleged corrective disclosures did not cause Settlement Class Members' losses, leaving only the November 2016 disclosure, maximum recoverable damages would be an estimated $480 million.  ¶ 190.  Thus, if $480 million were used in the comparison, the Settlement would represent approximately 9.2% of this amount, which still assumes success by Plaintiffs on all liability issues, including the stringent scienter standard.  This is over *five times or 500%* more than the median recovery obtained in recent securities class actions in which a similar damages amount was at issue.[6]  Accordingly, the recovery obtained here would be a good recovery in any securities litigation, but is particularly outstanding in light of Adeptus's bankruptcy and the other risks inherent in continuing to litigate this case through summary judgment and trial.  This factor therefore supports final approval.

### G.    Lead Counsel, Plaintiffs, and Settlement Class Members Support Final Approval of the Settlement

Lead Counsel, Plaintiffs, and Settlement Class Members all support final approval of the Settlement, thereby satisfying the sixth *Reed* factor.  *See Marcus v. J.C. Penney Co., Inc.*, 2017 WL 6590976, at *3 (E.D. Tex. Dec. 18, 2017) ("Significant weight is given to the opinion of class counsel concerning whether the settlement is in the best interest of the class and the court is not to substitute its own judgment for that of counsel."), *report and recommendation adopted*, 2018 WL 307024 (E.D. Tex. Jan. 4, 2018); *Schwartz*, 2005 WL 3148350, at *21 ("where the parties have

---

[6]       *See* NERA Report at 35 (finding median settlement between 1996 and 2018 in securities cases with investor losses between $400 million and $599 million recovered 1.8% of investor losses).

conducted an extensive investigation, engaged in significant fact-finding and Lead Counsel is experienced in class-action litigation, courts typically 'defer to the judgment of experienced trial counsel who has evaluated the strength of [the] case'".

Lead Counsel have conducted a thorough fact-finding investigation into the claims against Defendants and, after three years of intense litigation and hard-fought settlement negotiations, have a firm understanding of the strengths and risks attendant to these claims.  Based on this understanding, as well as Lead Counsel's substantial experience litigating complex securities class actions like this one, Lead Counsel have concluded that the Settlement is fair, reasonable, and adequate.  Moreover, Plaintiffs strongly endorse the Settlement.  *See* Declaration of Rod Graves on behalf of ATRS, attached to the Joint Decl. as Exhibit 1, at ¶ 9; Declaration of Susan L. Weiss on behalf of ACERA, attached to the Joint Decl. as Exhibit 2, at ¶ 8; and Declaration of Andrew McGarrell on behalf of Miami, attached to the Joint Decl. as Exhibit 3, at ¶ 7.  Each Plaintiff is a sophisticated institutional investor that has supervised Plaintiffs' Counsel throughout the Action, and each was kept apprised of the mediation and settlement negotiations with Defendants. Plaintiffs' recommendation supports approval of the Settlement.  *See City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *4 (S.D.N.Y. May 9, 2014) ("the recommendation of Lead Plaintiff, a sophisticated institutional investor, also supports the fairness of the Settlement.").

Additionally, the positive response of Settlement Class Members to date further supports final approval of the Settlement.  The Court-appointed Claims Administrator, A.B. Data, Ltd. ("A.B. Data"), has mailed 60,664 copies of the Notice to potential Settlement Class Members and nominees through April 14, 2020.  *See* Declaration of Eric J. Miller ("Miller Decl."), attached to the Joint Decl. as Exhibit 5, at ¶ 8.  The Notice describes the essential terms of the Settlement, and informs Settlement Class Members of their right to opt-out of the Settlement Class or object to any

aspect of the Settlement.  As set forth in the Notice, the deadline for Settlement Class Members to submit objections or request exclusion is April 29, 2020.  While this deadline has not yet passed, to date, there have been no objections to the Settlement or Plan of Allocation and no requests for exclusion from the Settlement Class.  ¶ 164; Miller Decl. ¶ 12.[7]  In sum, all of the *Reed* factors support a finding that the Settlement is fair, reasonable, and adequate.

### H.    The Other Factors Set Forth in Rule 23(e)(2) Support Final Approval of the Settlement

Rule 23(e)(2) also considers (i) the effectiveness of the proposed method of distributing relief to the class; (ii) the terms of any proposed award of attorneys' fees; (iii) any agreements made in connection with the proposed settlement; and (iv) the equitable treatment of class members.  *See* Fed. R. Civ. P. 23(e)(2)(C)(ii), (iii), and (iv); Fed. R. Civ. P. 23(e)(2)(D).

### 1.    The Proposed Method of Distributing Settlement Proceeds is Effective

The proceeds of the Settlement will be distributed to Settlement Class Members who submit eligible Claim Forms with required documentation to A.B. Data.  A.B. Data will review and process the claims received, provide claimants with an opportunity to cure any deficiency or request review of the denial of their claim by the Court, and will ultimately mail or wire claimants their *pro rata* share of the Net Settlement Fund as calculated under the Plant of Allocation.[8]  This type of claims processing is standard in securities class actions and has long been used and found to be effective.  *See, e.g.*, *OCA*, 2009 WL 512081, at *6; *Dell*, 2010 WL 2371864, at *10.

### 2.    The Requested Fees and Expenses are Fair and Reasonable

Lead Counsel have filed a motion for an award of attorneys' fees and Litigation Expenses

---

[7]    Under the schedule set by the Court, Plaintiffs will file reply papers in further support of final approval on May 13, 2020, addressing any requests for exclusion and objections that may be received.

[8]    The Settlement is not a claims-made settlement.  If the Settlement is approved, Defendants will have no right to the return of any portion of Settlement based on the number or value of Claims submitted. *See* Stipulation ¶ 13.

concurrently with this motion.  As detailed therein, Lead Counsel have applied for attorneys' fees

in the amount of 25% of the Settlement Fund, which is consistent with attorneys' fee awards

approved in comparable securities class actions and is reasonable in light of the extensive efforts

of Plaintiffs' Counsel and the substantial risks in the litigation.  Lead Counsel's motion also

includes a request for payment of $1,382,701.72 in expenses incurred by Plaintiffs' Counsel , and

$20,960.86 for Plaintiffs' costs.  Both the requested 25% fee and the repayment of expenses are

authorized by and made pursuant to agreements between Lead Counsel and Plaintiffs that were

reached at the outset of the litigation.  ¶¶ 176-177.

Pursuant to the terms of the Stipulation, and as is standard in securities class actions,

attorneys' fees and expenses will be paid upon any such award granted by the Court, and shall be

reimbursed to the Settlement Fund if the award is reduced or reversed in any subsequent legal

proceedings.  *See* Stipulation ¶ 16.  Most importantly with respect to the Court's consideration of

the fairness of the Settlement, is the fact that approval of attorneys' fees is entirely separate from

approval of the Settlement, and neither Plaintiffs nor Plaintiffs' Counsel may terminate the

Settlement based on this Court's or any appellate court's ruling with respect to the ultimate award

of attorneys' fees or expenses.  *See id*.

### 3. The Supplemental Agreement Does Not Affect the Fairness of the Settlement

Rule 23(e)(2)(C)(iv) asks the Court to consider any additional agreements made by the

Parties in connection with the Settlement.  Here, the only such agreement is the Parties'

confidential Supplemental Agreement that sets forth the conditions under which Defendants would

be able to terminate the Settlement if the number of Settlement Class Members who request

exclusion from the Settlement Class reaches a certain threshold.  That type of agreement is a

standard provision in securities class actions and is routinely maintained as confidential to avoid

allowing potential opt-outs to use this provision as leverage.  The agreement has no negative

impact on the fairness of the Settlement.  *See, e.g.*, *Erica P. John Fund*, 2018 WL 1942227, at *5

(granting final approval of securities settlement that included a similar agreement).

### 4.    The Settlement Treats Settlement Class Members Equitably

Finally, the proposed Settlement treats members of the Settlement Class equitably relative

to one another.  There is no preferential treatment for any members of the Settlement Class.

Plaintiffs will receive recoveries based on the same formula under the Plan of Allocation (other

than awards for reimbursement for the time their employees spent working on the Action as

permitted by the PSLRA).  As discussed immediately below, the Net Settlement Fund will be

distributed among Settlement Class Members in accordance with the Plan of Allocation, which

provides a fair and equitable method of allocation.

## II.    THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE APPROVED

The standard for approval of a plan of allocation of the settlement funds is the same as that

for approving a settlement: whether it is "fair, adequate and reasonable and is not the product of

collusion between the parties."  *Chicken Antitrust Litig.*, 669 F.2d at 238.  A plan of allocation

need not be perfect—to be fair, reasonable, and adequate, "[t]he allocation formula 'need only

have a reasonable, rational basis, particularly if recommended by experienced and competent

counsel.'"  *Dell*, 2010 WL 2371834, at *10.

The proposed Plan of Allocation was developed by Lead Counsel in consultation with

Plaintiffs' damages expert.  *See Schwartz*, 2005 WL 3148350, at *8 (approving plan of allocation

"formulated by Lead Counsel with assistance from its materiality and damages experts").  The

Plan takes into account the economic losses Settlement Class Members suffered as a result of

Defendants' alleged violations of the federal securities laws and the different statutes under which

21

members of the Settlement Class had claims against Defendants – Section 10(b) of the Exchange Act, Section 20A of the Exchange Act, and Sections 11, 12(a)(2), and 15 of the Securities Act.

Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of Adeptus Class A common stock during the Class Period listed in the Claim Form and for which adequate documentation is provided, which will include (i) a Section 10(b) Loss Amount, (ii) an additional Section 20A Loss Amount (if eligible), and (iii) an additional Securities Act Loss Amount (if eligible).

The formula for calculating a claimant's Section 10(b) Loss Amount is the same as that typically used in plans of allocations in other securities class action asserting Section 10(b) claims. ¶ 170.  In general, for each purchase of Adeptus Class A common stock during the Class Period, the Section 10(b) Loss Amount will be (a) the difference between the estimated artificial inflation in the stock price on date of purchase and the estimated artificial inflation on date of sale, as limited by the dollar amount of loss measured at each corrective disclosure, or (b) the difference between the actual purchase price and sales price of the stock, whichever is less.  *Id*.  Plaintiffs' damages expert calculated the amount of estimated artificial inflation by considering price changes in the stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes on those days that were attributable to market or industry forces.  *Id*.

Claimants who purchased shares of Adeptus Class A common stock "contemporaneously" with sales of Adeptus securities made or caused by Defendants Hall, Fielding, Cherrington, and the Sterling Defendants may receive an additional Section 20A Loss Amount, equal to 20% of their Section 10(b) Loss Amount in recognition of the strength of their insider trading claims under Section 20A of the Exchange Act and the value that the assertion of those claims brought to the

total Settlement achieved.  ¶ 171.[9]

Claimants who purchased shares of Adeptus Class A common stock in either the July 2015 Offering or June 2016 Offerings (or who purchased shares in the Class Period traceable to one of those offerings) may be entitled to a Securities Act Loss Amount as well, which will be calculated as the greater of (a) 25% of their Section 10(b) Loss Amount or (b) the amount by which their damages under the statutory formula under Section 11(e) of the Securities Act exceeds their Section 10(b) Loss Amount.  ¶ 172.  Awarding the Securities Act Loss Amount in addition to the other amounts is to recognize the greater strength of these claimants' claims under the Securities Act (which claims do not require proof of scienter or loss causation) and the additional defendants (such as Underwriter Defendants) against whom these claims could be asserted.  *Id*.

The sum of the Recognized Loss Amounts for all of a claimant's purchases of Adeptus Class A common stock during the Class Period is the claimant's "Recognized Claim" and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.  ¶ 173.  The Net Settlement Fund will be distributed to Authorized Claimants on this *pro rata* basis until the Net Settlement Fund is depleted or it is no longer economically feasible to do so.  *See* Plan of Allocation ¶ 24.

Thus, the Plan of Allocation fairly accounts for each Settlement Class Members' purchases and sales of Adeptus Class A common stock, the specific claims they have under the federal securities laws, and the strength of their claims.  *See In re Waste Mgmt., Inc. Sec. Litig.*, 2002 WL 35644013, at *20 (S.D. Tex. May 10, 2002) (approving plan of allocation in which "Class Members will receive relief based on the size and strength of their claims"), *amended*, 2003 WL

---

[9]    For purposes of the Settlement and the Plan of Allocation, shares of Adeptus Class A common stock purchased in the July 2015 and June 2016 Offerings or within six days after each of those Offerings are considered to have been purchased "contemporaneously" with sales made or caused by these Defendants.  *See* Notice ¶ 26 n.4; Plan of Allocation ¶¶ 10-11.

27380802 (S.D. Tex. July 31, 2003); *In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 669 (E.D. Va. 2001) (approving allocation plan that "sensibly makes interclass distinctions based upon, *inter alia*, the relative strengths and weaknesses of class members' individual claims").

Accordingly, Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the alleged misconduct.  ¶ 174.  Moreover, to date, no objections to the proposed Plan of Allocation have been received.  ¶ 175.

## III.   NOTICE TO THE SETTLEMENT CLASS SATISFIED RULE 23 AND DUE PROCESS

Notice to the Settlement Class satisfied the requirements of Rule 23, which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).  Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable" – *i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them."  *Maher v. Zapata Corp.*, 714 F. 2d 436, 451 (5th Cir. 1983); *see In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010) ("a settlement notice need only satisfy the 'broad reasonableness standards imposed by due process.'").

Both the substance of the notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards.  The Court-approved mailed Notice includes all of the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7), including, among other things: (i) the nature of the Action and the claims asserted; (ii) the definition of the Settlement Class; (iii) the amount of the Settlement; (iv) the Plan of Allocation; (v) reasons why the parties are proposing the Settlement; (vi) the maximum amount of attorneys' fees and expenses that will be sought; (vii) a description of Settlement Class

Members' right to request exclusion from the Settlement Class or to object to the Settlement, the Plan of Allocation, or the requested attorneys' fees or expenses; and (viii) notice of the binding effect of a judgment on Settlement Class Members.

In accordance with the Court's Preliminary Approval Order, A.B. Data began mailing copies of the Notice and Claim Form to potential Settlement Class Members and nominees on February 7, 2020.  *See* Miller Decl. ¶¶ 3-5.  As of April 14, 2020, A.B. Data had disseminated 60,664 copies of the Notice Packet to potential Settlement Class Members and nominees.  *See id*. ¶ 8.  In addition, Lead Counsel caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over the *PR Newswire* on February 20, 2020 and A.B. Data maintains, and updates as required, a website and toll-free telephone number dedicated to the Settlement.[10] *See id*. ¶¶ 9-11.  This combination of individual mail to all Settlement Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely-circulated publication, and transmitted over a newswire, was "the best notice . . . practicable under the circumstances."  Fed. R. Civ. P. 23(c)(2)(B); *see also Schwartz*, 2005 WL 3148350, at *10.

## CONCLUSION

Plaintiffs respectfully request that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate, and grant final certification of the Settlement Class for settlement purposes.

---

[10]    On April 1, 2020, A.B. Data updated the website to inform Settlement Class Members that, pursuant to the Court's March 31, 2020 Order (ECF No. 281), the hearing concerning final approval of the Settlement would be conducted by telephone and to provide the dial-in number to participate in the hearing. Miller Decl. ¶ 11.

Dated: April 15, 2020

Respectfully submitted,

By: */s/  Clyde M. Siebman*
Clyde M. Siebman
Texas Bar No. 18341600
Elizabeth S. Forrest
Texas Bar No. 24086207
**SIEBMAN, FORREST, BURG
& SMITH, LLP**
Federal Courthouse Square
300 N. Travis Street
Sherman, Texas 75090
Tel: (903) 870-0070
clydesiebman@siebman.com
elizabethforrest@siebman.com

*Liaison Counsel for Plaintiffs and
the Settlement Class*

George L. McWilliams
Texas Bar No. 13877000
**LAW OFFICES OF GEORGE L.
MCWILLIAMS, P.C.**
P.O. Box 58
Texarkana, Texas-Arkansas 75504
Tel: (870) 772-2055
Fax: (870) 772-0513
glmlawoffice@gmail.com

*Liaison Counsel for Plaintiffs and
the Settlement Class*

Jeremy P. Robinson
(Admitted *pro hac vice*)
Abe Alexander
(Admitted *pro hac vice*)
**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
jeremy@blbglaw.com
abe.alexander@blbglaw.com

*Lead Counsel for Lead Plaintiffs ACERA and*

26

*ATRS and the Settlement Class*

Gregory M. Castaldo
(Admitted *pro hac vice*)
Richard A. Russo, Jr.
(Admitted *pro hac vice*)
Justin O. Reliford
(Admitted *pro hac vice*)
Michelle M. Newcomer
(Admitted *pro hac vice*)
Evan R. Hoey
(Admitted *pro hac vice*)
**KESSLER TOPAZ MELTZER
& CHECK, LLP**
280 King of Prussia Road
Radnor, Pennsylvania 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
gcastaldo@ktmc.com
rrusso@ktmc.com
jreliford@ktmc.com
mnewcomer@ktmc.com
ehoey@ktmc.com

*Lead Counsel for Lead Plaintiffs ACERA and
ATRS, Plaintiff Miami and the Settlement Class*

Matt Keil
Texas Bar No. 11181750
**KEIL & GOODSON P.A.**
406 Walnut Street
Texarkana, Arkansas 71854
Tel: (870) 772-4113
Fax: (870) 773-2967
mkeil@kglawfirm.com

*Additional Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2020, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF Filing System.

/s/  Clyde M. Siebman
Clyde M. Siebman