### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

|  |  |
|---|---|
| OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ADEPTUS HEALTH INC., *et al.*,<br><br>Defendants. | Case No. 4:17-CV-0449-ALM<br><br>Judge Amos L. Mazzant, III |

### DECLARATION OF ERIC J. MILLER IN SUPPORT OF
### PLAINTIFFS' UNOPPOSED MOTION FOR APPROVAL OF DISTRIBUTION PLAN

I, ERIC J. MILLER, hereby declare under penalty of perjury as follows:

1.      I am a Senior Vice President of A.B. Data, Ltd.'s Class Action Administration Company ("A.B. Data"), which has its corporate office in Milwaukee, Wisconsin. I am over 21 years of age and am not a party to the above-captioned action (the "Action").[1] I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently thereto.

2.      A.B. Data was retained by Lead Counsel to serve as the Claims Administrator in connection with the Settlement of the Action. Pursuant to the Court's January 9, 2020 Order Preliminarily Approving Settlement and Providing for Notice (ECF No. 277) (the "Preliminary Approval Order"), A.B. Data was authorized to act as the Claims Administrator in connection

---

[1] Unless otherwise defined herein, all capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated November 26, 2019 (ECF No. 275-2) (the "Stipulation").

with the Settlement of the Action. As Claims Administrator, A.B. Data has, among other things: (i) mailed the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") and the Proof of Claim and Release Form (the "Claim Form" or "Proof of Claim" and, collectively with the Notice, the "Notice Packet") to potential Settlement Class Members, brokers, and other nominees; (ii) created and continues to maintain a toll-free helpline for inquiries during the course of the administration; (iii) created and continues to maintain a website for the Settlement ("Settlement Website") and posted case-specific documents on it; (iv) caused the Summary Notice to be published; (v) provided, upon request, additional copies of the Notice Packet to potential Settlement Class Members, brokers, and other nominees; and (vi) received and processed Claims.

3.    On May 20, 2020, the Court entered the Order Approving Plan of Allocation of Net Settlement Fund (ECF No. 288) and Judgment Approving Class Action Settlement (ECF No. 287) (the "Judgment"). A.B. Data has completed processing all Claims received through January 12, 2021, in accordance with the terms of the Stipulation and the Court-approved Plan of Allocation set forth in the Notice, and hereby submits its administrative determinations accepting and rejecting the Claims in preparation for a distribution of the Net Settlement Fund to Authorized Claimants. A.B. Data also presents this declaration in support of Plaintiffs' Unopposed Motion for Approval of Distribution Plan.

## DISSEMINATION OF NOTICE

4.    As more fully described in the Declaration of Eric J. Miller Regarding (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date (ECF No. 283-6) (the "Mailing Declaration") and

2

the Supplemental Declaration of Eric J. Miller Regarding (A) Mailing of the Notice and Claim Form; and (B) Report on Requests for Exclusion Received (ECF No. 286-1) (the "Supplemental Mailing Declaration"), as of May 12, 2020, A.B. Data had mailed 62,503 Notice Packets to potential Settlement Class Members and their nominees. Supplemental Mailing Decl. ¶ 2. Since that date, 169 additional Notice Packets have been disseminated. In total, A.B. Data has disseminated 62,672 Notice Packets to potential Settlement Class Members, brokers, and other nominees.

5.      A.B. Data established and continues to maintain the Settlement Website (www.AdeptusHealthSecuritiesLitigation.com) and a toll-free telephone helpline (1-866-778-9468) to assist potential Settlement Class Members. The Settlement Website (which provides access to important documents relevant to the Settlement) and the telephone helpline enable Settlement Class Members to obtain information about the Settlement.

6.      In accordance with paragraph 7(d) of the Preliminary Approval Order, on February 20, 2020, A.B. Data caused the Summary Notice to be published in *The Wall Street Journal* and released via *PR Newswire*. Mailing Decl. ¶ 9.

### PROCEDURES FOLLOWED IN PROCESSING CLAIMS

7.      Under the terms of the Preliminary Approval Order and as set forth in the Notice, each Settlement Class Member who wished to be eligible to receive a distribution from the Net Settlement Fund was required to complete and submit to A.B. Data a properly executed Claim Form postmarked no later than June 8, 2020, together with adequate supporting documentation for the transactions and holdings reported in the Claim Form. Through January 12, 2021, A.B. Data has received and fully processed 13,974 Claims (the "Presented Claims").

8.      In preparation for receiving and processing Claims, A.B. Data: (i) conferred with Lead Counsel to define the project guidelines for processing Claims; (ii) created a unique database to store Claim details, images of Claims, and supporting documentation; (iii) trained staff in the specifics of the project so that Claims would be properly processed; (iv) formulated a system so that telephone and email inquiries would be properly responded to; (v) developed various computer programs and screens for entry of Settlement Class Members' identifying information and their transactional information; and (vi) developed a proprietary "calculation module" that would calculate Recognized Claims pursuant to the Court-approved Plan of Allocation of the Net Settlement Fund stated in the Notice.

9.      Settlement Class Members seeking to share in the Net Settlement Fund were directed in the Notice to submit their Claims to a post office box address specifically designated for the Settlement. Notice Packets returned by the United States Postal Service as undeliverable were reviewed for updated addresses and, where available, updated addresses were entered into the database and Notice Packets were mailed to the updated addresses. Any correspondence received at the post office box was reviewed and, when necessary, appropriate responses were provided to the senders.

## PROCESSING CLAIMS

### A.      Paper Claims and Online Claims

10.      Of the 13,974 Presented Claims, 1,423 are paper Claims. Once received, the paper Claims were opened and prepared for scanning. This process included unfolding documents, removing staples, copying nonconforming-sized documents, and sorting documents. This manual task of preparing the paper Claims is very laborious and time-intensive. 616 of the 1,423 paper Claims were Claim Forms submitted via the online filing component of the Settlement Website.

Once prepared, paper Claims were scanned into a database together with all submitted documentation. Each paper Claim, as well as each online Claim, was assigned a unique Claim number. Once scanned, the information from each Claim Form, including the Claimant's name, address, account number/information from the supporting documentation, and the Claimant's purchase/acquisition transactions, sale transactions, and holdings listed on the Claim Form, was entered into a database developed by A.B. Data to process Claims submitted for the Settlement. Once entered into the database, each Claim was reviewed to verify that all required information had been provided. The documentation provided by the Claimant in support of the Claim was reviewed for authenticity and compared to the information provided in the Claim to verify the Claimant's identity and the purchase/acquisition transactions, sale transactions, and holdings listed on the Claim Form.

11.     To process the transactions detailed in the Claims, A.B. Data utilized internal codes ("flags") to identify and classify deficiency or ineligibility conditions existing within those Claims. Appropriate flags were assigned to the Claims as they were processed. For example, where a Claim was submitted by a Claimant who did not have any eligible transactions in Adeptus Class A common stock during the Class Period (e.g., the Claimant purchased Adeptus Class A common stock only before or after the Class Period), that Claim would receive a flag that denoted ineligibility. Similar defect flags were used to denote other ineligible conditions, such as duplicate Claims. These flags would indicate to A.B. Data that the Claimant was not eligible to receive any payment from the Net Settlement Fund with respect to that Claim unless the deficiency was cured in its entirety. Examples of conditions of ineligibility are as follows:

MIDOC          Inadequate or Missing Documentation for Entire Claim

DUPCL          Duplicate Claim

|       |                                          |
|-------|------------------------------------------|
| NOPUR | No Eligible Purchase during the Class Period |
| MISIG | No Signature                             |
| NOLOS | No Recognized Claim                      |

12.     Because a Claim may be deficient only in part, but otherwise acceptable, A.B. Data utilized flags that were applied only to specific transactions within a Claim. For example, if a Claimant submitted a Claim with supporting documentation for all but one purchase transaction, that one transaction would receive a defect flag. The flag indicated that although the transaction was deficient, the Claim was otherwise eligible for payment if other transactions in the Claim calculated to a Recognized Claim according to the Court-approved Plan of Allocation. Thus, even if the deficiency was never cured, the Claim could still be partially accepted. Examples of transaction-specific flags are as follows:

|      |                                                      |
|------|------------------------------------------------------|
| TDOC | Missing or Inadequate Documentation for Specific Transaction |
| INEL | Ineligible Transaction                               |
| TRN  | Transfer In/Free Receipt                             |

**B.     Electronic Claims**

13.     Of the 13,974 Presented Claims, 12,551 were submitted electronically ("Electronic Claims"). Electronic Claims are typically submitted by institutional investors ("Electronic Claim Filers" or "E-Claim Filers") who may have hundreds or thousands of transactions during the Class Period. Rather than provide reams of paper requiring data entry, the E-Claim Filers submitting Electronic Claims either mail a computer disc or electronically submit a file to A.B. Data so that A.B. Data can upload all transactions to its proprietary database developed for the Settlement.

14.     A.B. Data maintains an Electronic Claim Filing Team ("ECF Team") to coordinate and supervise the receipt and handling of all Electronic Claims. In this case, the ECF Team reviewed and analyzed each electronic file to ensure that it was formatted in accordance with A.B. Data's required format and to identify any potential data issues or inconsistencies within the file. If any issues or inconsistencies arose, A.B. Data notified the filer. If the electronic file was deemed to be in an acceptable format, it was then loaded into A.B. Data's database.

15.     Once each electronic file was loaded, the Electronic Claims were flagged to denote any deficient or ineligible conditions that existed within them. These flags are similar to those applied to paper and online Claims. In lieu of manually applying flags, the ECF Team performed programmatic reviews on Electronic Claims to identify deficient and ineligible conditions (such as, but not limited to, price out-of-range issues, out-of-balance conditions, transactions outside the Class Period, etc.). The output was thoroughly verified and confirmed as accurate.

16.     The review process also included flagging any Electronic Claims that were not accompanied by a signed Claim Form, which serves as a "Master Proof of Claim Form" for all Claims referenced on the electronic file submitted. This process was reviewed by A.B. Data's ECF Team and, when appropriate, A.B. Data contacted the E-Claim Filers whose submissions were missing information. This ensured that only fully completed Claims, submitted by properly authorized representatives of the Claimants, were considered eligible for payment from the Net Settlement Fund.

17.     Finally, at the end of the process, A.B. Data performed various targeted reviews of Electronic Claims. Specifically, A.B. Data used criteria such as the calculated Recognized Claims and other identified criteria to flag and reach out to a number of E-Claim Filers and

request that various sample purchases, sales, and holdings selected by A.B. Data be documented by providing confirmation slips or other transaction-specific supporting documentation. These targeted reviews help to ensure that electronic data supplied by Claimants does not contain inaccurate information.

## EXCLUDED PERSONS

18.     A.B. Data also reviewed all Claims to ensure that they were not submitted by, or on behalf of, "Excluded Persons," to the extent that the identities of such persons or entities were known to A.B. Data through the list of Defendants and other excluded persons and entities set forth in the Stipulation and the Notice and from the Claimants' certifications on the Claim Form. A.B. Data also reviewed all Claims against the list of persons who were excluded from the Settlement Class pursuant to request.

## THE DEFICIENCY PROCESS

**A.**     **Paper Claims and Online Claims**

19.     Approximately 53%, i.e., 755 of the 1,423 Claim Forms submitted either as paper Claims or via the Settlement Website, were incomplete or had one or more defects or conditions of ineligibility, such as the Claim not being signed, not being properly documented, or indicating no eligible transactions in Adeptus Class A common stock during the Class Period. The "Deficiency Process," which primarily involved mailing letters to Claimants and responding to communications from Claimants by email and/or telephone, was intended to assist Claimants in properly completing their otherwise deficient submissions so that they could be eligible to participate in the Settlement.

20.     For the paper and online Claims that were determined to be defective, letters were sent to the Claimants describing the defect(s) in these Claims and what, if anything, was

necessary to cure the defect(s) in these Claims (the "Deficiency Letter"). The Deficiency Letter advised Claimants that submission of appropriate information and/or documentary evidence to complete the Claim had to be sent within twenty (20) days from the date of the Deficiency Letter, or the Claim would be recommended for rejection to the extent that the deficiency or condition of ineligibility was not cured. The Deficiency Letters also advised Claimants that if they did not agree with A.B. Data's administrative determination(s) with respect to their Claim, they could request Court review of their Claim by submitting a written statement to A.B. Data requesting Court review of their Claim and setting forth the basis for such request. A.B. Data sent a total of 755 Deficiency Letters to Claimants who submitted paper or online Claims that A.B. Data determined to be defective. Attached hereto as Exhibit A is a sample Deficiency Letter.

21.     Claimants' responses to Deficiency Letters were scanned into A.B. Data's database and associated with the corresponding Claims. The responses were then carefully reviewed and evaluated by A.B. Data's team of processors. If a Claimant's response corrected the defect(s) in their Claim, A.B. Data updated the database manually to reflect the changes in the status of the Claim.

**B.      Electronic Claims**

22.     In addition, for Electronic Claims, A.B. Data used the following process to contact the banks, brokers, nominees, and other E-Claim Filers who submitted their data electronically to confirm receipt of their submissions and to notify the filers of any deficiencies or Electronic Claims that were ineligible. These E-Claim Filers were sent an email ("Status Email") with an attached Excel spreadsheet, which contained detailed information associated

with the Claims and indicated which of those Claims within the filing were deficient and/or rejected ("Status Spreadsheet").

23.     The Status Email sent to the email address of record provided with the Claim Form:

(a)     Notified the filer that any Claims with deficiencies not corrected within twenty (20) days from the date of the Status Email may be rejected;

(b)     Advised the filer of the right to contest the rejection of the Claim(s) and request this Court's review of A.B. Data's administrative determination within twenty (20) days from the date of the Status Email; and

(c)     Provided instructions for how to submit corrections.

24.     The Status Spreadsheet attached to the Status Email contained the following information:

(a)     A listing of all Claims associated with the filing and their unique identification numbers;

(b)     Identification of individual Claims that were found to be deficient or ineligible;

(c)     The current status of each Claim in A.B. Data's database; and

(d)     The current Recognized Claim calculation associated with each Claim.

25.     A.B. Data has mailed a Status Email and Status Spreadsheet to 148 E-Claim Filers. Samples of the Status Email and the Status Spreadsheet are attached hereto as Exhibit B and Exhibit C, respectively.

26.     The E-Claim Filers' responses were reviewed by A.B. Data's ECF Team, scanned and/or loaded into A.B. Data's database, and associated with the corresponding Electronic

10

Claims. If a response corrected the defect(s) or affected an Electronic Claim's status, A.B. Data manually and/or programmatically updated the database to reflect such change in status of the Electronic Claim.

## NO DISPUTED CLAIMS

27.     As noted above, Claimants were advised that they had the right to contest A.B. Data's administrative determination of deficiencies or ineligibility within twenty (20) days from the date of notification and that they could request that the dispute be submitted to the Court for review. More specifically, Claimants were advised in the Deficiency Letter or Status Email that, if they disputed A.B. Data's determination, they had to provide a statement of reasons indicating the grounds for contesting the determination, along with supporting documentation, and if the dispute concerning the Claim could not otherwise be resolved, Lead Counsel would thereafter present the request for review to the Court for a final determination.

28.     There are no requests for Court review by any Claimants.

## LATE BUT OTHERWISE ELIGIBLE CLAIMS

29.     Of the Presented Claims, 615 were received or postmarked after the June 8, 2020, Claim submission deadline established by the Court. A.B. Data processed all late Claims received through January 12, 2021, and 180 have been found to be otherwise eligible in whole or in part (the "Late But Otherwise Eligible Claims"). A.B. Data has not rejected any Claim received through January 12, 2021, solely based on its late submission, and A.B. Data believes no delay has resulted from the provisional acceptance of these Late But Otherwise Eligible Claims. To the extent they are eligible but for the fact that they were late, they are recommended for payment.

30.     However, there must be a final cut-off date after which no more Claims will be accepted so that there may be a proportional allocation of the Net Settlement Fund and the distribution may be accomplished. Acceptance of additional Claims or responses to notices of deficiency received during the finalization of the administration and the preparation of this declaration would necessarily require a delay in the distribution. Accordingly, A.B. Data also respectfully requests that this Court order that no Claim received after January 12, 2021, or previously submitted Claim cured or adjusted after January 12, 2021, be eligible for payment for any reason whatsoever subject only to the provision of paragraph 39(f) of the proposed distribution plan discussed below. If the Court adopts the proposed distribution plan, then, after Lead Counsel have determined that further distributions are not cost-effective and before any contribution of the residual funds to charity, if sufficient funds remain to warrant the processing of Claims received after January 12, 2021, these Claims will be processed and, if any would have been eligible if timely received, these Claimants may be paid their distribution amounts on a *pro rata* basis that would bring them into parity with other Authorized Claimants who have cashed all their prior distribution checks to the extent permitted by the amount of remaining funds. *See* ¶ 39(f) below. With respect to previously submitted Claims that are cured or adjusted after January 12, 2021, such Claims will be reevaluated upon receipt of the adjustment and, to the extent that they are found eligible for a distribution or additional distribution, they will be treated in the same manner as Claims received after January 12, 2021. However, should an adjustment be received that results in a lower Recognized Claim amount, that adjustment will be made and the Recognized Claim amount will be reduced accordingly prior to a distribution to that Claimant.

## QUALITY ASSURANCE

31.      An integral part of the claims administration process is the Quality Assurance review. Throughout this administration, A.B. Data's Quality Assurance Department worked to verify that Claims were processed properly by ensuring that information was entered correctly into the database, deficiency and/or rejection flags were assigned accurately, and deficiency and/or rejection notifications were sent appropriately. After all Claims were processed, deficiency and/or rejection notifications were sent, and Claimants' responses to the deficiency and/or rejection notifications were reviewed and processed, the supervisors and managers in A.B. Data's Quality Assurance Department performed additional Quality Assurance reviews. These final Quality Assurance reviews further ensured the correctness and completeness of all Claims processed prior to preparing this declaration and all A.B. Data's final documents in support of distribution of the Net Settlement Fund. As part of the Quality Assurance reviews, A.B. Data:

    (a)      Verified that all Claim Forms had signatures of authorized individuals;

    (b)      Verified that true duplicate Claims were identified, verified, and rejected;

    (c)      Verified that Tax Identification Numbers were provided;

    (d)      Verified that persons and entities excluded from the Settlement Class did not file Claims or their Claims were rejected upon review;

    (e)      Performed a final Quality Assurance audit of Claims and all supporting documentation to ensure completeness of Claims;

    (f)      Determined that all Claimants requiring deficiency and/or rejection notification were sent such notification;

    (g)      Performed an audit of deficient Claims;

(h)     Performed additional review of Claims with high Recognized Claim amounts;

(i)     Audited Claims that were designated invalid;

(j)     Audited Claims with a Recognized Claim amount equal to zero;

(k)     Performed other auditing based on Claims completion requirements and the approved calculation specifications based on the Court-approved Plan of Allocation; and

(l)     Re-tested the accuracy of the Recognized Claim amount calculation program.

32.     As part of its due diligence in processing the Claims, A.B. Data conducted a Questionable Claim Filer search of all Claims submitted in connection with the Settlement as follows. A.B. Data maintains a database of known questionable filers. This Questionable Claim Filer Database contains names, addresses, and aliases of individuals or entities that have been investigated by government agencies for questionable claim filing, as well as names and contact information compiled from previous settlements administered by A.B. Data in which fraudulent claims were received. A.B. Data updates this Questionable Claim Filer Database on a regular basis. The Settlement database was searched for all individuals identified in the Questionable Claim Filer Database. A.B. Data performs searches based on names, aliases, addresses, and city/zip codes. In addition, A.B. Data's claim processors are trained to identify any potentially inauthentic documentation when processing claims, including claims submitted by claimants not previously captured in the Questionable Claim Filer Database. Processors are instructed to flag any questionable claims and escalate them to management for review. There were no Claim(s)

identified as questionable for this Settlement and subject to internal audit for further investigation and determination as to eligibility.

## RECOMMENDATIONS FOR APPROVAL AND REJECTION

33.     As noted above, the number of Presented Claims in this motion is 13,974.

### Timely Submitted and Valid Claims

34.     A total of 13,359 Claims were received or postmarked on or before the Court-approved Claim submission deadline of June 8, 2020, of which 7,958 Claims were determined by A.B. Data to be eligible and are recommended for approval ("Timely Eligible Claims"). The total Recognized Claim amount for these Timely Eligible Claims is $829,589,302.50.

### Late But Otherwise Eligible Claims

35.     A total of 615 Claims were received or postmarked after the Court-approved Claim submission deadline of June 8, 2020, but received before January 12, 2021. Of those, 180 Claims were determined by A.B. Data to be otherwise eligible and are recommended for approval ("Late But Otherwise Eligible Claims"). The total Recognized Claim amount for these Late But Otherwise Eligible Claims is $8,331,427.29.

### Rejected Claims

36.     After the responses to Deficiency Letters and Status Emails were processed, a total of 5,836 Claims remain recommended for rejection by the Court ("Rejected Claims") for the following reasons:

(a)     1,721 Claims had no purchase(s) of Adeptus Class A common stock during the Class Period;

(b)     3,435 Claims did not result in a Recognized Claim;

(c)     14 Claims were withdrawn by filer;

(d)     609 Claims were duplicates or replaced; and

(e)     57 Claims had uncured conditions of ineligibility.

**Lists of All Presented Claims**

37.     Attached hereto as Exhibits D through F are listings of all the Presented Claims:

(a)     Exhibit D lists the Timely Eligible Claims and shows each Claimant's Recognized Claim;

(b)     Exhibit E lists the Late But Otherwise Eligible Claims and shows each Claimant's Recognized Claim; and

(c)     Exhibit F lists the Rejected Claims and the reasons for rejection.

**FEES AND DISBURSEMENTS**

38.     A.B. Data agreed to be the Claims Administrator in exchange for payment of its fees and out-of-pocket expenses. Lead Counsel received reports on and invoices for the work A.B. Data performed with respect to the provision of notice and administration of the Settlement. Attached hereto as Exhibit G are copies of A.B. Data's invoices for its work performed on behalf of the Settlement Class as well as an estimate for the work that will be performed and the costs that will be incurred in connection with the initial distribution of the Net Settlement Fund.[2] As set forth in these invoices, A.B. Data's fees and expenses for its work performed through December 31, 2020, are $178,217.73, and the fees and expenses estimated to be performed on behalf of the Settlement Class in connection with the initial distribution are $20,897.68. To date,

---

[2] Should the estimate of fees and expenses to conduct the initial distribution of the Net Settlement Fund exceed the actual cost to conduct the distribution, the excess will be returned to the Net Settlement Fund and will be available for subsequent distribution to Authorized Claimants.

A.B. Data has received payment in the amount of $166,887.98 for its fees and expenses. Accordingly, there is a total of $32,227.43 payable to A.B. Data.

## DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND

39.      Should the Court concur with A.B. Data's determinations concerning the provisionally accepted and rejected Claims, including the Late But Otherwise Eligible Claims, A.B. Data recommends the following distribution plan (the "Distribution Plan"):

(a)      A.B. Data will conduct an initial distribution (the "Initial Distribution") of the Net Settlement Fund, after deducting all payments approved by the Court, and after payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, while maintaining a 5% reserve to address any tax liability and claims administration-related contingencies that may arise, as follows:

(1)      A.B. Data will calculate award amounts for all Authorized Claimants as if the entire Net Settlement Fund were to be distributed now. In accordance with the Court-approved Plan of Allocation, A.B. Data will calculate each Authorized Claimant's *pro rata* share of the Net Settlement Fund based on the amount of the Authorized Claimant's Recognized Claim in comparison to the total Recognized Claims of all Authorized Claimants.

(2)      A.B. Data will, pursuant to the terms of the Plan of Allocation, eliminate from the Initial Distribution any Authorized Claimant whose *pro rata* share calculates to less than $10.00. These Claimants will not receive any payment from the Net Settlement Fund and will be so notified by A.B. Data.

(3)      After eliminating Claimants who would have received less than $10.00, A.B. Data will recalculate the *pro rata* share of the Net Settlement Fund

for Authorized Claimants who would have received $10.00 or more pursuant to the calculations described in subparagraph (a)(1) above. This *pro rata* share is the Authorized Claimant's "Distribution Amount."

(4)     Authorized Claimants whose Distribution Amount calculates to less than $200.00 will be paid their full Distribution Amount in the Initial Distribution ("Claims Paid in Full"). These Authorized Claimants will receive no additional funds in subsequent distributions.

(5)     After deducting payments to the Claims Paid in Full, 95% of the remaining balance of the Net Settlement Fund will be distributed *pro rata* to Authorized Claimants whose Distribution Amount calculates to $200.00 or more. The remaining 5% of the Net Settlement Fund will be held in reserve (the "Reserve") to address any tax liability and claims administration-related contingencies that may arise following the Initial Distribution. To the extent the Reserve is not depleted, the remainder will be distributed in the "Second Distribution" described in subparagraph (d) below.

(b)     In order to encourage Authorized Claimants to deposit their payments promptly, all distribution checks in the Initial Distribution will bear a notation: "CASH PROMPTLY. VOID AND SUBJECT TO REDISTRIBUTION IF NOT CASHED BY [DATE 90 DAYS AFTER ISSUE DATE]."[3] Subsequent distributions shall have a 30-

---

[3] For Authorized Claimants whose checks are returned as undeliverable, A.B. Data will endeavor to locate new addresses by running the undeliverable addresses through address-lookup services. Where a new address is located, A.B. Data will update the database accordingly and reissue a distribution check to the Authorized Claimant at the new address. In the event a distribution check is lost or damaged or otherwise requires reissuance, A.B. Data will issue replacements. Distribution reissues will be undertaken only upon written instructions from the Authorized Claimant, provided that the Authorized Claimant returns the previous check where appropriate.

day stale date.

(c)      Authorized Claimants who do not cash their Initial Distribution checks within the time allotted or on the conditions set forth in footnote 3 will irrevocably forfeit all recovery from the Net Settlement Fund. The funds allocated to all such stale-dated checks will be available to be redistributed to other Authorized Claimants in the second distribution. Similarly, Authorized Claimants who do not cash their second or subsequent distribution checks, should such distributions occur, within the time allotted or on the conditions set forth in footnote 3 will irrevocably forfeit any further recovery from the Net Settlement Fund.

(d)      Consistent with the Court-approved Plan of Allocation, after A.B. Data has made reasonable and diligent efforts to have Authorized Claimants cash their Initial Distribution checks, which efforts shall consist of the follow-up efforts described in footnote 3, but not earlier than seven (7) months after the Initial Distribution, A.B. Data will, after consulting with Lead Counsel, conduct a second distribution of the Net Settlement Fund (the "Second Distribution") in a reasonable period of time. Any amounts remaining in the Net Settlement Fund after the Initial Distribution, including the amount remaining in the Reserve and the funds allocated for all void stale-dated checks, after

---

For all checks, A.B. Data will void the initial payment prior to reissuing a payment. In order not to delay further distributions to Authorized Claimants who have timely cashed their checks, A.B. Data's outreach program, described in the preceding sentences, shall end 30 days after the initial void date. Authorized Claimants will be informed that, if they do not cash their Initial Distribution checks within 90 days of the mail date, or they do not cash check reissues within 30 days of the mailing of such reissued check, their check will lapse, their entitlement to recovery will be irrevocably forfeited, and the funds will be reallocated to other Authorized Claimants. Reissue requests for lost or damaged checks will be granted after the void date on the checks as long as the request for the reissue is received no later than 45 days prior to the next planned distribution. Requests for reissued checks in connection with any subsequent distributions (should such distributions occur) will be handled in the same manner.

deducting A.B. Data's unpaid fees and expenses incurred in connection with administering the Settlement, including A.B. Data's estimated costs of the Second Distribution and after deducting the payment of any estimated taxes, the costs of preparing appropriate tax returns, any escrow fees, and appropriate reserves, will be distributed to all Authorized Claimants in the Initial Distribution (other than Claims Paid in Full) who cashed their first distribution check and who would receive at least $10.00 from such distribution based on their *pro rata* share of the remaining funds. Additional distributions, after deduction of costs and expenses as described above and subject to the same conditions, may occur every six (6) months until Lead Counsel, in consultation with A.B. Data, determine that further distribution is not cost-effective.

(e)     At such time as Lead Counsel, in consultation with A.B. Data, determine that further distribution of the funds remaining in the Net Settlement Fund is not cost-effective, if sufficient funds remain to warrant the processing of Claims received after January 12, 2021, those Claims will be processed, and any otherwise valid Claims received after January 12, 2021, as well as any earlier-received Claims for which an adjustment was received after January 12, 2021, which resulted in an increased Recognized Claim amount, will be paid in accordance with subparagraph (f) below. If any funds remain in the Net Settlement Fund after payment of these late or late-adjusted Claims, the remaining balance of the Net Settlement Fund, after payment of any unpaid fees or expenses incurred in administering the Net Settlement Fund and after the payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, will be contributed to the National Consumer Law Center ("NCLC"), a non-

sectarian, not-for-profit, 501(c)(3) organization.[4]

(f)     No new Claims may be accepted after January 12, 2021, and no further adjustments to previously received Claims that would result in an increased Recognized Claim amount may be made, subject to the following exception. If Claims are received or modified that would have been eligible for payment or additional payment under the Plan of Allocation if timely received, then, at the time that Lead Counsel, in consultation with A.B. Data, determine that a redistribution is not cost-effective as provided in subparagraph (e) above, and after payment of any unpaid fees or expenses incurred in connection with administering the Net Settlement Fund and after deducting the payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, such Claimants, at the discretion of Lead Counsel, may be paid the distribution amounts or additional distribution amounts on a *pro rata* basis that would bring them into parity with other Authorized Claimants who have cashed all their prior distribution checks to the extent possible.

(g)     Unless otherwise ordered by the Court, A.B. Data may destroy the paper copies of the Claims and all supporting documentation one year after the Second Distribution, and one year after all funds have been distributed may destroy the electronic copies of the same.

## CONCLUSION

40.     A.B. Data respectfully requests that the Court enter an Order approving its administrative determinations accepting and rejecting the Claims submitted herein and approving the proposed Distribution Plan. A.B. Data further respectfully submits that its unpaid fees and

---

[4] *See* Notice Appendix A ¶ 24.

21

expenses, as reflected on the invoices attached hereto as Exhibit G, should be approved for payment from the Settlement Fund.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on February 19, 2021.

Eric J. Miller